UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

**06   6720**

---

JOHN RESTIVO, DENNIS HALSTEAD, MELISSA
LULLO, JASON HALSTEAD, and TAYLOR
HALSTEAD,

               Plaintiffs,

               v.

NASSAU COUNTY, JOSEPH VOLPE, in his individual
capacity, ROBERT DEMPSEY, in his individual
capacity, FRANK SIRIANNI, in his individual capacity,
MILTON GRUBER, in his individual capacity, HARRY
WALTMAN, in his individual capacity, ALBERT
MARTINO, in his individual capacity, CHARLIE
FRAAS, in his individual capacity, THOMAS ALLEN, in
his individual capacity, RICHARD BRUSA, in his
individual capacity, VINCENT DONNELLY, in his
individual capacity, MICHAEL CONNAUGHTON, in
his individual capacity, WAYNE BIRDSALL, in his
individual capacity, WILLIAM DIEHL, in his individual
capacity, JACK SHARKEY, in his individual capacity,
DANIEL PERRINO, in his individual capacity,
ANTHONY KOZIER, in his individual capacity,
DETECTIVE SERGEANT CAMPBELL (SHIELD #48),
in his individual capacity, ROBERT EDWARDS, in his
individual capacity, SEAN SPILLANE, in his individual
capacity, JOHN DOE OFFICERS AND DETECTIVES
#1-10, in their individual capacities, and RICHARD ROE
SUPERVISORS #1-10, in their individual capacities,

               Defendants.

SEYBERT, J.

WALL, M.J.

**ORIGINAL**

COMPLAINT AND
JURY DEMAND

FILED
DEC 21 2006
BROOKLYN OFFICE

---

       Plaintiffs John Restivo, Dennis Halstead, Melissa Lullo, Jason Halstead, and Taylor

Halstead, by and through their attorneys, the law firm of Cochran Neufeld & Scheck, LLP, state

as follows:

## INTRODUCTION

1.      Plaintiffs John Restivo and Dennis Halstead were wrongly convicted in 1986 for the rape

and murder of a sixteen-year-old girl in Lynbrook, New York.  They suffered through nearly

eighteen years in prison until DNA testing of the semen found in the victim excluded Mr.

Restivo and Mr. Halstead as perpetrators of the crime.  Their convictions—along with the

conviction of John Kogut, who was also wrongly convicted of the rape and murder—were

vacated in June 2003, but the charges against them were not dismissed until December 29, 2005.

2.      The wrongful convictions of Mr. Restivo and Mr. Halstead were not the result of

innocent or even negligent mistakes and were not accidental.  This gross miscarriage of justice

was the direct result of a small group of Nassau County Police Department ("NCPD") Homicide

Squad detectives, including defendants Detective Joseph Volpe, Detective Robert Dempsey, and

other named and as yet unnamed detectives and officers, who fabricated and coerced inculpatory

statements from Mr. Restivo, Mr. Kogut, and other witnesses in this case.

3.      Defendants Volpe, Dempsey and their fellow officers conspired with one another in this

case, and as a matter of custom and practice, to violate the constitutional rights of suspects by

intentionally coercing and otherwise fabricating witness statements and other evidence.  This

conspiracy and pattern and practice of coercion and fabrications began on or before 1983 when

Volpe started in the NCPD Homicide Squad, continued long after the misconduct perpetrated

against Mr. Halstead, Mr. Restivo, and Mr. Kogut in this case, and led directly to the wrongful

arrests, prosecutions, and/or convictions of other innocent men including, for example, Robert

Moore, Shonnard Lee, and Jose Martinez.

4.      These widespread, notorious, and willful violations of the most basic constitutional rights

–2–

of those accused of crimes could only occur where, as in the NCPD Homicide Squad, there was a complete absence of supervision and training for detectives concerning the most basic investigative tasks, such as interrogating suspects and witnesses. Defendants Volpe, Dempsey, and their colleagues violated the constitutional rights of Mr. Restivo, Mr. Halstead, and many others with impunity and with the active or tacit approval of supervisors—both direct and at the highest levels of the NCPD chain of command—who actually or constructively knew that the defendant detectives and officers employed constitutionally inadequate investigative practices, yet failed to adequately train, supervise, or discipline them.

5.      As a direct result of the defendants' intentional and/or deliberately indifferent acts and omissions, John Restivo and Dennis Halstead were deprived of their federal constitutional rights, were robbed of nearly eighteen years of their lives and freedom, and sustained severe physical, emotional, and monetary damages.

## JURISDICTION

6.      This Court has federal question jurisdiction, pursuant to 28 U.S.C. § 1331, over claims arising under 42 U.S.C. § 1983.

7.      Supplemental jurisdiction over Mr. Restivo and Mr. Halstead's state law claims exists pursuant to 28 U.S.C. § 1367(a).

8.      Mr. Restivo and Mr. Halstead have complied with the requirements of New York General Municipal Law Section 50-i by serving a notice of claim on the Nassau County Attorney on March 20, 2006, within the time required by New York General Municipal Law Section 50-e. More than thirty days have elapsed since the service of that notice, and no offer of settlement has been made.

9.     At the request of Nassau County, Mr. Restivo and Mr. Halstead submitted to hearings

pursuant to New York General Municipal Law Section 50-h.

## VENUE

10.    Pursuant to 28 U.S.C. § 1391(b), venue is proper in the Eastern District of New York, the

judicial district in which the claims arose.

## JURY DEMAND

11.    Pursuant to the Seventh Amendment of the United States Constitution, plaintiffs request a

jury trial on all issues and claims set forth in this Complaint.

## PARTIES

12.    Plaintiff John Restivo was at all times material to this Complaint a citizen and resident of

the State of New York.  He is currently a citizen of the State of Florida and resides in Vero

Beach, Florida.

13.    Plaintiff Dennis Halstead was at all times material to this Complaint a citizen and

resident of the State of New York.  He is currently a citizen of the State of Florida and resides in

Tallahassee, Florida.

14.    Plaintiff Melissa Lullo is the daughter of Dennis Halstead and at all times relevant to this

Complaint a citizen and resident of the State of New York.

15.    Plaintiff Jason Halstead is the son of Dennis Halstead and at all times relevant to this

Complaint a citizen and resident of the State of New York.  He is currently a citizen of the State

of Florida and resides in Tallahassee, Florida.

16.    Plaintiff Taylor Halstead is the son of Dennis Halstead and at all times relevant to this

Complaint a citizen and resident of the State of New York.

–4–

17.    Nassau County is a municipality that is a political subdivision of the State of New York, was the employer of the individual defendants, and is and was at all times relevant to this Complaint responsible for the policies, practices, and customs of the Nassau County Police Department ("NCPD").

18.    Defendant Joseph Volpe at all times relevant to this Complaint was a duly appointed and acting police officer of the NCPD with the rank of detective, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of Nassau County and the State of New York.

19.    Defendant Robert Dempsey at all times relevant to this Complaint was a duly appointed and acting police officer of the NCPD with the rank of detective, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of Nassau County and the State of New York.

20.    Defendant Frank Sirianni at all times relevant to this Complaint was a duly appointed and acting police officer of the NCPD with the rank of detective, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of Nassau County and the State of New York.

21.    Defendant Milton Gruber at all times relevant to this Complaint was a duly appointed and acting police officer of the NCPD with the rank of detective, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of Nassau County and the State of New York.

22.    Defendant Harry Waltman at all times relevant to this Complaint was a duly appointed and acting police officer of the NCPD with the rank of detective, acting under color of law and in

–5–

his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of Nassau County and the State of New York.

23.    Defendant Albert Martino at all times relevant to this Complaint was a duly appointed and acting police officer of the NCPD with the rank of detective, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of Nassau County and the State of New York.

24.    Defendant Charlie Fraas at all times relevant to this Complaint was a duly appointed and acting police officer of the NCPD with the rank of detective, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of Nassau County and the State of New York.

25.    Defendant Thomas Allen at all times relevant to this Complaint was a duly appointed and acting police officer of the NCPD with the rank of detective, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of Nassau County and the State of New York.

26.    Defendant Richard Brusa at all times relevant to this Complaint was a duly appointed and acting police officer of the NCPD with the rank of detective, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of Nassau County and the State of New York.

27.    Defendant Vincent Donnelly at all times relevant to this Complaint was a duly appointed and acting police officer of the NCPD with the rank of detective, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of Nassau County and the State of New York.

–6–

28.     Defendant Michael Connaughton at all times relevant to this Complaint was a duly appointed and acting police officer of the NCPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of Nassau County and the State of New York.

29.     Defendant Wayne Birdsall at all times relevant to this Complaint was a duly appointed and acting police officer of the NCPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of Nassau County and the State of New York.

30.     Defendant William Diehl at all times relevant to this Complaint was a duly appointed and acting police officer of the NCPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of Nassau County and the State of New York.

31.     Defendant Jack Sharkey at all times relevant to this Complaint was a duly appointed and acting police officer of the NCPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of Nassau County and the State of New York.

32.     Defendant Daniel Perrino at all times relevant to this Complaint was a duly appointed and acting police officer of the NCPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of Nassau County and the State of New York.

33.     Defendant Anthony Kozier at all times relevant to this Complaint was a duly appointed and acting police officer of the NCPD, acting under color of law and in his individual capacity

-7-

within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of Nassau County and the State of New York.

34.     Defendant Campbell (Shield # 48) at all times relevant to this Complaint was a duly appointed and acting police officer of the NCPD with the rank of detective sergeant who had responsibilities over the hiring, training, and supervision of NCPD officers, including the individual defendants named herein, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of Nassau County and the State of New York.

35.     Defendant Robert Edwards at all times relevant to this Complaint was a duly appointed and acting police officer of the NCPD with the rank of detective sergeant who had responsibilities over the hiring, training, and supervision of NCPD officers, including the individual defendants named herein, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of Nassau County and the State of New York.

36.     Defendant Sean Spillane at all times relevant to this Complaint was a duly appointed and acting police officer of the NCPD with the rank of detective lieutenant who had responsibilities over the hiring, training, and supervision of NCPD officers, including the individual defendants named herein, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of Nassau County and the State of New York.

37.     Defendants John Doe Officers and Detectives #1-10, whose actual names plaintiffs have been unable to ascertain notwithstanding reasonable efforts to do so, but who are sued herein by

−8−

the fictitious designation "John Doe," represents those officers and detectives of the NCPD, acting under color of law and in their individual capacities within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of Nassau County and the State of New York, who participated in the investigation that led to Mr. Restivo and Mr. Halstead's wrongful convictions.

38.     Defendants Richard Roe Supervisors #1-10, whose actual names plaintiffs have been unable to ascertain notwithstanding reasonable efforts to do so, but who are sued herein by the fictitious designation "Richard Roe" and who include both direct supervisors as well as command-level supervisors within the NCPD, were at all times relevant to this Complaint duly appointed and acting police officers of the NCPD with responsibilities over the hiring, training, and supervision of NCPD officers, including the individual defendants named herein, acting under color of law and in their individual capacities within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of Nassau County and the State of New York.

## FACTS

39.     Theresa Fusco, a sixteen-year-old girl, was last seen alive at approximately 9:47pm on the night of November 10, 1984, leaving her shift at Hot Skates, a local roller-skating rink located at 14 Merrick Road in Lynbrook, New York, shortly after her employment there had been terminated.

40.     The next morning, November 11, 1984, Ms. Fusco's mother reported to the Lynbrook Police Department that her daughter was missing. Her disappearance was subsequently investigated by detectives in the NCPD Missing Persons Squad.

–9–

41.    On December 5, 1984 at approximately 4:12pm, Ms. Fusco's naked and brutalized body was discovered under wooden pallets by two teenage boys near the railroad tracks at Park Place and Rocklyn Avenue in Lynbrook, an area commonly referred to as "the Fort," only a short distance from Hot Skates.

42.    A Lynbrook Police Department officer immediately responded to the scene where Ms. Fusco's body was found, and members of the NCPD Crime Scene Unit subsequently arrived at the scene to collect evidence.  Defendant Volpe, who had been assigned as lead detective of the investigation, arrived at the scene later that day, along with other members of the NCPD Homicide Squad.

43.    Based on an autopsy conducted on December 6, 1984, the medical examiner determined that Ms. Fusco had suffered from blows to her face and had been strangled to death by ligature. No trauma was observed in the vaginal or anal areas of her body, but a vaginal swab showed the presence of seminal fluids.  The medical examiner estimated the date of the victim's death as approximately seven to fourteen days before the date the body was discovered.

44.    Defendant Waltman was present during the autopsy and defendants Volpe, Dempsey, Martino, Sirianni, and others were made aware of the findings in the autopsy report on or about December 6, 1984.  However, these findings were not made public.

45.    Accordingly, defendants Volpe, Dempsey, Martino, Sirianni, Waltman, and others possessed specific medical and factual details about Ms. Fusco's death—facts that were not made public—long before their interrogations of Mr. Restivo, Mr. Kogut, and various other suspects and witnesses.

46.    During his examination of the victim's body on December 6, 1984, Robert Baumann, a

–10–

serologist in the Nassau County Medical Examiner's Office, collected blood and hair samples from her body.

47.     On December 6, 1984, defendant Waltman took possession of the victim's blood and hair samples from Bauman and, according to his trial testimony, gave them to defendant Birdsall in the NCPD Scientific Investigation Bureau. Defendant Birdsall, according to his trial testimony, later gave the victim's hair samples to defendant Fraas, who was a detective in the Scientific Investigation Bureau trained in hair microscopy, to compare to hair samples allegedly found in Mr. Restivo's van.

48.     Based on searches conducted in the area where Ms. Fusco's body was discovered and interviews with Ms. Fusco's mother and her best friend, Lisa Kaplan, defendants Volpe, Dempsey, and their fellow officers had knowledge of the clothing and jewelry Ms. Fusco was wearing on the night she disappeared and of the fact that Ms. Fusco was not believed to be sexually active.

49.     On or about March 3, 1985, after months of no leads, defendants Sirianni, Perrino, and others questioned Harold Smyle, upon information and belief, as a suspect in the Fusco rape and murder. Defendants Sirianni, Perrino, and others interrogated Smyle, who had a history of psychological illness, for numerous hours and coerced Smyle into falsely informing them that John Restivo, an acquaintance of his, had stated that he knew who killed Ms. Fusco. Defendants Sirianni, Perrino, and others failed to take contemporaneous notes of their interrogation of Smyle, nor did they prepare formal reports or other records to document the interrogation, and they further misrepresented the substance, source, and timing of subsequent statements made by Smyle in other reports, communications with prosecutors, and at pre-trial hearings and at trial.

-11-

50.     On March 5, 1985, at approximately 4:30pm, defendants Volpe, Dempsey, and others

brought Mr. Restivo to NCPD headquarters against his will after his car was surrounded by

several unmarked police vehicles and multiple plainclothes NCPD detectives, including Volpe

and Dempsey, forced him into one of their vehicles and took him to NCPD headquarters.

51.     Upon arriving at headquarters, Mr. Restivo was taken to a small room and interrogated

by defendants Volpe, Dempsey, and others about the Fusco rape and murder. Mr. Restivo

repeatedly denied having any knowledge about the crime. At this time, Mr. Restivo was not

informed of his *Miranda* rights by defendants Volpe, Dempsey, or any of their colleagues, nor

was he told that he was not under arrest or that he was free to leave.

52.     Some hours after arriving at headquarters, Mr. Restivo was asked to take a polygraph

examination and, knowing that he was innocent, he consented to do so. He was taken to

defendant Kozier, who administered the polygraph test from 9:00pm to 11:22pm, according to

his own report. At the conclusion of the polygraph test, Volpe took Mr. Restivo to another room

and falsely informed him that he failed the polygraph.

53.     It was at this point that defendants Volpe, Dempsey, and others began employing

escalating coercive tactics to force Mr. Restivo to make statements or admissions with respect to

the Fusco rape and murder. Defendants began to verbally abuse Mr. Restivo and threaten him

both physically and otherwise.

54.     In response to defendants' intensified interrogation tactics, Mr. Restivo asked to leave,

but Volpe, Dempsey and their fellow officers rejected this request. Mr. Restivo also asked to

call his girlfriend, who was at home alone with their newborn baby and was worried because he

had not been in touch with her since he was picked up off the street nearly seven hours earlier.

−12−

Volpe, Dempsey, and their fellow officers denied Mr. Restivo's request, and Dempsey then deceived him into believing that Dempsey had called Mr. Restivo's girlfriend to inform her of Mr. Restivo's whereabouts when, in fact, he did not.

55.     Mr. Restivo asked for a lawyer, but defendants Volpe, Dempsey, and their fellow officers rejected this request.

56.     Despite denying Mr. Restivo's requests to leave headquarters, to call his loved ones, or to contact a lawyer and despite the increasingly threatening atmosphere to which Mr. Restivo was being subjected, defendants Volpe and Dempsey, with the assistance of defendants Perrino and Sharkey and the actual and constructive knowledge of defendants Campbell, Edwards, Spillane, and Richard Roe Supervisors #1-10, continued to interrogate Mr. Restivo about his knowledge of the Fusco rape and murder. Mr. Restivo continued to tell the truth and denied knowing anything about the crime.

57.     Defendants Volpe, Dempsey, and their fellow officers repeatedly suggested to Mr. Restivo that his friend Dennis Halstead had committed the Fusco rape and murder and had admitted as much to Mr. Restivo. In spite of defendants' threats, Mr. Restivo repeatedly denied that Mr. Halstead had made any such admission to him.

58.     Unable to coerce an admission with verbal intimidation, defendants Volpe, Dempsey, and their fellow officers began to use physical violence to coerce Mr. Restivo into making a false accusation against Mr. Halstead. Volpe, Dempsey, and others repeatedly assaulted Mr. Restivo by, for example, choking and punching him. Only after hours of psychological and physical coercion at the hands of the defendants did Mr. Restivo yield to defendants' false accusations about Mr. Halstead.

-13-

59.    Defendants Volpe, Dempsey, and their fellow officers through coercion, intimidation, and physical force fed non-public facts to Mr. Restivo and had him sign a written statement created by defendants falsely indicating that Mr. Halstead had told him that he raped a girl in, near, or across from a cemetery and then strangled and killed her. Mr. Restivo's statement included non-public facts that conformed to the police's theory of the case, including but not limited to the fact that the police believed the rape occurred in or near a cemetery and was connected to another girl's disappearance.

60.    Mr. Restivo had no involvement in the Fusco rape and murder nor did he know anyone who did and, therefore, he had no knowledge, personal or otherwise, of the non-public details of the crime. These facts were fed to him and falsely attributed to him by defendants Volpe, Dempsey, and others to fabricate his statement falsely implicating Mr. Halstead in the crime.

61.    As a result of defendants' unjustified use of physical force, Mr. Restivo suffered injuries to his face, neck, back, and broke a tooth. Defendants Volpe, Dempsey, and their fellow officers nonetheless compelled Mr. Restivo to sign a document falsely stating that he left police custody in good physical condition and received no injuries while in custody.

62.    As described below, the NCPD had a pattern and practice of fabricating such documents to conceal their officers' unconstitutional interrogation techniques, including but not limited to their unjustified use of physical violence to procure false confessions and statements.

63.    Mr. Restivo was not released from police custody until the afternoon of March 6, 2006 when he was driven to his home by NCPD officers. During the approximately twenty-four hours that he was held incommunicado and interrogated by defendants, he was prohibited from leaving headquarters, calling his girlfriend, or contacting his lawyer despite repeatedly making requests

–14–

to do so.

64.     On March 7, 1985, immediately after being released by defendants Volpe, Dempsey, and others, Mr. Restivo contacted an attorney, Theodore Robinson, Esq. Mr. Robinson subsequently contacted defendants Volpe, Dempsey, Spillane, Donnelly, and others by phone and/or letter to complain about the mistreatment of Mr. Restivo during their two-day interrogation of him.

65.     After they conducted a coercive interrogation of Mr. Restivo and fabricated statements, defendants Volpe, Dempsey, and others sought and obtained from Nassau County prosecutors determinations that there was probable cause to place a wiretap on Dennis Halstead's home telephone and subsequently maintain the wiretap, despite their knowledge that Mr. Restivo's fabricated statement was obtained through coercion, intimidation, physical force, and feeding of non-public facts.

66.     During these meetings with prosecutors, defendants Volpe, Dempsey, and others presented fabricated evidence and failed to disclose material exculpatory facts that would have vitiated probable cause, including but not limited to the fact that defendants had used coercion, intimidation, physical force, and suggestion in interviewing Mr. Restivo.

67.     Mr. Restivo's fabricated statement, which defendants Volpe, Dempsey, and others procured through suggestion, coercion, intimidation, and physical force, was the basis for the warrant authorizing a wiretap of Mr. Halstead's phone and the continuing extensions of the wiretap on his phone. The warrant application deliberately omitted the material fact of this misconduct. The wiretap application was granted by Justice Stuart Ain, Judge of County Court, Nassau County.

68.     On March 11 and again on March 13, 1985, defendants Volpe, Allen, and others stopped

–15–

Mr. Halstead as he was walking in the street, placed him in one of their police vehicles, and drove him to the parking lot of the Lynbrook Police Department while, upon information and belief, their NCPD colleagues placed listening devices in his apartment. During the time that he was in police custody on both dates, Mr. Halstead was questioned about the Fusco rape and murder and repeatedly denied any involvement in or knowledge of the crime.

69.     On the evening of March 21, 1985, at Volpe's direction, defendants Connaughton and Diehl brought John Kogut, a part-time employee of Mr. Restivo's moving business, to NCPD headquarters. Defendants Volpe and others questioned Mr. Kogut for several hours about the Fusco case, and Mr. Kogut repeatedly denied any involvement in or knowledge of the crime.

70.     On the evening of March 25, 1985, despite Mr. Kogut's prior truthful denials of having any involvement in or knowledge of the Fusco crime, at the instruction of Volpe, defendants Connaughton and Diehl brought Mr. Kogut to headquarters again for what would become a twenty-hour ordeal, resulting in defendants Volpe, Dempsey, and Martino coercing Mr. Kogut into signing a statement created by defendants falsely implicating himself, Mr. Restivo, and Mr. Halstead in the Fusco rape and murder.

71.     Upon his arrival at NCPD headquarters, Mr. Kogut was taken to defendant Gruber to submit to a polygraph test, which was administered between 6:44pm and 9:26pm, according to Gruber's own report. Mr. Kogut repeatedly denied any involvement or knowledge of the crime. At the conclusion of the test, Gruber falsely notified Volpe and Connaughton that Mr. Kogut failed the polygraph.

72.     After informing Mr. Kogut that he failed the polygraph test, defendants Volpe, Dempsey, and Martino proceeded to interrogate him about the Fusco rape and murder. Mr. Kogut again

–16–

repeatedly denied having any involvement or knowledge about the crime. Despite his repeated denials, defendants Volpe, Dempsey, Martino and others subjected Mr. Kogut to verbal abuse, threats and intimidation, and physical force to coerce him into falsely confessing and falsely implicating Mr. Halstead and Mr. Restivo in the crime.

73.     In response to defendants' increasingly coercive and violent interrogation techniques, Mr. Kogut attempted to leave the interrogation room but was physically obstructed from doing so by defendants Volpe, Dempsey, and others. In addition to his physical attempts to leave police custody, Mr. Kogut repeatedly requested that defendants permit him to make a phone call, which was his only means of seeking outside assistance from a lawyer or third party. Defendants Volpe, Dempsey, and others denied Mr. Kogut's requests and continued interrogating him for the rest of the night and through the following the day.

74.     On March 25, 1985, Mr. Kogut's fiancée, Lisa Price, called the NCPD Homicide Squad on three separate occasions in order to reach Mr. Kogut. At approximately 11:30pm, Ms. Price spoke with defendant Volpe, who told her that Mr. Kogut would be brought home by the police within the hour. In fact, defendants Volpe, Dempsey, and others would continue to interrogate Mr. Kogut until the next afternoon when he was arrested for the rape and murder of Theresa Fusco.

75.     After twelve continuous hours of intensive interrogation, at approximately 10:30am on March 26, 1985, defendants Volpe, Dempsey, and Martino, with the actual and constructive knowledge of defendants Campbell, Edwards, Spillane, and Richard Roe Supervisors #1-10, caused through coercion, intimidation, physical force, and suggestion Mr. Kogut to sign a false confession created by Volpe, which included the following fabricated statements:

−17−

    A. Kogut, John Restivo, and Dennis Halstead were drunk and high in Restivo's blue Ford van on November 10, 1984 returning from a moving job when they picked up Ms. Fusco of the street;

    B. Halstead and Restivo raped Ms. Fusco in the cemetery;

    C. Kogut strangled her to death with a cord as she lay face down on the ground because she threatened to tell the authorities who raped her; and

    D. They transported her dead body in the van to "the Fort" area where they hid her body under leaves and wooden pallets.

76.    Mr. Kogut's fabricated confession included non-public facts that were known by the defendants or that conformed to the police's theory of the case, including but not limited to the type of clothing and jewelry Ms. Fusco was wearing at the time of her death, the color of the purse she had with her, and the fact that the police believed a nylon type rope was used to strangle her. Due to the fact that Mr. Kogut had no involvement in the Fusco rape and murder, he had no knowledge of any non-public details of the crime. Defendants Volpe, Dempsey, and Martino fed Mr. Kogut these non-public details and falsely attributed them to Mr. Kogut in order to bolster his coerced confession, which directly implicated Mr. Restivo and Mr. Halstead in the crime.

77.    Aside from the alleged confession, defendants Volpe, Dempsey, and Martino failed to take any notes, fill out reports, or otherwise contemporaneously document the twelve continuous hours that they spent interrogating Mr. Kogut, their coercive and abusive conduct, or the fact that they fed him non-public facts. The only report indicating what happened during those twelve hours was made by Volpe well after the interrogation took place and indicates that Mr. Kogut

–18–

allegedly made six completely different statements concerning the circumstances of the Fusco rape and murder. In the initial statements, according to Volpe's report, Mr. Kogut allegedly only vaguely recalled that he and John Restivo picked up a girl on Merrick Road one night and failed to even mention Dennis Halstead. In the final statement, according to Volpe's report, Mr. Kogut allegedly provided a detailed description of the Fusco rape and murder, which precisely conformed to the details of the false written confession Volpe created and forced Mr. Kogut to sign.

78.     During the course of the interrogation, defendants failed to inform Mr. Kogut of his *Miranda* rights and refused to let him leave or make a phone call, despite his repeated requests to do so. In fact, Mr. Kogut only signed a *Miranda* waiver form after being compelled to do so by defendant Volpe at 10:30am on March 26, 1985, following nearly fifteen hours of intense custodial interrogation and abusive treatment.

79.     Even after coercing and fabricating his false confession, defendants Volpe, Dempsey, and their fellow officers continued to coach Mr. Kogut regarding the circumstances of the crime, all in preparation for a videotaped confession in front of prosecutors in the Nassau County District Attorney's Office. At the request of Volpe and Dempsey, defendants Sirianni and Waltman, with the active participation and approval of defendant Campell, took Mr. Kogut to the cemetery, the alleged scene of the rape, and "the Fort" area, where the victim's body was found, in order to instruct Mr. Kogut, who had no personal knowledge of Ms. Fusco's rape and murder, about the location and circumstances of the crime that were known to the police or conformed to the police's theory of the case.

80.     Defendants Volpe, Dempsey, and their fellow officers subsequently took Mr. Kogut to

–19–

the Nassau County District Attorney's Office and compelled him to repeat his coerced and fabricated confession on videotape to Assistant District Attorneys Peck and McCarty.

81.     On March 26, 1985, after approximately nineteen hours of interrogation in police custody, Mr. Kogut was arrested and arraigned for the rape and murder of Theresa Fusco.

82.     Despite the knowledge that Mr. Kogut's confession was fabricated and procured through coercion, intimidation, physical force, and feeding of facts, which they failed to disclose to prosecutors, on March 26, 1985, defendants Volpe and Dempsey sought and obtained from Nassau County prosecutors a determination that there was probable cause to search Mr. Restivo's van.

83.     On March 26, 1985, at approximately 3:30pm, defendants Allen, Connaughton, and Diehl executed the search warrant by stopping and seizing Mr. Restivo's van, which was being driven by Mr. Restivo's employee Donna Schneider and had earlier that morning been used to unload trash to a local dump. According to his trial testimony, Diehl remained with the vehicle and had possession of the keys while Connaughton and Allen transported Schneider to NCPD headquarters in their own vehicle. Defendant Brusa, according to his trial testimony, arrived on the scene shortly before 5:00pm, received the keys from Diehl, and solely occupied the van when he drove it to the Emergency Services Buiding at NCPD headquarters.

84.     Defendant Edwards, according to his trial testimony, received the van at NCPD headquarters and notified defendants Fraas and Birdsall of the NCPD Scientific Investigation Bureau that the van needed to be processed for fingerprints and hair and fiber samples. Fraas and Birdsall, according to their trial testimony, searched the van for hair samples and placed the hair samples found in the van in eight envelopes, which were ultimately held by Fraas for

$-20-$

testing.

85.     Defendants either intentionally planted Ms. Fusco's hair samples in the van or
deliberately commingled Ms. Fusco's hair samples with the hair samples found in the van in the
laboratory or elsewhere to corroborate Mr. Kogut's fabricated confession, which indicated that
he, Mr. Restivo, and Mr. Halstead allegedly transported the victim's dead body in the van from
the cemetery to "the Fort" area on the night of her death.

86.     At Mr. Kogut's second trial in 2005, scientific evidence concerning the post-mortem
banding on the victim's hairs allegedly found in the van was introduced and established that the
hairs at issue could not have been left in the van by the victim at the time the crime allegedly
took place.  Indeed, in his decision acquitting Mr. Kogut of all charges after his second trial,
Judge Ort of the Nassau County Supreme Court concluded, "I do not believe that the question
hairs were left in the van on or about November 10th of 1984, and absent those hairs, there is no
corroboration, whatsoever, for [Mr. Kogut's] confession concerning the count of rape."

87.     Defendant Fraas, according to his trial testimony, compared the hair samples allegedly
found in the van to Ms. Fusco's hairs, which he had received from defendant Birdsall, and
determined that two hairs allegedly from the van matched Ms. Fusco's hairs.  Fraas observed
post-mortem banding in the hairs found in the van and knew or should have known that those
hairs could have only come from Ms. Fusco's body several or more days after her death.

88.     Furthermore, defendants, with the actual or constructive knowledge of defendants
Campbell, Edwards, Spillane, and Richard Roe Supervisors #1-10, deliberately fabricated
witness statements and police reports, deliberately withheld from prosecutors material
exculpatory and impeachment evidence, and intentionally failed to conduct an adequate

-21-

investigation in order to make it appear that Mr. Kogut's fabricated confession implicating Mr. Restivo and Mr. Halstead was corroborated by other evidence of Mr. Restivo and Mr. Halstead's alleged involvement in the rape and murder of Theresa Fusco.

89.     Between March 1, 1985 and June 20, 1985 defendants Volpe, Dempsey, and others conducted interviews with numerous witnesses, during which coercion, intimidation, physical force, and/or suggestion were employed to secure false evidence against Mr. Restivo and Mr. Halstead.

90.     Defendants Volpe, Dempsey, and others created fabricated documentation of those witness interviews and statements, and through those documents as well as statements to prosecutors and others falsely represented that the witnesses had volunteered consistent and corroborating information, when in actuality many of the facts allegedly obtained from the witnesses had originated with the defendant police officers, had been coerced, or contradicted the police theory of the case.

91.     Defendants Volpe, Dempsey, and others also deliberately failed to disclose the material exculpatory fact that they had employed suggestion, coercion, intimidation, and/or physical force with the witnesses.

92.     Defendants Volpe, Dempsey, and others further deliberately failed to disclose or document their unsuccessful attempts to coerce other witnesses into falsely implicating Mr. Restivo or Mr. Halstead and the exculpatory statements that many of these witnesses made.

93.     Despite this knowledge and based entirely on fabricated and/or coerced evidence and despite withholding material exculpatory evidence, in the spring of 1985, defendants Volpe, Dempsey, and others sought and obtained from Nassau County prosecutors a determination that

-22-

there was probable cause to charge John Restivo and Dennis Halstead for the rape and murder of
Theresa Fusco.

94.     During this meeting with prosecutors, defendants Volpe, Dempsey, and others presented
fabricated evidence and failed to disclose material exculpatory facts that would have vitiated
probable cause, including but not limited to the fact that defendants had used coercion,
intimidation, physical force, and/or suggestion in interviewing witnesses and suspects and
fabricated forensic evidence to falsely implicate Mr. Restivo and Mr. Halstead in the Fusco rape
and murder.

95.     On June 20, 1985, defendants Volpe and Dempsey arrested John Restivo and Dennis
Halstead for the rape and murder of Theresa Fusco.  Mr. Halstead was arrested by approximately
eight to ten police officers in the presence of his son Jason while they were on a fishing trip
together.

96.     At the time of their father's arrest, plaintiff Jason Halstead was twelve years old, plaintiff
Melissa Lullo was eleven years old, and plaintiff Taylor Halstead was five years old.  Mr.
Halstead's daughter Heather, who is not a party to this Complaint, was seven years old at the
time of her father's arrest.

97.     In the year-and-a-half leading up to the trial, defendants Volpe, Dempsey, and others
continued to fabricate evidence against Mr. Restivo and Mr. Halstead by conducting coercive
interrogations of other witnesses to corroborate Mr. Kogut's false confession implicating Mr.
Restivo and Mr. Halstead, including, for example, by coercing and feeding facts to jailhouse
"informants" who were promised reduced sentences or other benefits.  Defendants further failed
to disclose statements from witnesses who resisted their coercive tactics and/or provided

–23–

exculpatory evidence.

## The Criminal Trial

98.    Mr. Kogut was tried separately in May 1986, and was convicted of all counts.

99.    Mr. Restivo and Mr. Halstead were tried jointly in October and November 1986.

100.    The only physical evidence presented by the prosecution to connect Mr. Restivo and Mr. Halstead to the crime were the victim's hairs that were allegedly found in the back of Mr. Restivo's van. These hairs were either planted in the van by one or more of the defendant officers or deliberately commingled in the laboratory or elsewhere with the hairs found in the van.

101.    In addition to the tainted hair evidence, the prosecution's case consisted almost entirely of the fabricated or unreliable testimony of witnesses who had been fed facts and coerced by the defendant officers and of jailhouse snitches, similarly fed facts and coerced, who had been promised more lenient sentences or other benefits.

102.    The prosecution also presented a twenty-second portion of the wiretap of Mr. Halstead's home telephone, which was misleading and taken out of context, in which Mr. Halstead sarcastically answered "yeah" in response to his sister's question about whether he was present during the crime.

103.    Mr. Restivo and Mr. Halstead both testified in their own defense, explaining their precise whereabouts on the night of the crime. Mr. Restivo testified that he was not working on a moving job with either Mr. Kogut or Mr. Halstead on November 10, 1984 and that he had spent the day sanding the floors of his new house with the assistance of some of his friends and went to bed after having dinner with Michael Cockeral, who had assisted him with the floors, around

–24–

10:30pm.

104.    Mr. Halstead testified that he did not see Mr. Restivo or Mr. Kogut on November 10, 1984 and that he spent the day working on a siding job and had dinner at home with his family that night.

105.    The testimony of Mr. Restivo and Mr. Halstead was corroborated by receipts, telephone records, and witness testimony, which included witness recollections that Mr. Halstead and Mr. Kogut hated each other and would never spend time with each other socially and evidence that Mr. Restivo's van was up on blocks at his mother's house on November 10, 1984 and, thus, was inoperable on that night.

106.    On December 3, 1986, Mr. Restivo and Mr. Halstead were wrongly convicted of rape and second-degree murder as a direct result of the above-described police misconduct

107.    In February 1987, Mr. Restivo and Mr. Halstead were each sentenced to thirty-three and one-third years to life in prison for a crime that they did not commit.

### The DNA Exoneration

108.    Mr. Restivo and Mr. Halstead both consistently maintained their innocence and worked tirelessly throughout their wrongful incarcerations to clear their names.  From 1993 to 2003, DNA testing was conducted on the vaginal smears and swabs obtained during Ms. Fusco's autopsy, and on five separate occasions Mr. Restivo and Mr. Halstead were conclusively excluded as the contributors of the semen recovered from the victim's body.

109.    On June 11, 2003, the convictions of Mr. Restivo, Mr. Halstead, and Mr. Kogut were vacated, but the Nassau County District Attorney's Office, relying on the tainted, fabricated, and coerced evidence generated by the defendants, refused to drop the charges against any of the

men.

110.     In December 2005, the Nassau County District Attorney proceeded to retry Mr. Kogut based on his fabricated confession, a substantial portion of which was a factual impossibility because the DNA evidence showed that Mr. Restivo and Mr. Halstead did not rape the victim.

111.     On December 20, 2005, Judge Ort found Mr. Kogut not guilty of all counts. Judge Ort made the specific finding that Mr. Kogut's confession, which also implicated Mr. Restivo and Mr. Halstead in the crime, was uncorroborated, unreliable, and, in fact, contradicted by the objective scientific evidence in the case. Judge Ort also found that the victim's hairs could not have been left in the van on or about the date the crime occurred.

112.     On December 29, 2005, upon the motion of the Nassau County District Attorney's Office, Judge William C. Donnino of the Nassau County Supreme Court dismissed the charges against Mr. Restivo and Mr. Halstead for lack of evidence.

113.     Mr. Restivo and Mr. Halstead's arrests, indictments, prosecutions, convictions, and almost eighteen years of wrongful imprisonment would not have occurred in the absence of police misconduct of the most extreme order at every step of the investigation. If not for the efforts of defendants, who deliberately deprived Mr. Restivo and Mr. Halstead of their constitutional rights with the knowledge and assistance of their fellow police officers, supervisors, and the NCPD itself, Mr. Restivo and Mr. Halstead would never have been arrested, charged, and convicted, and never would have lost nearly eighteen years of their lives.

### Systemic Violations at the NCPD:

### Custom and Practice of Coercive Interrogations and Fabrication of Evidence

114.     Beginning in the years leading up to Mr. Restivo and Mr. Halstead's wrongful

–26–

convictions and continuing through their unjust incarcerations, the NCPD had a custom, policy, or pattern and practice of condoning, facilitating, or promoting the use of unconstitutional investigative techniques, including coercing witnesses and suspects, fabricating inculpatory evidence, manipulating interrogations to make them appear non-custodial, coercing or fabricating physical injury and *Miranda* waiver forms, manufacturing false police reports, failing to adequately investigate other leads, withholding material exculpatory and impeachment evidence from prosecutors, and suborning perjury of witnesses and police officers.

115.    Numerous other cases involving the NCPD Homicide Squad's unconstitutional interrogation techniques have been brought to the attention of Nassau County policymakers, including, without limitation, the following:

A.  Defendant Volpe coerced Robert Moore into falsely confessing to the murder of Joshua Chisolm. The criminal charges against Mr. Moore were ultimately dismissed. Nassau County subsequently settled a civil rights suit brought by Mr. Moore alleging that NCPD homicide detectives engaged in unlawful interrogation techniques for $90,000.

B.  Defendant Dempsey coerced Shonnard Lee into falsely confessing to the murder of Sammy Jones. Mr. Lee was eventually acquitted after trial. Following a trial in a civil rights suit brought by Mr. Lee alleging that NCPD homicide detectives engaged in unlawful interrogation techniques, the jury found in favor of Mr. Lee and awarded him $2 million in damages, which included a punitive damages award of $1.25 million against Dempsey for his unlawful actions with respect to the arrest, interrogation, and subsequent criminal proceedings.

C.  NCPD homicide detectives coerced Jose Martinez into falsely confessing to the murder

–27–

of his best friend Jose Alberto Cruz. The charges against Mr. Martinez were eventually

dismissed. Nassau County settled a civil rights suit brought by Mr. Martinez alleging

that NCPD homicide detectives engaged in unlawful interrogation techniques for

$950,000.

D. Other Nassau County criminal cases, such as the cases against Blair Gardner and Michael

Prince, raise similar issues concerning multiple incidents of illegal conduct by NCPD

homicide detectives during interrogations.

116.    On April 11, 2005, in recognition of the pre-existing unconstitutional custom, practice,

and policy, NCPD Police Commissioner James Lawrence publicly stated that the NCPD would

start videotaping interrogations conducted in homicide cases in order to preserve the integrity of

the process. Commissioner Lawrence also represented that a panel had been created to conduct

an internal review of the NCPD's interrogation procedures and implement their

recommendations based on the review.

117.    Despite the fact that Nassau County policymakers have been made aware of numerous

cases involving NCPD homicide detectives' unlawful interrogation practices and Commissioner

Lawrence made representations with respect to videotaping interrogations and conducting an

internal review process, Nassau County, upon information and belief, has not yet begun to

videotape interrogations or otherwise rectify the illegal investigative and interrogation practices

of the NCPD Homicide Squad and, thus, NCPD homicide detectives are free to continue to

coerce witnesses and suspects and fabricate evidence.

## **Custom and Practice of Failing to Train or Supervise**

118.    The NCPD had a custom, policy, or pattern and practice of failing to adequately train,

−28−

supervise, or discipline officers concerning basic homicide investigation techniques,
constitutionally adequate interrogation methods, and the obligation to disclose exculpatory and
impeachment material to the prosecution.

119.    The NCPD had no written policies, procedures, or guidelines concerning the execution of
lawful homicide investigations, constitutionally adequate interrogation procedures, and the legal
obligation to disclose exculpatory and impeachment material to the prosecution.

120.    Although Nassau County's final policymakers and defendants Campbell, Edwards,
Spillane and Richard Roe Supervisors #1-10 had actual or constructive notice of defendants
Volpe, Dempsey, and their fellow officers' outrageous and pervasive misconduct, they took no
steps or grossly inadequate steps to train, supervise, or discipline them.

121.    The only supervision defendants Campbell, Edwards, Spillane, and Richard Roe
Supervisors #1-10 actually conducted over defendants Volpe, Dempsey, and others was to
actually or constructively condone, facilitate, or encourage their unconstitutional practices.

## DAMAGES

122.    The actions of the defendants deprived plaintiffs of their civil rights under the First,
Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and
the laws of New York.

123.    The unlawful, intentional, willful, deliberately indifferent, reckless, and/or bad-faith acts
and omissions of the defendants caused John Restivo and Dennis Halstead to be falsely arrested
and imprisoned, unfairly tried, wrongfully convicted, and forced to serve nearly eighteen years in
jail and prison for a crime they did not commit.

124.    The unlawful, intentional, willful, deliberately indifferent, reckless, and/or bad-faith acts

–29–

and omissions of the defendants caused John Restivo and Dennis Halstead the following injuries and damages, which continue to date and will continue into the future: personal injuries; pain and suffering; severe mental anguish; emotional distress; loss of family relationships, including the total loss of relationships with some of their children; severe psychological damage; damage to business and property; loss of income; costs of defense; infliction of physical illness; inadequate medical care; humiliation, indignities and embarrassment; degradation; permanent loss of natural psychological development; and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression, for which they are entitled monetary relief.

125.    As a direct and proximate result of the acts of the defendants, and the resulting unlawful incarceration of Mr. Halstead, plaintiffs Melissa Lullo, Jason Halstead, and Taylor Halstead suffered pecuniary and non-pecuniary damages in that they were deprived of those benefits one would normally derive from the presence of their father, Mr. Halstead. As the result of their father's absence, Melissa, Jason, and Taylor suffered loss of society, companionship, advice, moral support, family services, attention, protection, parental care, financial support. They also suffered from mental anguish, bereavement, and the stigma of being the children of a man who was tried and convicted of the reprehensible crime of raping and murdering a sixteen-year-old girl.

126.    All the acts and omissions committed by the defendants described herein for which liability is claimed were done intentionally, unlawfully, maliciously, wantonly, recklessly, negligently and/or with bad faith, and said acts meet all of the standards for imposition of

–30–

punitive damages.

## COUNT I

## 42 U.S.C. § 1983 4th and 14th Amendment Claims for False Arrest, Malicious Prosecution, and False Imprisonment

127.    Plaintiffs hereby incorporate by reference all of the foregoing paragraphs and further

allege as follows.

128.    Defendants, despite knowing that probable cause did not exist to arrest and prosecute Mr.

Restivo and Mr. Halstead for the rape and murder of Theresa Fusco, with malice, acted

individually and in concert to cause Mr. Restivo and Mr. Halstead to be arrested, charged, and

prosecuted for that crime, thereby violating Mr. Restivo and Mr. Halstead's rights pursuant to

the Fourth and Fourteenth Amendments of the United States Constitution to be free of

unreasonable searches and seizures.

129.    Specifically, defendants intentionally withheld from and misrepresented to prosecutors

and the grand jury exculpatory facts that vitiated probable cause against Mr. Restivo and Mr.

Halstead, including but not limited to the fact that Mr. Restivo's statement implicating Mr.

Halstead, Mr. Kogut's confession implicating Mr. Restivo and Mr. Halstead, witness statements

and the hair evidence connecting Mr. Restivo and Mr. Halstead to the crime, and other evidence

against Mr. Restivo and Mr. Halstead were the product of fabrication and/or coercion.  The

defendants performed the above-described acts deliberately, with reckless disregard for the truth,

and with malice.

130.    In fact, Mr. Restivo and Mr. Halstead, as they stated from the time of their arrests and

maintained throughout their wrongful incarcerations, are innocent of the rape and murder of

Theresa Fusco.

–31–

131.    On December 29, 2005, the prosecution terminated in Mr. Restivo and Mr. Halstead's favor when the Nassau County District Attorney dropped the charges against them.

132.    Mr. Restivo and Mr. Halstead's causes of action for false arrest, malicious prosecution, and false imprisonment were unavailable to them until December 29, 2005 upon the favorable termination of the criminal proceedings against them.  Furthermore, these claims are tolled as defendants concealed from Mr. Restivo and Mr. Halstead—and still are concealing to this day— the facts vitiating probable cause to arrest and prosecute them.

133.    But for defendants' conduct Mr. Restivo and Mr. Halstead would not have been arrested and/or prosecuted for the rape and murder of Theresa Fusco.

134.    Defendants' actions to deprive Mr. Restivo and Mr. Halstead of their liberty without probable cause were in violation of clearly established constitutional law, including *Franks v. Delaware*, 438 U.S. 154 (1978), and no reasonable police officer in 1985 would have believed that the defendants' actions were lawful.

135.    As a direct and proximate result of the defendants' actions Mr. Restivo and Mr. Halstead were wrongly convicted and imprisoned for nearly eighteen years, and suffered the other grievous and continuing injuries and damages as set forth above.

## COUNT II

**42 U.S.C. § 1983 14th Amendment Claims for Deprivation of Liberty Without Due Process of Law and Denial of a Fair Trial by Fabricating Evidence, Withholding Material Exculpatory and Impeachment Evidence, Coercion, and Deliberately Failing to Conduct a Constitutionally Adequate Investigation**

136.    Plaintiffs hereby incorporate by reference all of the foregoing paragraphs and further allege as follows.

137.    Defendants, acting individually and in concert, coerced witnesses, fabricated evidence,

–32–

and withheld material exculpatory and impeachment evidence from prosecutors, thereby

depriving Mr. Restivo and Mr. Halstead of their clearly established constitutional right, pursuant

to the Fourteenth Amendment, to a fair trial.

138.     Specifically, defendants, deliberately and with reckless disregard for the constitutional

rights of Mr. Restivo and Mr. Halstead, coerced and fabricated statements from Mr. Kogut, Mr.

Restivo, and numerous other witnesses, by using physical and psychological force, in a manner

that shocks the conscience, to procure those statements, and by falsely representing in police

reports, in pretrial conversations with prosecutors, and during Mr. Restivo and Mr. Halstead's

trial that the facts recounted by those witnesses originated with the witnesses when in fact they

had been fed to the witnesses or otherwise fabricated by the defendant police officers.

139.     Defendants also intentionally planted or deliberately commingled the victim's hairs with

hairs found in the van, thereby fabricating forensic evidence and failing to disclose exculpatory

evidence to the prosecution.

140.     Furthermore, the defendants deliberately and with reckless disregard for the

constitutional rights of Mr. Restivo and Mr. Halstead failed to disclose to prosecutors their

coercion and fabrications and attempted coercion and fabrications, as well as other material

exculpatory and impeachment evidence, including but not limited to witness statements, forensic

evidence, and investigative misconduct on the part of the defendants and others. Had this

evidence been documented and/or disclosed it would have tended to prove Mr. Restivo and Mr.

Halstead's innocence, cast doubt on the entire police investigation of the Fusco rape and murder,

impeached the trial testimony of critical witnesses, and undermined confidence in the verdict

against Mr. Restivo and Mr. Halstead. But for defendants' actions, Mr. Restivo and Mr.

−33−

Halstead would not have been indicted for or convicted of the rape and murder of Ms. Fusco.

141.    In their drive to secure the wrongful convictions of Mr. Restivo and Mr. Halstead, defendants deliberately failed to investigate leads pointing toward other suspects and corroborating Mr. Restivo and Mr. Halstead's innocence, including but not limited to intentionally failing to interview witnesses whose knowledge tended to disprove Mr. Restivo and Mr. Halstead's guilt and failing to investigate exculpatory and potentially exculpatory forensic evidence. The defendants purposefully failed to conduct a thorough and adequate criminal investigation into the murder of Ms. Fusco because they knew or should have known that such an investigation would have exonerated Mr. Restivo and Mr. Halstead.

142.    Mr. Restivo and Mr. Halstead's causes of action for denial of their liberty without due process of law and for denial of their right to a fair trial were unavailable to them until December 29, 2005 upon the favorable termination of the criminal proceedings against them. Furthermore, these claims are tolled as defendants concealed from Mr. Restivo and Mr. Halstead—and still are concealing to this day—the coercion of witnesses, fabrication of evidence, withholding of material exculpatory evidence, deliberate failure to investigate, and other facts giving rise to these claims.

143.    Defendants' conduct violated Mr. Restivo and Mr. Halstead's clearly established constitutional rights to a fair trial and not to be deprived of liberty without due process of law as guaranteed by the Fourteenth Amendment. No reasonable police officer in 1985 would have believed that the actions taken by the defendants in coercing suspects and witnesses, fabricating evidence, failing to document and disclose material exculpatory evidence to prosecutors, and failing to conduct a constitutionally adequate investigation were lawful. As a direct and

–34–

proximate result of defendants' actions, Mr. Restivo and Mr. Halstead were wrongly convicted and imprisoned for nearly eighteen years, and suffered the other grievous and continuing injuries and damages as set forth above.

## COUNT III

### 42 U.S.C. § 1983 Claim for Failure to Intercede

144.   Plaintiffs hereby incorporate by reference all of the foregoing paragraphs and further allege as follows.

145.   By their conduct and under color of state law, defendants had opportunities to intercede on behalf of Mr. Restivo and Mr. Halstead to prevent their abusive interrogations, false arrest, malicious prosecution, false imprisonment, and deprivation of liberty without due process of law, but, due to their intentional conduct and/or reckless or deliberate indifference, declined or refused to do so.

146.   Defendants' failures to intercede violated Mr. Restivo and Mr. Halstead's clearly established constitutional rights to be free from unreasonable search and seizure and not to be deprived of liberty without due process of law as guaranteed by the Fourth and Fourteenth Amendments. No reasonable police officer in 1985 would have believed that failing to intercede to prevent defendants from coercing and abusing suspects and witnesses, fabricating evidence, failing to document and disclose material exculpatory evidence, deliberately failing to conduct a constitutionally adequate investigation, and causing Mr. Restivo and Mr. Halstead to be arrested and prosecuted without probable cause were lawful. As a direct and proximate result of the defendants' failures to intercede Mr. Restivo and Mr. Halstead were wrongly convicted and imprisoned for nearly eighteen years, and suffered the other grievous and continuing injuries and

–35–

damages as set forth above.

**COUNT IV**

**42 U.S.C. § 1983 Civil Rights Conspiracy Claim**

147.    Plaintiffs hereby incorporate by reference all of the foregoing paragraphs and further allege as follows.

148.    Defendants Volpe, Dempsey, and their fellow detectives and officers, acting within the scope of their employment and under color of law, agreed among themselves and with other individuals, to act in concert in order to deprive criminal suspects, including Mr. Restivo and Mr. Halstead, of their clearly established Fourth and Fourteenth Amendment rights to be free from unreasonable searches and seizures, false arrest, false imprisonment, malicious prosecution, and deprivation of liberty without due process of law, and to a fair trial.

149.    Defendants' conspiracy to deprive criminal suspects of their basic constitutional rights was not limited to this case. Beginning on or before 1983 when defendant Volpe started in the NCPD Homicide Squad and continuing long after the misconduct perpetrated against Mr. Halstead, Mr. Restivo, and Mr. Kogut in this case, defendants conspired to violate the rights of innocent suspects including, for example, Robert Moore, Shonnard Lee, and Jose Martinez.

150.    In furtherance of the conspiracy each defendant engaged in and facilitated numerous overt acts, including, without limitation, the following:

   A. Defendants Volpe, Dempsey, and others procured, through coercion, intimidation, physical force, and feeding of facts Mr. Restivo's statement implicating Mr. Halstead in the Fusco rape and murder, despite the fact that they knew or should have known that Mr. Halstead had no involvement in the crime;

–36–

B. Defendants Volpe, Dempsey, and others procured, through coercion, intimidation, physical force, and feeding of facts Mr. Kogut's confession implicating Mr. Restivo and Mr. Halstead in the Fusco rape and murder, despite the fact that they knew or should have known that Kogut, Restivo, and Halstead were not together on the night of November 10, 1984 and had no involvement in the crime;

C. Defendants coerced, intimidated, and threatened witnesses in order to obtain what the defendants knew to be false evidence corroborating Mr. Kogut's confession implicating Mr. Restivo and Mr. Halstead;

D. Defendants intentionally planted the victim's hair samples in Mr. Restivo's van or deliberately commingled the victim's hairs with the hairs from the van in the laboratory or elsewhere to fabricate physical evidence connecting Mr. Restivo and Mr. Halstead to Ms. Fusco and corroborating Mr. Kogut's false confession.

E. Defendants deliberately fabricated reports and other accounts of their investigative activities, and failed to document and disclose material exculpatory evidence to prosecutors;

F. Defendants intentionally or with deliberate indifference failed to conduct an adequate investigation of the case, which would have uncovered evidence undermining evidence implicating Mr. Restivo and Mr. Halstead;

G. Defendants deliberately provided perjured testimony in the grand jury, pre-trial hearings, and/or in Mr. Restivo and Mr. Halstead's criminal trial;

H. Defendants Campbell, Edwards, Spillane, and Richard Roe Supervisors #1-10 signed off on investigative reports and authorized the decision to arrest Mr. Restivo and Mr.

Halstead, notwithstanding that they knew or should have known that defendants Volpe, Dempsey, and others had conducted their investigation, as they conducted other investigations, in a manner that violated the constitutional rights of Mr. Restivo and Mr. Halstead.

I.  Defendants Volpe, Dempsey, and other Homicide Squad detectives also engaged in coercive interrogations and otherwise fabricated the confessions of other criminal suspects, including, for example, Robert Moore, Shonnard Lee, and Jose Martinez.

151.    As a direct and proximate result of the defendants' conspiracy and actions in furtherance of that conspiracy, Mr. Restivo and Mr. Halstead were wrongly convicted and imprisoned for nearly eighteen years, and suffered the other grievous and continuing injuries and damages as set forth above.

## COUNT V

### 42 U.S.C. § 1983 Supervisory Liability Claim

152.    Plaintiffs hereby incorporate by reference all of the foregoing paragraphs and further allege as follows.

153.    The individual defendant police officers acted with impunity in an environment in which they were not trained, supervised, or disciplined by defendants Campbell, Edwards, Spillane, and Richard Roe Supervisors #1-10.

154.    Defendants Campbell, Edwards, Spillane, and Richard Roe Supervisors #1-10 were personally involved in the deprivation of plaintiffs' constitutional rights as they acted with gross negligence, recklessness, and/or deliberate indifference to the constitutional rights of citizens by failing to provide adequate training, supervision, and discipline of the defendant police officers,

−38−

and thereby caused the individual defendant police officers to deprive Mr. Restivo and Mr. Halstead of their clearly established constitutional rights, including their rights to be free from unreasonable searches and seizures, false arrest, false imprisonment, malicious prosecution, and deprivation of liberty without due process of law, and to a fair trial despite actual or constructive knowledge that such constitutional violations were occurring or had occurred. Had Defendants Campbell, Edwards, Spillane, and Richard Roe Supervisors #1-10 not provided grossly inadequate training, supervision, and discipline of the defendant officers, defendants would not have fabricated evidence, coerced witnesses, failed to document and disclose exculpatory evidence, and intentionally and maliciously caused Mr. Restivo and Mr. Halstead to be arrested, charged, and prosecuted without probable cause.

155.    Specifically, defendants Campbell, Edwards, Spillane, and Richard Roe Supervisors #1-10 knew or should have known of a high degree of risk that defendants Volpe, Dempsey, and others would conduct criminal investigations in a manner that violated the constitutional rights of citizens.

156.    Defendants Campbell, Edwards, Spillane, and Richard Roe Supervisors #1-10 either knew or, in the absence of their supervision or their grossly inadequate supervision of defendants Volpe, Dempsey, and their fellow officers, should have known, that Volpe, Dempsey, and their fellow officers routinely violated the constitutional rights of criminal suspects in the course of criminal investigations, including by coercing witnesses, fabricating evidence, concealing the fabrication of evidence in police reports and conversations with prosecutors, suppressing material exculpatory and impeachment evidence from the prosecution and defense, committing perjury and compelling witnesses to commit perjury at pre-trial proceedings and the trial, and

−39−

failing to adequately investigate evidence of suspects' innocence.

157.    Moreover, defendants Campbell, Edwards, Spillane, and Richard Roe Supervisors #1-10 knew or should have known in this case that defendants Volpe, Dempsey, and their fellow officers followed the above-described practices in the Fusco rape and murder investigation, and coerced and intimidated witnesses, fabricated evidence, failed to document and disclose material exculpatory evidence, conducted a constitutionally inadequate investigation, and caused the arrest and prosecution of Mr. Restivo and Mr. Halstead without probable cause.

158.    The grossly negligent, reckless, and/or deliberately indifferent conduct of defendants Campbell, Edwards, Spillane, and Richard Roe Supervisors #1-10 violated their clearly established duty, in 1985, to supervise defendants Volpe, Dempsey, and their fellow officers, and no reasonable police supervisor in 1985 would have believed that grossly negligent, reckless, and/or deliberately indifferent supervision in the face of actual or constructive notice of misconduct by their subordinate officers was lawful.

159.    The actions and omissions of defendants Campbell, Edwards, Spillane, and Richard Roe Supervisors #1-10 proximately and directly caused Mr. Restivo and Mr. Halstead to be wrongly convicted and imprisoned for nearly eighteen years, and to suffer the other grievous and continuing injuries and damages as set forth above.

## COUNT VI

### 42 U.S.C. § 1983 Monell Claim Against Nassau County:
### Unconstitutional Custom and Practice of Conducting Unlawful Investigations
### and Failing to Train and Supervise

160.    Plaintiffs hereby incorporate by reference all of the foregoing paragraphs and further allege as follows.

–40–

161.   Nassau County, by and through the deliberate indifference of its final policymakers, maintained a custom, policy, or practice of condoning, facilitating, or promoting the use of unconstitutional investigative techniques, including coercing witnesses and suspects, fabricating inculpatory evidence, manipulating interrogations to make them appear non-custodial, coercing or fabricating physical injury and *Miranda* waiver forms, manufacturing false police reports, failing to adequately investigate other leads, withholding material exculpatory and impeachment evidence from prosecutors, and suborning perjury of witnesses and police officers despite actual or constructive notice that such constitutional violations were occurring or were likely to occur.

162.   Nassau County, by and through the deliberate indifference of its final policymakers, failed to provide or provided grossly inadequate training, supervision, and discipline regarding basic homicide investigation practices, constitutionally adequate interrogation techniques, and the obligation to disclose exculpatory evidence to prosecutors despite actual or constructive knowledge that the failure to provide such training, supervisor, and discipline had led to or was likely to lead to the constitutional violations described herein.

163.   As a direct result of Nassau County's unconstitutional policies and practices of conducting constitutionally inadequate investigations and providing grossly inadequate mechanisms for training, supervision, and discipline, the individual defendants in this case caused Mr. Restivo and Mr. Halstead to be deprived of their Fourth and Fourteenth Amendment rights to be free from unreasonable searches and seizures, false arrest, false imprisonment, malicious prosecution, and deprivation of liberty without due process of law, and to a fair trial, and directly and proximately caused the other grievous and continuing injuries and damages set forth above.

-41-

## COUNT VII

### 42 U.S.C. § 1983 1st and 14th Amendment Loss of Familial Association Claim

164.   Plaintiffs hereby incorporate by reference all of the foregoing paragraphs and further allege as follows.

165.   Defendants, through their misconduct against Mr. Halstead, recklessly or deliberately violated Melissa Lullo, Jason Halstead, and Taylor Halstead's First and Fourteenth Amendment rights to be free from unwarranted government interference with their familial relationship to Mr. Halstead without due process of law.

166.   These acts caused Melissa Lullo, Jason Halstead, and Taylor Halstead to suffer the damages set forth above.

## COUNT VIII

### State Law False Arrest, Malicious Prosecution, and False Imprisonment Claims

167.   Plaintiffs hereby incorporate by reference all of the foregoing paragraphs and further allege as follows.

168.   Defendants, despite knowing that probable cause did not exist to arrest, charge, and prosecute Mr. Restivo and Mr. Halstead for the rape and murder of Ms. Fusco, intentionally, recklessly, and with malice caused Mr. Restivo and Mr. Halstead to be arrested, charged, prosecuted, and convicted for Fusco's rape and murder.

169.   Furthermore, defendants intentionally withheld from and misrepresented to prosecutors and the grand jury material exculpatory facts that further vitiated probable cause against Mr. Restivo and Mr. Halstead, including but not limited to the fact that Mr. Kogut's confession implicating Mr. Restivo and Mr. Halstead, witness statements connecting Mr. Restivo and Mr.

–42–

Halstead to the crime, and other evidence against Mr. Restivo and Mr. Halstead were the product of fabrication and coercion.

170.    Mr. Restivo and Mr. Halstead's causes of action for false arrest, malicious prosecution, and false imprisonment were unavailable to them until December 29, 2005 upon the favorable termination of the criminal proceedings against them.  Furthermore, these claims are tolled as defendants concealed from Mr. Restivo and Mr. Halstead—and still are concealing to this day— the facts vitiating probable cause to arrest and prosecute Mr. Restivo and Mr. Halstead.

171.    Defendants' conduct directly and proximately caused Mr. Restivo and Mr. Halstead's wrongful conviction and nearly eighteen years of imprisonment, as well as the other grievous and continuing injuries and damages set forth above.

## COUNT IX

### State Law Claims for Assault and Battery

172.    Plaintiffs hereby incorporate by reference all of the foregoing paragraphs and further allege as follows.

173.    By using physical force against Mr. Restivo during his interrogation, defendants Volpe, Dempsey, and their fellow officers each committed a willful, unlawful, unwarranted, and intentional assault and battery upon Mr. Restivo.

174.    As a direct and proximate result of this misconduct and unwarranted use of force, Mr. Restivo sustained the injuries and damages set forth above.

## COUNT X

### State Law Claim for Intentional or Reckless Infliction of Emotional Distress

175.    Plaintiffs hereby incorporate by reference all of the foregoing paragraphs and further

–43–

allege as follows.

176.    The conduct of defendants in deliberately causing, or recklessly disregarding the risk of

causing, the wrongful arrest, prosecution, and incarceration of John Restivo and Dennis Halstead

was extreme and outrageous, and directly and proximately caused the grievous and continuing

injuries and damages set forth above.

177.    Mr. Restivo and Mr. Halstead's cause of action for intentional or reckless infliction of

emotional distress by defendants was unavailable to them until December 29, 2005 upon the

favorable termination of the criminal proceedings against them.  Furthermore, this claim is tolled

as defendants concealed from Mr. Restivo and Mr. Halstead—and still are concealing to this

day—their conduct giving rise to this cause of action.

## COUNT XI

### State Law Claim for Negligent Infliction of Emotional Distress

178.    Plaintiffs hereby incorporate by reference all of the foregoing paragraphs and further

allege as follows.

179.    The defendants negligently and grossly negligently, and in breach of their duties owed to

him to refrain from fabricating evidence, coercing witnesses, withholding material exculpatory

and impeachment evidence, and otherwise acting to deny them due process of law, directly and

proximately caused Mr. Restivo and Mr. Halstead, both innocent men, to be falsely arrested,

maliciously prosecuted, and wrongly imprisoned for nearly eighteen years.  Defendants' actions

caused Mr. Restivo and Mr. Halstead to suffer physical harm, including physical ailments

resulting from the circumstances and duration of their wrongful incarceration, and to fear for

their physical safety throughout the period of their pretrial and postconviction incarceration.

−44−

180.    Mr. Restivo and Mr. Halstead's cause of action for negligent infliction of emotional distress by defendants was unavailable to them until December 29, 2005 upon the favorable termination of the criminal proceedings against them.  Furthermore, this claim is tolled as defendants concealed from Mr. Restivo and Mr. Halstead—and still are concealing to this day— their conduct giving rise to this cause of action.

## COUNT XII

### State Law Respondeat Superior Claim Against Nassau County

181.    Plaintiffs hereby incorporate by reference all of the foregoing paragraphs and further allege as follows.

182.    At all times relevant to this complaint the individual defendants acted as agents of, and in the scope of their employment with, Nassau County.  The conduct by which defendants committed the torts of false arrest, malicious prosecution, false imprisonment, assault and battery, intentional or reckless infliction of emotional distress, and negligent infliction of emotional distress was undertaken while defendants were on duty, carrying out their routine investigative functions as NCPD detectives or officers, and engaging in such conduct as would have been reasonably expected by their employer.  Indeed, the specific conduct of defendants Volpe, Dempsey, and their fellow officers was known by, should have been known by, and/or was reasonably foreseeable to NCPD supervisors.

183.    Nassau County is liable for its agents' state law torts of false arrest, malicious prosecution, false imprisonment, assault and battery, intentional or reckless infliction of emotional distress, and negligent infliction of emotional distress under the doctrine of respondeat superior.

## COUNT XIII

### State Law Negligent Supervision Claim

184.    Plaintiffs hereby incorporate by reference all of the foregoing paragraphs and further allege as follows.

185.    Defendants Campbell, Edwards, Spillane, and Richard Roe Supervisors #1-10 were grossly negligent and negligent in the training, supervision, and discipline of defendants Volpe, Dempsey, and their fellow officers.

186.    Defendants Campbell, Edwards, Spillane, and Richard Roe Supervisors #1-10 knew or, but for their grossly negligent and negligent training, supervision, and discipline, should have known that defendants Volpe, Dempsey, and others engaged in investigative misconduct including coercing witnesses, fabricating evidence, and failing to document and disclose material exculpatory and impeachment evidence, and that they thereby caused Mr. Restivo and Mr. Halstead to be maliciously prosecuted and falsely arrested.

187.    As a proximate result of the gross negligence and negligence of defendants Campbell, Edwards, Spillane, and Richard Roe Supervisors #1-10, defendants Volpe, Dempsey, and others engaged in the previously set forth misconduct and caused the above-described acts of false arrest, malicious prosecution, false imprisonment, assault and battery, intentional or reckless infliction of emotional distress, and negligent infliction of emotional distress inflicted on Mr. Restivo and Mr. Halstead, which directly and proximately caused Mr. Restivo and Mr. Halstead's wrongful conviction and nearly eighteen years of imprisonment, as well as the other grievous and continuing injuries and damages set forth above.

−46−

**WHEREFORE**, John Restivo, Dennis Halstead, Melissa Lullo, Jason Halstead, and Taylor Halstead pray as follows:

A. That the Court award compensatory damages to them and against defendants, jointly and severally, in an amount to be determined at trial;

B. That the Court award punitive damages to them, and against all individual defendants, in an amount to be determined at trial, that will deter such conduct by defendants in the future;

C. For a trial by jury;

D. For pre-judgment and post-judgment interest and recovery of their costs, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 for all 42 U.S.C. § 1983 claims; and

E. For any and all other relief to which they may be entitled.

Respectfully submitted,

December 21, 2006

Barry C. Scheck (BS 4612)
Nick Brustin (NB 0605)
Deborah L. Cornwall (DC 2186)
Monica R. Shah (MS 9846)
Cochran, Neufeld & Scheck LLP
99 Hudson Street, 8th Floor
New York, New York 10013
(212) 965-9081

Attorneys for Plaintiffs John Restivo, Dennis Halstead, Melissa Lullo, Jason Halstead, and Taylor Halstead

−47−