# Exhibit 1

1

                UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - -x
JOHN KOGUT,

                    Plaintiff,

        - against -                    CV-06-6695
                                       (JS)(WDW)
THE COUNTY OF NASSAU, POLICE
COMMISIONER DONALD KANE, POLICE COMMISSIONER
WILLIAM J WILLETT (2005), POLICE COMMISSIONER
JAMES LAWRENCE, DETECTIVE SEAN SPILLANE(HEAD
OF HOMICIDE 1985), DETECTIVE DENNIS FARRELL
(HEAD OF HOMICIDE 2005), DETECTIVE JOSEPH VOLPE,
DETECTIVE ROBERT DEMPSEY, DETECTIVE ALBERT
MARTINO, DETECTIVE WAYNE BIRDSALL, DETECTIVE
MILTON G. GRUBER, DETECTIVE CHARLES FRAAS,
DETECTIVE FRANK SIRIANNI, DETECTIVE HARRY
WALTMAN, P.O. MICHAEL CONNAUGHTON, P.O.
WILLIAM DIEHL, and JOHN DOES 1-5,
                         Defendants.
- - - - - - - - - - - - - - - - - - - - x
- - - - - - - - - - - - - - - - - - - - x
JOHN RESTIVO, DENNIS HALSTEAD, MELISSA LULLO,
JASON HALSTEAD, HEALTHER HALSTEAD and TAYLOR
HALSTEAD,

                    Plaintiffs,

        - against -                    CV-06-6720
                                       (JS)(WDW)
NASSAU COUNTY, JOSEPH VOLPE, in his
individual capacity, ROBERT DEMPSEY, in his
individual capacity, FRANK SIRIANNI, in his
individual capacity, MILTON GRUBER, in his
individual capacity, HARRY WALTMAN, in his
individual capacity, ALBERT MARTINO, in his
individual capacity, CHARLIE FRAAS, in his
individual capacity, THOMAS ALLEN, in his
individual capacity, RICHARD BRUSA, in his
individual capacity, VINCENT DONNELLY, in his
individual capacity, MICHAEL CONNAUGHTON, in
his individual capacity, WAYNE BIRDSALL, in
his individual capacity, WILLIAM DIEHL, in his
individual capacity, JACK SHARKEY, in his

ALLIANCE REPORTING SERVICE, INC.  (516) 741-7585

2

1    individual capacity, DANIEL PERRINO, in his
2    individual capacity, ANTHONY KOZIER, in his
     individual capacity, DETECTIVE SERGEANT
3    CAMPBELL (SHIELD #48) in his individual
     capacity, ROBERT EDWARDS, in his individual
4    capacity, SEAN SPILLANE, in his individual
     capacity, JOHN DOE OFFICERS AND DETECTIVES
5    #1-10, in their individual capacities, and
     RICHARD ROE SUPERVISORS #1-10, in their
6    individual capacities,
7                      Defendants.
     - - - - - - - - - - - - - - - - - - - - x
8
9
10                   One West Street
                     Mineola, New York
11
                     January 26, 2009
12                   9:51  A.M.
13
14
15
16
17        VIDEOTAPE DEPOSITION OF JOSEPH VOLPE, one
18   of the Defendants, taken by Plaintiffs, pursuant
19   to Notice, held at the above-noted time and place,
20   before a Notary Public of the State of New York.
21
22
23
24
25

ALLIANCE REPORTING SERVICE, INC.  (516) 741-7585

25

```
 1                          VOLPE                    25

 2          Q       So there's a separate tank in the

 3   car?

 4          A       Yes.

 5          Q       Can you drive?

 6          A       As much as the breathing is the

 7   neuropathy.  Can I drive, the answer would be,

 8   yes.

 9          Q       Do you drive?

10          A       Do I drive, I try not to.

11          Q       Now, you understand that we have

12   modified the protocol for the typical deposition

13   for you so that if you need a break at any time

14   you simply let us know and we'll stop?

15          A       Yes, I do understand.

16          Q       Would you be kind enough, sir, to

17   tell me  -- well, you're a retired detective with

18   the Nassau County Police Department; correct?

19          A       Correct.

20          Q       And as of 1984 how many years had

21   you been on the job?

22          A       In 1984?

23          Q       Right.

24          A       14.

25          Q       In 1984, of those 14 years of
```

ALLIANCE REPORTING SERVICE, INC.  (516) 741-7585

```
 1                          VOLPE                    26

 2   service how many of those years were you assigned

 3   to the homicide bureau?

 4        A       I was assigned in '84 until I

 5   retired.

 6        Q       What part of 1984?

 7        A       May.

 8        Q       Now, your involvement with the

 9   Theresa Fusco case happened on December 5th, 1984;

10   correct?

11        A       Yes.

12        Q       So that was, approximately, you were

13   in the bureau maybe six months?

14        A       Yes.

15        Q       Was this your first assignment as a

16   carrying detective?

17        A       I had one prior, a manslaughter

18   case, was resolved quickly because they knew each

19   other, and then Fusco was my first assignment as a

20   murder trial, murder case.

21        Q       Now, where were you working within

22   the department prior to coming to homicide?

23        A       I did six years in robbery and then

24   two in the 5th squad in Elmont.

25        Q       When you came over to homicide were
```

```
 1                          VOLPE                    31
 2          Q       Of suspects and witnesses?
 3          A       Correct.
 4          Q       And can you tell me specifically
 5   what if anything you learned concerning your
 6   conduct during the course of an interrogation of a
 7   suspect?
 8               MR. FERGUSON:  You're asking him
 9          specific information from 1976, like 32
10          years ago, is that your question?  You want
11          specific information, is that what you're
12          saying?
13               MR. GRANDINETTE:  Yes.
14          A       I can't  --
15               MR. FERGUSON:  Just objection to the
16          question.
17          A       I don't recall.
18          Q       Okay.  Directing your attention to
19   December 5th, 1984, on that date the body of a 16
20   year old named Theresa Fusco was discovered in
21   Lynbrook, New York, under some wooden palettes by
22   two young boys, an Andrew Tursi and a Marcelo
23   Baez; correct?
24          A       That's correct.
25          Q       And after the discovery of that body
```

32

1                        **VOLPE**                    32

2    Theresa Fusco's death was deemed a homicide;

3    correct?

4          A      Yes.

5          Q      I would like to show you what has

6    been marked as Plaintiff's 44 for identification.

7                MR. GRANDINETTE:  Michael, I'd ask

8    you to change the number at the bottom of

9    the page, it's Rosario 43, it's a bit

10   confusing.

11               MR. FERGUSON:  You want me to change

12   what number?

13               MR. GRANDINETTE:  Your number, just

14   so you're aware of it.  You see Rosario,

15   it's marked 43, it's a little bit confusing.

16               MR. FERGUSON:  There are three

17   pages, there's three different Rosario

18   numbers.

19               MR. GRANDINETTE:  We're going to go

20   through Plaintiff's 44.

21               MR. FERGUSON:  Has this been marked

22   at a prior deposition?

23               MR. GRANDINETTE:  No.

24               MR. FERGUSON:  Off the record.

25               MR. GRANDINETTE:  We can't go off

1                          VOLPE                    34

2    sergeant, specifically Sergeant Overs, arrived at

3    the scene; correct?

4         A       Yes.

5         Q       After Sergeant Overs confirms that

6    there's a dead body, he calls the homicide bureau;

7    correct?

8         A       No, no, he would call the 5th squad

9    and the 5th squad would call us.

10        Q       At any rate there came a point in

11   time when the homicide bureau was notified;

12   correct?

13        A       Yes.

14        Q       And your boss at the time contacted

15   you and assigned you as the carrying detective in

16   this case?

17        A       Yes.

18        Q       How did that come about, was that

19   just a random assignment?

20        A       It's an on-call assignment, I was,

21   for lack of a better choice of words, I was up; up

22   meaning that I was catching the cases from the

23   four to midnight tour.

24        Q       And can you tell me what if anything

25   your boss told you about this specific case when

85

85

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - -x
JOHN KOGUT,

                    Plaintiff,

     - against -                    CV-06-6695
                                    (JS)(WDW)
THE COUNTY OF NASSAU, POLICE
COMMISIONER DONALD KANE, POLICE COMMISSIONER
WILLIAM J WILLETT (2005), POLICE COMMISSIONER
JAMES LAWRENCE, DETECTIVE SEAN SPILLANE(HEAD
OF HOMICIDE 1985), DETECTIVE DENNIS FARRELL
(HEAD OF HOMICIDE 2005), DETECTIVE JOSEPH VOLPE,
DETECTIVE ROBERT DEMPSEY, DETECTIVE ALBERT
MARTINO, DETECTIVE WAYNE BIRDSALL, DETECTIVE
MILTON G. GRUBER, DETECTIVE CHARLES FRAAS,
DETECTIVE FRANK SIRIANNI, DETECTIVE HARRY
WALTMAN, P.O. MICHAEL CONNAUGHTON, P.O.
WILLIAM DIEHL, and JOHN DOES 1-5,
                         Defendants.
- - - - - - - - - - - - - - - - - - - - x
- - - - - - - - - - - - - - - - - - - - x
JOHN RESTIVO, DENNIS HALSTEAD, MELISSA LULLO,
JASON HALSTEAD, HEATHER HALSTEAD and TAYLOR
HALSTEAD,

                    Plaintiffs,

     - against -                    CV-06-6720
                                    (JS)(WDW)
NASSAU COUNTY, JOSEPH VOLPE, in his
individual capacity, ROBERT DEMPSEY, in his
individual capacity, FRANK SIRIANNI, in his
individual capacity, MILTON GRUBER, in his
individual capacity, HARRY WALTMAN, in his
individual capacity, ALBERT MARTINO, in his
individual capacity, CHARLIE FRAAS, in his
individual capacity, THOMAS ALLEN, in his
individual capacity, RICHARD BRUSA, in his
individual capacity, VINCENT DONNELLY, in his
individual capacity, MICHAEL CONNAUGHTON, in
his individual capacity, WAYNE BIRDSALL, in
his individual capacity, WILLIAM DIEHL, in his
individual capacity, JACK SHARKEY, in his

86

86

individual capacity, DANIEL PERRINO, in his

individual capacity, ANTHONY KOZIER, in his

individual capacity, DETECTIVE SERGEANT

CAMPBELL (SHIELD #48) in his individual

capacity, ROBERT EDWARDS, in his individual

capacity, SEAN SPILLANE, in his individual

capacity, JOHN DOE OFFICERS AND DETECTIVES

#1-10, in their individual capacities, and

RICHARD ROE SUPERVISORS #1-10, in their

individual capacities,

                    Defendants.

- - - - - - - - - - - - - - - - - - - - x



                    100 Federal Plaza

                    Central Islip, New York


                    March 5, 2009

                    11:17  A.M.






          CONTINUED VIDEOTAPE DEPOSITION OF JOSEPH

VOLPE, one of the Defendants, taken by Plaintiffs,

pursuant to Notice, held at the above-noted time

and place, before a Notary Public of the State of

New York.

157

1                          VOLPE                      157

2    ~~last hours of her life, right?~~

3                  ~~MS. BEN-SOREK:   Objection.~~

4         ~~A      That's a start.~~

5         Q      That's a start.  And according to

6    the very detailed report of Doherty, it appears

7    pretty clear that after a fairly intensive

8    investigation for weeks they had no credible

9    legitimate leads as to where Theresa Fusco went,

10   with whom, et cetera; correct?

11                 MS. BEN-SOREK:  Objection.

12        A      You mean leads toward the homicide?

13        Q      Right, toward the homicide.  Reading

14   this report,  I mean what they had is a bunch of

15   rumor and speculation, you know, she was face up

16   in a lake in Hempstead Park, she was dropped off

17   in the Rockaways.  You know, there's a lot of

18   speculation and rumor based upon

19   their investigation, nothing substantive, nothing

20   concrete, right?

21                 MS. BEN-SOREK:  Objection to form.

22        A      For the homicide, yes.

23        Q      Right, for the homicide.  So we're

24   really starting fresh, we're really starting,

25   you're starting this thing fresh?

158

1                              **VOLPE**                        **158**

2                    MS. BEN-SOREK:  Objection.

3          A       Absolutely.

4          Q       Okay.  And this will probably be a

5    great time to break, okay?

6                    THE VIDEOGRAPHER:  The time is 12:45

7    p.m.  This concludes tape number one of the

8    videotape deposition of Joseph Volpe.

9                    (Time Noted:  12:45 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - -x
JOHN KOGUT,

                    Plaintiff,

        - against -                    CV-06-6695
                                       (JS)(WDW)
THE COUNTY OF NASSAU, POLICE
COMMISIONER DONALD KANE, POLICE COMMISSIONER
WILLIAM J WILLETT (2005), POLICE COMMISSIONER
JAMES LAWRENCE, DETECTIVE SEAN SPILLANE(HEAD
OF HOMICIDE 1985), DETECTIVE DENNIS FARRELL
(HEAD OF HOMICIDE 2005), DETECTIVE JOSEPH VOLPE,
DETECTIVE ROBERT DEMPSEY, DETECTIVE ALBERT
MARTINO, DETECTIVE WAYNE BIRDSALL, DETECTIVE
MILTON G. GRUBER, DETECTIVE CHARLES FRAAS,
DETECTIVE FRANK SIRIANNI, DETECTIVE HARRY
WALTMAN, P.O. MICHAEL CONNAUGHTON, P.O.
WILLIAM DIEHL, and JOHN DOES 1-5,
                         Defendants.
- - - - - - - - - - - - - - - - - - - - x
- - - - - - - - - - - - - - - - - - - - x
JOHN RESTIVO, DENNIS HALSTEAD, MELISSA LULLO,
JASON HALSTEAD, HEALTHER HALSTEAD and TAYLOR
HALSTEAD,

                    Plaintiffs,

        - against -                    CV-06-6720
                                       (JS)(WDW)
NASSAU COUNTY, JOSEPH VOLPE, in his
individual capacity, ROBERT DEMPSEY, in his
individual capacity, FRANK SIRIANNI, in his
individual capacity, MILTON GRUBER, in his
individual capacity, HARRY WALTMAN, in his
individual capacity, ALBERT MARTINO, in his
individual capacity, CHARLIE FRAAS, in his
individual capacity, THOMAS ALLEN, in his
individual capacity, RICHARD BRUSA, in his
individual capacity, VINCENT DONNELLY, in his
individual capacity, MICHAEL CONNAUGHTON, in
his individual capacity, WAYNE BIRDSALL, in
his individual capacity, WILLIAM DIEHL, in his
individual capacity, JACK SHARKEY, in his

2

1

individual capacity, DANIEL PERRINO, in his

2     individual capacity, ANTHONY KOZIER, in his

individual capacity, DETECTIVE SERGEANT

3     CAMPBELL (SHIELD #48) in his individual

capacity, ROBERT EDWARDS, in his individual

4     capacity, SEAN SPILLANE, in his individual

capacity, JOHN DOE OFFICERS AND DETECTIVES

5     #1-10, in their individual capacities, and

RICHARD ROE SUPERVISORS #1-10, in their

6     individual capacities,

7                         Defendants.

- - - - - - - - - - - - - - - - - - - - - x

8

9

10                      One West Street

Mineola, New York

11

January 26, 2009

12                      9:51  A.M.

13

14

15

16

17           VIDEOTAPE DEPOSITION OF JOSEPH VOLPE, one

18      of the Defendants, taken by Plaintiffs, pursuant

19      to Notice, held at the above-noted time and place,

20      before a Notary Public of the State of New York.

21

22

23

24

25

43

1                          VOLPE                        43

2    correct?

3              A        Correct.

4              Q        And in this specific case there were

5    no eyewitnesses placing John Kogut, John Restivo

6    or Dennis Halstead at the crime scene; correct?

7              A        That's correct.

8              Q        And there are also factual witnesses

9    and factual witnesses can provide different types

10   of information.   You mentioned earlier a fact

11   witness may have information concerning Theresa

12   Fusco's background; correct?

13             A        Correct.

14             Q        And since there were no eyewitnesses

15   or fact witnesses placing John Restivo, Dennis

16   Hal -- placing anybody at the scene; correct?

17             A        Correct.

18             Q        One of the things you wanted to do

19   is speak to factual witnesses who knew Theresa

20   Fusco to find out, for example, who is the last

21   person to see her alive?

22             A        Correct.

23             Q        What she was wearing?

24             A        Correct.

25             Q        Where she was last seen?

44

1                          VOLPE                        44

2          A      Correct.

3          Q      Where she might have been going to?

4          A      Would have liked to have found that

5    out.

6          Q      Now, there's other types of evidence

7    that you're going to be looking for as a

8    detective, correct, you're going to be looking for

9    physical evidence, right?

10         A      That's correct.

11         Q      Example of physical evidence might

12   be in this case a blanket or a murder weapon found

13   at the crime scene; correct?

14         A      Correct.

15         Q      Then you also have medical evidence

16   and that might take the form of a death report or

17   an autopsy report; correct?

18         A      Correct.

19         Q      And then you'd be looking for

20   forensic evidence and forensic evidence would be

21   hair samples, blood samples, DNA analysis today,

22   right?

23                MR. FERGUSON:  Wait.  What do you

24         mean DNA analysis today?  This is 1984.

25         Q      Well, in 1984 we didn't have the

85

85

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - -x
JOHN KOGUT,

                    Plaintiff,

      - against -                      CV-06-6695
                                       (JS)(WDW)
THE COUNTY OF NASSAU, POLICE
COMMISIONER DONALD KANE, POLICE COMMISSIONER
WILLIAM J WILLETT (2005), POLICE COMMISSIONER
JAMES LAWRENCE, DETECTIVE SEAN SPILLANE(HEAD
OF HOMICIDE 1985), DETECTIVE DENNIS FARRELL
(HEAD OF HOMICIDE 2005), DETECTIVE JOSEPH VOLPE,
DETECTIVE ROBERT DEMPSEY, DETECTIVE ALBERT
MARTINO, DETECTIVE WAYNE BIRDSALL, DETECTIVE
MILTON G. GRUBER, DETECTIVE CHARLES FRAAS,
DETECTIVE FRANK SIRIANNI, DETECTIVE HARRY
WALTMAN, P.O. MICHAEL CONNAUGHTON, P.O.
WILLIAM DIEHL, and JOHN DOES 1-5,
                         Defendants.
- - - - - - - - - - - - - - - - - - - - x
- - - - - - - - - - - - - - - - - - - - x
JOHN RESTIVO, DENNIS HALSTEAD, MELISSA LULLO,
JASON HALSTEAD, HEATHER HALSTEAD and TAYLOR
HALSTEAD,

                    Plaintiffs,

      - against -                      CV-06-6720
                                       (JS)(WDW)
NASSAU COUNTY, JOSEPH VOLPE, in his
individual capacity, ROBERT DEMPSEY, in his
individual capacity, FRANK SIRIANNI, in his
individual capacity, MILTON GRUBER, in his
individual capacity, HARRY WALTMAN, in his
individual capacity, ALBERT MARTINO, in his
individual capacity, CHARLIE FRAAS, in his
individual capacity, THOMAS ALLEN, in his
individual capacity, RICHARD BRUSA, in his
individual capacity, VINCENT DONNELLY, in his
individual capacity, MICHAEL CONNAUGHTON, in
his individual capacity, WAYNE BIRDSALL, in
his individual capacity, WILLIAM DIEHL, in his
individual capacity, JACK SHARKEY, in his

ALLIANCE REPORTING SERVICE, INC.  (516) 741-7585

1                                                      86

2

individual capacity, DANIEL PERRINO, in his

3    individual capacity, ANTHONY KOZIER, in his

individual capacity, DETECTIVE SERGEANT

4    CAMPBELL (SHIELD #48) in his individual

capacity, ROBERT EDWARDS, in his individual

5    capacity, SEAN SPILLANE, in his individual

capacity, JOHN DOE OFFICERS AND DETECTIVES

6    #1-10, in their individual capacities, and

RICHARD ROE SUPERVISORS #1-10, in their

7    individual capacities,

8                          Defendants.

- - - - - - - - - - - - - - - - - - - - x

9

10

11                       100 Federal Plaza

Central Islip, New York

12

March 5, 2009

13                       11:17  A.M.

14

15

16

17

18        CONTINUED VIDEOTAPE DEPOSITION OF JOSEPH

19    VOLPE, one of the Defendants, taken by Plaintiffs,

20    pursuant to Notice, held at the above-noted time

21    and place, before a Notary Public of the State of

22    New York.

23

24

25

VOLPE                          109

1

2  two for me, the second to last entry, the first

3  green tab, its referenced Hot Skates on the

4  subject matter on the left-hand column.  It says,

5  on November 14th Detective Bailey and I went to

6  speak to the owners of Hot Skates, Mr. and Mrs.

7  Bernstein and Mr. Bernstein said that Theresa

8  punched out at 9:49 p.m. on Saturday, November

9  10th, and then walked out the door.

10  Mrs. Bernstein said that she was fired, but if she

11  knew she was so upset she wouldn't have let her

12  go; correct?

13        A      That's what the caption reads, yes.

14        Q      So we were aware very early on that

15  Theresa Fusco was fired from Hot Skates, that was

16  not a fact unknown to you or unknown to the Nassau

17  County Police; correct?

18        A      Yes.

19        Q      And it was known, was it not, that

20  Theresa Fusco punched out from her place of

21  employment at 9:49 p.m. from Hot Skates and Hot

22  Skates was located on Merrick Avenue intersecting

23  Rockland Avenue, correct?

24        A      Merrick Road.

25        Q      Merrick Road, correct?

110

1                          VOLPE                    110

2          A       Yes.

3          Q       And so the police and you knew that

4    fact very early on in this investigation, correct,

5    almost immediately?

6          A       Yes.

7          Q       Now, the next entry indicates the

8    subject, complainant, and it says that on November

9    14th, Bailey and I, again referring to Doherty,

10   went to the house and picked up a clearer picture

11   of the subject and she told us that Matt Wilson

12   had a couple of friends and also said that her

13   daughter used to hang out at a place called Jelly

14   Bean on Union Avenue and Gino's Pizza on Sunrise

15   Highway, right, both in Lynbrook?

16         A       Yes.

17         Q       And, once again, that would be

18   information which you would suspect that these

19   detectives would be looking for and at this point

20   in time, as early as November 14th, there were

21   several photographs of Theresa Fusco provided to

22   the police for identification purposes, right, for

23   creating a flier which was eventually posted

24   throughout the community, a missing persons flier

25   of Theresa Fusco; correct?

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - -x
JOHN KOGUT,

                    Plaintiff,

        - against -                    CV-06-6695
                                       (JS)(WDW)
THE COUNTY OF NASSAU, POLICE
COMMISIONER DONALD KANE, POLICE COMMISSIONER
WILLIAM J WILLETT (2005), POLICE COMMISSIONER
JAMES LAWRENCE, DETECTIVE SEAN SPILLANE(HEAD
OF HOMICIDE 1985), DETECTIVE DENNIS FARRELL
(HEAD OF HOMICIDE 2005), DETECTIVE JOSEPH VOLPE,
DETECTIVE ROBERT DEMPSEY, DETECTIVE ALBERT
MARTINO, DETECTIVE WAYNE BIRDSALL, DETECTIVE
MILTON G. GRUBER, DETECTIVE CHARLES FRAAS,
DETECTIVE FRANK SIRIANNI, DETECTIVE HARRY
WALTMAN, P.O. MICHAEL CONNAUGHTON, P.O.
WILLIAM DIEHL, and JOHN DOES 1-5,
                         Defendants.
- - - - - - - - - - - - - - - - - - - - x
- - - - - - - - - - - - - - - - - - - - x
JOHN RESTIVO, DENNIS HALSTEAD, MELISSA LULLO,
JASON HALSTEAD, HEALTHER HALSTEAD and TAYLOR
HALSTEAD,

                    Plaintiffs,

        - against -                    CV-06-6720
                                       (JS)(WDW)
NASSAU COUNTY, JOSEPH VOLPE, in his
individual capacity, ROBERT DEMPSEY, in his
individual capacity, FRANK SIRIANNI, in his
individual capacity, MILTON GRUBER, in his
individual capacity, HARRY WALTMAN, in his
individual capacity, ALBERT MARTINO, in his
individual capacity, CHARLIE FRAAS, in his
individual capacity, THOMAS ALLEN, in his
individual capacity, RICHARD BRUSA, in his
individual capacity, VINCENT DONNELLY, in his
individual capacity, MICHAEL CONNAUGHTON, in
his individual capacity, WAYNE BIRDSALL, in
his individual capacity, WILLIAM DIEHL, in his
individual capacity, JACK SHARKEY, in his

ALLIANCE REPORTING SERVICE, INC.  (516) 741-7585

2

1

individual capacity, DANIEL PERRINO, in his

2      individual capacity, ANTHONY KOZIER, in his

individual capacity, DETECTIVE SERGEANT

3      CAMPBELL (SHIELD #48) in his individual

capacity, ROBERT EDWARDS, in his individual

4      capacity, SEAN SPILLANE, in his individual

capacity, JOHN DOE OFFICERS AND DETECTIVES

5      #1-10, in their individual capacities, and

RICHARD ROE SUPERVISORS #1-10, in their

6      individual capacities,

7                      Defendants.

- - - - - - - - - - - - - - - - - - - - x

8

9

10                     One West Street

Mineola, New York

11

January 26, 2009

12                     9:51  A.M.

13

14

15

16

17          VIDEOTAPE DEPOSITION OF JOSEPH VOLPE, one

18      of the Defendants, taken by Plaintiffs, pursuant

19      to Notice, held at the above-noted time and place,

20      before a Notary Public of the State of New York.

21

22

23

24

25

ALLIANCE REPORTING SERVICE, INC.  (516) 741-7585

1                          VOLPE                    73

2    specific case; correct?

3          Q       And would it be fair to say that

4    none of the personal property, physical property

5    recovered from the scene, linked John Kogut, John

6    Restivo or Dennis Halstead to that crime scene;

7    correct?

8          A       That's correct.

9          Q       So despite the care that was taken,

10   the preservation and the testing, of all the

11   resources available to the Nassau County Police

12   Department, no physical evidence recovered from

13   that crime scene linked John Kogut, Dennis

14   Halstead or John Restivo to the crime scene;

15   correct?

16         A       Correct.

17         Q       And there were certainly no

18   eyewitnesses placing John Kogut, John Restivo or

19   Dennis Halstead at that crime scene; correct?

20         A       Correct.

21         Q       Now, the body of Theresa Fusco is a

22   piece of physical evidence as well; correct?

23         A       Correct.

24         Q       And then after her body was

25   removed -- what time was her body removed, could

54

| | | VOLPE | 54 |

1

2      A      Eighth of a mile.

3      Q      And Theresa had a best friend by the

4    name of Lisa Kaplan; correct?

5      A      Correct.

6      Q      And Lisa Kaplan lived where?

7      A      I don't recall.

8      Q      Now, after you arrived at the crime

9    scene, in addition to the homicide detectives that

10   you mentioned, there were three members of the

11   medical examiner's office that arrived; correct?

12     A      Yes.

13     Q      Dr. Green, Dr. Taft, Dr. McCarthy?

14     A      That's correct.

15     Q      Would it be fair to say that you

16   discussed with them their thoughts, their

17   observations, their opinions after they viewed the

18   body?

19     A      No, I didn't really speak at length

20   with them because the body was removed shortly

21   after  -- McCarthy was the lead medical examiner

22   and he was only there a short time and I think

23   there was a weather issue that we were having and

24   they wanted to remove the body before it lost any

25   potential valuable evidence.

314

314

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
- - - - - - - - - - - - - - - - - - - - x
JOHN RESTIVO, DENNIS HALSTEAD, MELISSA LULLO,
JASON HALSTEAD, HEALTHER HALSTEAD and TAYLOR
HALSTEAD,

                              Plaintiffs,

        - against -                    CV-06-6720
                                       (JS)(WDW)

NASSAU COUNTY, JOSEPH VOLPE, in his
individual capacity, ROBERT DEMPSEY, in his
individual capacity, FRANK SIRIANNI, in his
individual capacity, MILTON GRUBER, in his
individual capacity, HARRY WALTMAN, in his
individual capacity, ALBERT MARTINO, in his
individual capacity, CHARLIE FRAAS, in his
individual capacity, THOMAS ALLEN, in his
individual capacity, RICHARD BRUSA, in his
individual capacity, VINCENT DONNELLY, in his
individual capacity, MICHAEL CONNAUGHTON, in
his individual capacity, WAYNE BIRDSALL, in
his individual capacity, WILLIAM DIEHL, in his
individual capacity, JACK SHARKEY, in his
individual capacity, DANIEL PERRINO, in his
individual capacity, ANTHONY KOZIER, in his
individual capacity, DETECTIVE SERGEANT
CAMPBELL (SHIELD #48) in his individual
capacity, ROBERT EDWARDS, in his individual
capacity, SEAN SPILLANE, in his individual
capacity, JOHN DOE OFFICERS AND DETECTIVES
#1-10, in their individual capacities, and
RICHARD ROE SUPERVISORS #1-10, in their
individual capacities,


                              Defendants.
- - - - - - - - - - - - - - - - - - - - x
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - -x
JOHN KOGUT,

                              Plaintiff,

        - against -                    CV-06-6695
                                       (JS)(WDW)

THE COUNTY OF NASSAU, POLICE

ALLIANCE REPORTING SERVICE, INC.  (516) 741-7585

315

315

COMMISIONER DONALD KANE, POLICE COMMISSIONER
WILLIAM J WILLETT (2005), POLICE COMMISSIONER
JAMES LAWRENCE, DETECTIVE SEAN SPILLANE(HEAD
OF HOMICIDE 1985), DETECTIVE DENNIS FARRELL
(HEAD OF HOMICIDE 2005), DETECTIVE JOSEPH VOLPE,
DETECTIVE ROBERT DEMPSEY, DETECTIVE ALBERT
MARTINO, DETECTIVE WAYNE BIRDSALL, DETECTIVE
MILTON G. GRUBER, DETECTIVE CHARLES FRAAS,
DETECTIVE FRANK SIRIANNI, DETECTIVE HARRY
WALTMAN, P.O. MICHAEL CONNAUGHTON, P.O.
WILLIAM DIEHL, and JOHN DOES 1-5,

                    Defendants.
- - - - - - - - - - - - - - - - - - - - x

                    100 Federal Plaza
                    Central Islip, New York
                    May 4, 2009
                    11:17  A.M.




        CONTINUED VIDEOTAPE DEPOSITION OF JOSEPH
VOLPE, one of the Defendants, taken by Plaintiffs,
pursuant to Notice, held at the above-noted time
and place, before a Notary Public of the State of
New York.

377

1                          VOLPE                    377

2    detective Sharkey and Alger and the handwritten

3    notes of Detective Sharkey and Alger of their

4    interview of Lisa Kaplan on December 5th at 2200

5    hours, at 10 p.m.?

6            A       Appears to be.

7            Q       Okay, there's also also one lead

8    sheet in their, correct?

9                    MR. FERGUSON:   Isn't there two lead

10           sheets?

11           A       Two lead sheets.

12           Q       Okay, the lead sheets are of whom?

13           A       Lisa Kaplan received by Shripner

14   (phonetic) and one is a list of the names of the

15   Rockville Centre crew or boys from Lisa Kaplan.

16           Q       Okay.  Let's start with a review of

17   the typewritten notes of Sharkey and Alger.

18   Having looked at Plaintiff's 58 does that refresh

19   your recollection that on the night that the body

20   was discovered Sharkey and Alger went over to

21   speak to Lisa Kaplan?

22           A       Yes.

23           Q       Would it be fair to say that

24   apparently Sharkey went from Theresa's mom's house

25   to speak to Lisa right away based upon the fact

380

|   |   |   |
|---|---|---|
| 1 | VOLPE | 380 |

2    interview people and assist you, right?

3         A    That's correct.

4         Q    And when they do that they would

5    reduce the information that they learned into

6    written notes, right?

7         A    Yes.

8         Q    Just like you did when you went to

9    speak to Dr. McCarthy at the M.E.'s office, right?

10        A    Yes.

11        Q    And in this particular case they

12   interviewed Lisa and they took three pages of

13   notes that night, right?

14        A    Yes.

15        Q    And that's reflected in this

16   exhibit?

17        A    Yes.

18        Q    And the top page of the exhibit is

19   the typewritten form of those notes, correct?

20        A    That's correct.

21        Q    And it would be routine that after

22   detectives interviewed witnesses with pertinent

23   information concerning a homicide that they would

24   talk to you about those interviews and the facts

25   that they learned, right?

1                          VOLPE                    381

2          A        Where applicable, yes.

3          Q        And in this particular case the

4    information that Lisa Kaplan had regarding Theresa

5    Fusco was very, very significant to the

6    investigation, no?

7          A        Yes.

8          Q        There has been discussion about the

9    term credible witness' throughout the course of

10   these depositions in general.  I don't know if you

11   and I have discussed it, but being in the line of

12   work that you are, there's all sorts of characters

13   that you meet and speak to, right?

14         A        The line of work I was in.

15         Q        Right, right, for years?

16         A        Yes, yes.

17         Q        And we use that the legal term

18   credibility in assessing whether or not a witness

19   is believable or, you know, less than truthful,

20   correct?

21         A        Say it again.

22         Q        We use the term credibility in

23   assessing whether or not a witness is believable

24   or less than truthful, correct?

25         A        We're allowed to do that, yes.

1                          VOLPE                    383

2       someone had the opportunity to see, hear and

3       observe what they claim they saw heard and

4       observed?

5              A      Meaning?

6              Q      Meaning if somebody said I witnessed

7       something you'd want to know that they had the

8       actual opportunity to observe it, right?

9              A      And the ability.

10             Q      Right.

11             A      To observe it and then report it

12      accurately.

13             Q      Correct.

14             A      As credibility.

15             Q      You'd want to know whether or not a

16      particular witness had a motive to alter an

17      account of what he was portraying he observed,

18      saw, correct?

19             A      Can happen.

20             Q      So you assess these various factors

21      in making a determine of whether or not somebody's

22      being truthful with you or not, right?

23             A      Sometimes.

24             Q      And would it be fair to say that a

25      witness such as Lisa Kaplan who was the best

1                          VOLPE                    384

2    friend of Theresa Fusco obviously had no motive to

3    fabricate, no reason to mislead and would want to

4    be as generally helpful and accurate as possible?

5          A      Well, I couldn't or wouldn't make

6    that assessment on a first meeting.

7          Q      Well, what was your assessment of

8    Lisa Kaplan?

9          A      Nothing, I hadn't met had her.

10         Q      There came a point in time you did

11   meet herthough, right?

12         A      Oh, a while later, yeah.

13         Q      In fact not interview her on

14   December 6th, 1984, after Alger and Sharkey?

15         A      I may have, I don't remember.

16         Q      Would it be fair to say that you

17   found her to be a very helpful intelligent young

18   lady concerned about the well-being of her best

19   friend?

20         A      It appeared that way, yes.

21         Q      And she was trying to give you as

22   much accurate information as she possibly could?

23         A      It appeared that way.

24         Q      Any time you called her how would

25   you describe her assistance to the Nassau County

385

```
1                        VOLPE                    385
2    Police Department?
3          A       I don't recall.  I don't see how it
4    would be anything but helpful, but I don't recall.
5          Q       Right, but she would be immediately
6    responsive, punctual, right?
7          A       I spoke to her a few times.
8          Q       Devastated by the loss of her best
9    friend, right?
10         A       Upset.
11         Q       And in recreating the last day of
12   her life Alger and Sharkey and you learn several
13   things about what Theresa and Lisa did that
14   Saturday afternoon, right?
15         A       Yes.
16         Q       And in a summary fashion that's
17   recorded in these notes, that is that on Saturday
18   November 10th, met Theresa for lunch at Burger
19   King, 1250 to 1330 hours, right?
20         A       That's what it says, yes.
21         Q       So what Lisa Kaplan communicated to
22   the homicide bureau was that on Saturday, November
23   10th, she worked at the Lynbrook pharmacy, right,
24   is that your recollection?
25         A       I don't remember the name of it, but
```

386

VOLPE                                           386

2   she worked in a pharmacy.

3          Q        Worked in a pharmacy and Theresa

4   came to meet her when she got on a lunch break at

5   12:50 and the two of them walked over to local

6   Burger King, they sat down, they had lunch

7   together, right?

8          A        That's correct.

9          Q        And then Theresa walked Lisa back to

10  the pharmacy and they made plans at 1600 hours or

11  at four o'clock, when Lisa was getting off of work

12  that day, that Theresa was going to meet her at

13  the pharmacy and they were going to walk into town

14  and hang out, right?

15         A        Yes.

16         Q        And this says at 1600 hours or 4

17  o'clock met again at pharmacy when Lisa got

18  finished work, both walked to Lisa's house, never

19  came in the house, agreed to meet at Lisa's house

20  on Saturday evening after T got off Hot Skates

21  2100 hours or 9 o'clock, right?

22         A        That's correct.

23         Q        Okay.  Now, from further interviews

24  and discussions you learned that Lisa Kaplan met,

25  Theresa met Lisa Kaplan at the pharmacy at

ALLIANCE REPORTING SERVICE, INC.  (516) 741-7585

387

1                          VOLPE                    387

2       4 o'clock, they walked into town and then they

3       walked back to Lisa Kaplan's house which was

4       located very close, maybe two blocks away from

5       where Theresa lived, right?

6              A       Right.

7              Q       And although Theresa never went in

8       with Lisa to the house she told you that the two

9       sat outside and they talked and they made a game

10      plan that they were going to get together again

11      later that night, right?

12             A       That's correct.

13             Q       And that game plan according to Lisa

14      was that Theresa was going to work at Hot Skates

15      that night and when she got off about 9:00, 9:30,

16      she was going to walk down to Lisa's house, right?

17             A       I believe that's correct, yeah.

18             Q       And Lisa told you, and it's

19      reflected in these notes, that she had to stay

20      home that night and baby-sit, and she communicated

21      that to Theresa and she expected Theresa to stop

22      by when she got out of work, right?

23             A       That's correct.

24             Q       And she told you that unfortunately

25      she never saw Theresa again?

ALLIANCE REPORTING SERVICE, INC.  (516) 741-7585

388

1                          VOLPE                    388

2          A      Yes.

3          Q      Theresa never stopped by on the

4    night, that Saturday night, right?

5          A      That's right.

6          Q      She also communicated that her

7    boyfriend, a Robert Martini, had come over to her

8    house and was present on that Saturday night,

9    11/10, right?

10         A      I don't remember that.

11         Q      Okay, we'll get to that.

12         A      I don't remember that.

13         Q      You don't have an independent

14   recollection?

15         A      I don't, I'd have to review.

16         Q      All right.  Now I'd like to show you

17   for a second a map.  And this map was marked as

18   Plaintiff's 172.  Let me put it this way.  Now,

19   this will help you identify without having to get

20   up, the locations on the map.

21                Theresa Fusco lived at 6 Windsor

22   Place in Lynbrook identified by the star labeled A

23   on this map, correct?

24         A      The star is on Windsor, it takes up

25   about five houses.

| | VOLPE | 389 |

1

2    Q    Right, the point is it's supposed to

3    depict the approximate location of Theresa Fusco's

4    residence back in 1984 at six  --

5    A    For the record, approximately.

6    Q    Right, approximately?

7    A    Approximate location, letter A.

8    Q    Right, this isn't to scale.

9    B represents the location of Lisa

10   Kaplan's house on Malden Avenue in Lynbrook,

11   right?

12   A    Approximately.

13   Q    Okay.  And you learn from speaking

14   to Lisa Kaplan, from speaking to Connie Napoli,

15   from visiting and traveling between the two

16   locations that they were very close together, they

17   were maybe two blocks apart, right?

18   A    Three blocks, yeah.  Two or three

19   blocks.

20   Q    And in fact if you look on the

21   scale, according to Mapquest anyway, we have a

22   distance between Windsor Place, 6 Windsor and

23   Malden Avenue, of 25 Malden Avenue, of one-tenth

24   of a mile, correct?

25   MR. FERGUSON:  Just note my

1                        VOLPE                    390

2           objection to utilizing some document to

3           determine measurements that we haven't

4           really, you know, looked at.

5                   MR. GRANDINETTE:  Your objection is

6           noted.

7           Q       Do you have any reason to dispute --

8     wouldn't it be fair to say that having visited

9     those areas that it is a very short distance?

10          A       I couldn't say, all right, you know.

11          Q       You can't make that assessment as

12    you sit here today?

13          A       Well, in favor of being accurate, I

14    mean I don't know what to say, it could be an

15    eighth of a mile.

16          Q       Two young kids, best friends, they

17    got together twice that day, they have plans to

18    meet again later that night, right?

19          A       Yeah.  What does that have to do

20    with the length of it?

21          Q       Robert Martini you learned was the

22    boyfriend of Lisa Kaplan, correct?

23          A       Right.

24          Q       These two were always running back

25    and forth between their homes, is that what you

VOLPE                         391

2    learned from interviewing the relevant parties

3    involved here?

4        A      They were best friends as we

5    discussed, yeah.

6        Q      Right, they were like Frick and

7    Frack these two, right, they were like glue,

8    right?

9              MR. FERGUSON:   Note my objection.

10       Q      Well, is that the impresion you got,

11   very, very close?

12       A      They were good friends.

13       Q      Good friends, okay.  As a matter of

14   fact, Lisa Kaplan told you that Theresa Fusco

15   confided in her probably about  -- more about her

16   personal affairs than she shared even with her own

17   mother, right?

18       A      Oh, I would say so, yeah.

19       Q      Definitely.

20       A      Yeah.

21       Q      And you would find that to be true

22   especially, predicated on your life's experiences

23   especially when you're dealing with 16-year olds,

24   right, and we're talking about the topic of now

25   sexual exploration?

```
 1                        VOLPE                    392
 2         A        Right.
 3         Q        And we said that earlier we'd want
 4   to know whether or not Theresa Fusco had begun to
 5   engage in any sexual activity at this age, right?
 6         A        Right.
 7         Q        And we know that Lisa Kaplan is a
 8   very credible, trustworthy, witness and she was
 9   asked pointblank, was she not, did Theresa Fusco
10   to your knowledge, engage in sexual activity with
11   anybody, right?
12         A        Somewhere in the investigation she
13   was asked that, yes.
14         Q        And she specifically communicated to
15   her knowledge her girlfriend was a virgin, right?
16         A        Yes.
17         Q        So we have, from a very good source,
18   factual information conveyed to you that would
19   lead you to believe that the sperm found in her
20   vagina was a result of a rape as opposed to a
21   sexual encounter; correct?
22         A        No, no.  Say that again.
23         Q        We have now, based upon your
24   interviews with Lisa, information that would lead
25   us to believe that the sperm found in her vagina
```

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - -X
JOHN KOGUT,

        Plaintiff,

       vs.          No. CV-06-6695

THE COUNTY OF NASSAU, POLICE
COMMISSIONER DONALD KANE,
POLICE COMMISSIONER WILLIAM
J. WILLETT (2005); POLICE
COMMISSIONER JAMES LAWRENCE,
DETECTIVE SEAN SPILLANE
(HEAD OF HOMICIDE 1985),
DETECTIVE DENNIS FARRELL
(HEAD OF HOMICIDE 2005),
DETECTIVE ALBERT MARTINO,
DETECTIVE WAYNE BIRDSDALL,
DETECTIVE MILTON G. GRUBER,
DETECTIVE CHARLES FRAAS,
DETECTIVE FRANK SIRIANNI,
DETECTIVE HARRY WALTMAN,
P.O. MICHAEL CONNAUGHTON,
P.O. WILLIAM DIEHL, and
JOHN DOES 1-5,

        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - -X

      CONTINUED VIDEOTAPE DEPOSITION OF
            JOSEPH VOLPE
        Garden City, New York
     Wednesday, December 2, 2009


Reported by:
DONNA PALMIERI
JOB NO. 305785



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

Joseph Volpe                                      December 2, 2009

29

1                        Volpe

███████████████████████████████████████

7        Q.  Okay.  Let me show you what has

8    been, marked as Plaintiff's Exhibit 60.

9             Plaintiff's Exhibit 60, just take

10   a second to review it.

11            MR. FERGUSON:  Three pages?

12            MR. GRANDINETTE:  Three pages.

13            MR. FERGUSON:  You want this one?

14            MR. GRANDINETTE:  No, I

15   highlighted the sections for you so

16   you could follow them.

17            MR. FERGUSON:  This is Exhibit

18   No. 60?

19            MR. GRANDINETTE:  Uh-hmm.

20        Q.  Okay.  Did you have an

21   opportunity to review Plaintiff's 60?

22        A.  I've looked at it.  I scanned it.

23        Q.  And is Plaintiff's 60 your

24   typewritten notes of your interview with

25   Connie Napoli back on December 11, 1984?



# ESQUIRE
an Alexander Gallo Company

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

Joseph Volpe

December 2, 2009

30

Volpe

1

2       A.  Yes.

3       Q.  Okay.  You and Detective Allen

4   went to interview Connie Napoli, correct?

5       A.  Yes.

6       Q.  When you went to interview Connie

7   Napoli, you wanted to learn as much

8   information as you could about her

9   daughter to assist in her murder

10  investigation, correct?

11      A.  I'm sorry.  Say that again.

12      Q.  You wanted to learn as much

13  information as you could about --

14      A.  Of course, yeah.

15      Q.  And what you learned was first

16  some general information, but the number

17  one in your notes which is highlighted

18  states that "Mrs. Napoli stated her

19  daughter was not sexually active",

20  correct?

21      A.  Yes.

22      Q.  That she, in fact, red her

23  daughter's diary from cover to cover and

24  found it boring.

25          So she wasn't only stating that



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

Joseph Volpe                                          December 2, 2009

31

                          Volpe

1

2   she thought her daughter was sexually

3   active predicated upon her daily contact

4   --

5        A.   You mean inactive?

6        Q.   Inactive.  Based upon her daily

7   communication and contact with the

8   daughter, but also reading her daughter's

9   private diary, correct?

10       A.   Yes.

11       Q.   So this is now the second

12  credible witness who indicates that

13  Theresa Fusco was sexually inactive as far

14  as intercourse goes, right?

15       A.   Yes, in their opinion, a mother

16  and her friend.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

Joseph Volpe                                          December 2, 2009

110

1                          Volpe

19        Q.   All right.   We knew -- you also

20   knew that the victim was sexually inactive

21   according to Lisa Kaplan as well as Connie

22   Napoli, correct?

23        A.   That was their opinion of

24   Theresa.

25        Q.   And we had nothing to suggest



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

111

Volpe

1

2    otherwise, right?

3         A.   No.

4         Q.   We knew that there was sperm

5    found in her vaginal cavity?

6         A.   Yes.





ESQUIRE
an Alexander Gallo Company

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com