# Exhibit 2

1

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK


----------------------------x  Docket #

                                    06-CV-6695 (JS)(WDW)
KOGUT,                              06-CV-6720 (JS)(WDW)
          Plaintiff,


                                    U.S. Courthouse,

  - versus -                        Central Islip, New York


THE COUNTY OF NASSAU, et al.,


          Defendant.
----------------------------x


VIDEOTAPED DEPOSITION OF FRANK SIRIANNI


Tuesday, June 15, 2010
10:19 - 6:04 p.m.


295 Lakeview Avenue

West Palm Beach, Florida 33401


Reported By:
Teresa Whalen, RPR, FPR
Notary Public, State of Florida
West Palm Beach Office   Job #166489
Phone:  800.330.6952
        561.659.4155

Frank Sirianni                                              June 15, 2010

12

1          A.    No.

2          Q.    Did you read any of your prior testimony?

3          A.    What, five years ago.

4          Q.    From the retrial of Mr. Kogut in 2005?

5          A.    Yes.

6          Q.    So in preparation for your deposition, did you

7    review that testimony from the 2005 retrial of

8    John Kogut?

9          A.    No, I did not.

10         Q.    So is it fair to say that the last time you

11   looked at any of your testimony was in preparation for

12   this 2005 trial?

13         A.    Yes.

14         Q.    You are currently a retired detective from the

15   Nassau County Police Department?

16         A.    Yes.

17         Q.    When did you first join the department?

18         A.    1964, 24th of January.

19         Q.    Please walk us through your promotion and

20   assignment history.

21         A.    I went to the police academy for six months,

22   then I was assigned to the fourth precinct, and I stayed

23   in the fourth precinct for approximately two and a half,

24   three years, and then I was assigned to CPU, crime

25   prevention unit.

Frank Sirianni                                        June 15, 2010

13

1      Q.    While on the fourth, you were a patrol
2   officer?
3      A.    Yes.
4      Q.    And what was your assignment at the CPU?
5      A.    Then we were in civilian clothes, unmarked
6   cars, and we'd ride the area of the precincts.
7      Q.    How long were you posted to CPU?
8      A.    About a year, year and a half.
9      Q.    What was your next assignment or change in
10   rank?
11      A.    Detective.
12      Q.    When was that?
13      A.    1968.
14      Q.    Where were you posted first as a detective?
15      A.    In the fifth precinct, fifth squad.
16      Q.    How long were you at the fifth?
17      A.    Until probably around 1972.
18      Q.    What happened then?
19      A.    Then I was requested or asked for to go to
20   robbery squad.
21      Q.    And did you receive that transfer?
22      A.    Yes, I did.
23      Q.    How long did you work robbery?
24      A.    About eleven, twelve years.
25      Q.    As a detective?

Frank Sirianni                                    June 15, 2010

14

1        A.    Yes.

2        Q.    What was your next posting thereafter?

3        A.    Then I was -- let me see.  Then I went to

4    homicide squad, they requested me to come to homicide

5    squad, because they needed more manpower.

6        Q.    When was that?

7        A.    I have no idea.

8        Q.    Let's see if we can pin that down a little bit

9    more.  You remember the body of Theresa Fusco being

10   found on December 5th of 1984?

11       A.    Yes, I do.

12       Q.    How long approximately before that date were

13   you assigned to the homicide division?

14       A.    I asked to be assigned to the homicide squad

15   from time to time, in the period of like 1973 to the

16   time Theresa's body was found.

17       Q.    How many detectives were assigned to the

18   homicide unit during that period of time?

19       A.    I don't know.

20       Q.    Permanently assigned?

21       A.    I don't know.

22       Q.    Why were you asked to participate in homicides

23   during that time period, if you were assigned to

24   robbery?

25       A.    Usually they call for all seasoned detectives.

Frank Sirianni                                          June 15, 2010

16

1           MR. FERGUSON: Note my objection.

2           THE WITNESS: I was just temporary assigned, I

3       wasn't formally assigned.

4   BY MS. CORNWALL:

5       Q.   I'm sorry.  You mentioned first that you were

6   in the robbery division for eleven to twelve years?

7       A.   That's correct.

8       Q.   What was your next change of assignment

9   thereafter?

10       A.   Then I think I went into major case squad for

11   a year, maybe a year and a half.

12       Q.   Approximately when was that?

13       A.   I can't tell you the date, I don't know.

14       Q.   What were your duties in the major case squad?

15       A.   To investigate major cases, major crimes.

16       Q.   And which crimes qualified as major crimes?

17       A.   Gun dealing, major narcotics, hijacking.

18       Q.   Did you have another assignment after your

19   tenure at the major case squad?

20       A.   I went back to robbery squad.

21       Q.   Approximately when was that?

22       A.   Again, I don't know.

23       Q.   How long were you in the robbery squad on your

24   second tour there?

25       A.   Till the day I retired.

17

1       Q.    When was that?

2       A.    1989.

3       Q.    Do you collect a pension from Nassau County?

4       A.    Yes, I do.

5       Q.    What is your yearly pension?

6             MR. FERGUSON:  Note my objection to the

7       relevancy of this line of questioning.

8    BY MS. CORNWALL:

9       Q.    You may answer.

10       A.    I don't think it's of any your personal

11    business.

12       Q.    Sir, with all respect, it is relevant to this

13    action, and I would respectfully ask you to answer the

14    question.

15       A.    I'll give you an approximate.

16       Q.    Okay.

17       A.    25,000.

18       Q.    Is your current yearly pension?

19       A.    Between 25 and 32.

20       Q.    Have you had any employment since retiring

21    from the Nassau County Police Department in '89?

22       A.    In '89?

23       Q.    Since your '89 retirement.

24       A.    Right.

25       Q.    Have you worked?

Frank Sirianni                                                June 15, 2010

20

1          A.    Yes, I would say that.

2          Q.    Learning by experience from your fellow

3     officers?

4          A.    From a seasoned detective.

5          Q.    Did you have a partner while you were a

6     detective?

7          A.    Yeah.

8          Q.    Who was that?

9          A.    What squad are you talking about?

10         Q.    Let's start with robbery.

11         A.    Yes.  He's dead now, Al Norton.

12         Q.    And at major case squad?

13         A.    I can't remember who that was.  I can't

14    remember who the partner was, who they hooked me up

15    with.  I don't think I did, we just bounced with the

16    guys, different guys.

17         Q.    And when you worked homicide, did you have a

18    partner?

19         A.    I had Danny Perrino, who is dead, and Volpe, I

20    worked with him.

21         Q.    Was it your custom and practice at Nassau

22    County that any time a witness was brought into the

23    station, to make an entry on the blotter indicating the

24    time that they arrived and the time that they left?

25         A.    That's the practice.

Frank Sirianni                                                    June 15, 2010

41

1          THE VIDEOGRAPHER:   We are back on the record,

2      the time is 11:13.

3  BY MS. CORNWALL:

4      Q.    Detective Sirianni, did you respond to the

5  crime scene on December 5th of 1984 when the body was

6  discovered?

7      A.    Yes, I did.

8      Q.    And as of that date were you asked to join the

9  investigation?

10     A.    Yes, I was.

11     Q.    What was your first assignment, what did you

12 first do on the case after leaving the crime scene?

13     A.    We started to conduct a canvas of the area.

14     Q.    See if you can locate anyone who had witnessed

15 anything?

16     A.    Yes.

17     Q.    Did you turn up any information that led

18 anywhere?

19     A.    At that time, no.  It started to snow, and we

20 just backed away from the crime scene after Theresa's

21 body was removed.

22     Q.    Did there come a time when you were asked to

23 interview a man named Harry Smyle?

24     A.    Yes.

25     Q.    And he had first come to the department's

Frank Sirianni                                              June 15, 2010

42

attention based on a phone call from a teenager named
Eileen Tosner.  Do you remember that?

     A.   No.  I don't remember the name, no.

     Q.   Do you remember that a teenage girl had called
and said she had been given a ride home from a man
calling himself Smyle?

     A.   Now that you said "given a ride home," that
triggered it, yes.

     Q.   Who said he knew what happened to Fusco and
who had done it?

     A.   Yes.

     Q.   And do you recall that this teenage girl
making the report about the man named Smyle who gave her
a ride also told her not to bother taking his license
plate number because he was driving her in a borrowed
car?

     A.   I don't know who took that statement.

     Q.   But whoever interviewed Eileen Tosner, the
teenager who got a ride from Smyle, would have taken
notes?

     A.   Whoever interviewed her?  She might have
called in on the phone and on a lead sheet, they put it
down on a lead sheet.

     Q.   And what was the lead sheet for?

     A.   For any type of witnesses, any information

Frank Sirianni                                                    June 15, 2010

44

1    BY MS. CORNWALL:

2          Q.    Let's take a look at Exhibit 189.  It's a

3    handwritten note of an interview with Eileen Tosner on

4    January 22nd, 1985.

5          A.    Right.

6          Q.    Do you recognize that as Joe Volpe's

7    handwriting?

8          A.    That's correct, it is.

9          Q.    And this note by Volpe indicates that

10   Eileen Tosner was given a ride by a white male?

11         A.    Uh-huh.

12         Q.    Just for the record, that's a yes?

13         A.    Yes.

14         Q.    And that she had been given a ride just two

15   days earlier, on January 20th of 1985?

16         A.    Yes.

17         Q.    And that's after Theresa Fusco's raped and

18   strangled body had been found?

19         A.    Yes.

20         Q.    Exhibit 189 indicates Tosner said the guy

21   giving her a ride said that he knew Theresa Fusco

22   because his daughter is friends with her?

23         A.    Said he knew her, and his daughter was

24   recently came out of the hospital and was friends with

25   her, yes.

Frank Sirianni                                                    June 15, 2010

45

1       Q.   Yes.   And then he further stated that he was

2   getting high with some friends and knows who did kill

3   Theresa?

4       A.   Yes.   It just says in the statement.

5       Q.   And then at the bottom of the next paragraph,

6   Volpe wrote down:   Tosson told him Smyle told her not to

7   take his plate as it wasn't his car, right?

8       A.   Yes.

9       Q.   And that's a suspicious thing to say, isn't

10  it?

11      A.   I don't know what Joe was thinking or what he

12  was saying.

13      Q.   If...

14      A.   Now, every suspect and every witness is

15  different.

16      Q.   Sir, would you agree it raises a question to

17  hear a man talking about Theresa Fusco with a teenage

18  girl he's picked up says don't write down my license

19  plate, it's a borrowed car?

20      A.   That was Joe Volpe, not me.   I don't know what

21  Joe Volpe was thinking.

22      Q.   If you had been given this statement, wouldn't

23  it raise a question for you about --

24      A.   I'm different than Joe Volpe.

25      Q.   I'm not asking about Joe Volpe at this point,

Frank Sirianni                                      June 15, 2010

46

1    I'm just asking about you.

2          A.    Yeah.   I'm different.

3          Q.    How are you different?

4          A.    If something like that, if I would have wrote

5    something down, I would have tried to expound upon it

6    more.

7          Q.    Why?

8          A.    That's my nature.

9          Q.    You'd want to learn more?

10         A.    Right.

11         Q.    About what that statement was about?

12         A.    Right.   And go into it with her more.

13         Q.    You're very thorough?

14         A.    I tried to be.

15         Q.    And that's important to you?

16         A.    Yes, it is.

17         Q.    Fair to say when you were asked to track down

18   Harry Smyle, he was a potential suspect?

19         A.    Yes.

20         Q.    How did you go about finding him?

21         A.    Canvas.

22         Q.    And eventually you found Harry Smyle?

23         A.    Yes.

24         Q.    Did you do any surveillance on him before you

25   spoke to him directly?

Frank Sirianni                                          June 15, 2010

47

1        A.    Yes.

2        Q.    For how long?

3        A.    Couple of days.

4        Q.    And that surveillance was in a vehicle outside
5    of his house?

6        A.    Yes.

7        Q.    You sat out at the end of his driveway
8    watching the house for a couple of days?

9        A.    Down the street.

10       Q.    Watching the house?

11       A.    Yes.

12       Q.    Watching his comings and goings?

13       A.    Yes.

14       Q.    Did you follow him in the car?

15       A.    I don't know if I did or not.

16       Q.    Were you with any other officer during that
17   surveillance?

18       A.    I could have been with Joe Volpe, or I could
19   have been with Connaughton, Diehl, or Danny Perrino.
20   Mostly Danny Perrino.

21       Q.    And Danny Perrino actually knew Harry Smyle,
22   didn't he?

23       A.    I don't know what Danny, if he knew him or
24   not, I don't know.  He didn't make it known to me that
25   he knew him.

Frank Sirianni

Page 273

1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK
2

                     Docket # 06-CV-6695 (JS) (WDW)
3                              06-CV-6695 (JS) (WDW)
4

    KOGUT,
5

              Plaintiff,
6

    vs.
7

    THE COUNTY OF NASSAU, et al.,
8

              Defendants.
9    _____/
10                              Tuesday, December 13, 2011
                                1601 Belvedere Road
11                              West Palm Beach, Florida
                                10:10 a.m. to 2:31 p.m.
12

13                          VOLUME 2
14                     CONTINUED VIDEOTAPED
15                 DEPOSITION OF FRANK SIRIANNI
16

17

18           Reported before Tracey S. LoCastro, Registered
19    Professional Reporter, Notary Public in and for the
20    State of Florida at Large, pursuant to Notice of Taking
21    Deposition filed by the Defendants in the above cause.
22

23

24

25

Frank Sirianni

Page 301

1    that information, you weren't sure it was the person

2    you were looking for, but you thought it was worth

3    investigating?

4        A.    Yes.

5        Q.    And how did you come to find or speak to,

6    how did you come to speak to Harold Smyle?

7        A.    We located him on East Rockway Road where he

8    lived.  Then we sat down the block and we waited for

9    him to come out of his house and get into his car.

10       Q.    Why did you do that?

11       A.    We wanted to stop him, see where he was

12   going.

13       Q.    I mean, why didn't you knock on his door?  I

14   don't understand.

15       A.    Well, he was a suspect, so we just wanted to

16   stop him and see who he really was.

17       Q.    I'm still not following you.

18       A.    I wanted to see if he was the same guy that

19   was in the deli that purchased the beer.

20       Q.    I mean, procedurally thinking, was it your

21   decision to use the element of surprise and stop him as

22   opposed to knocking on his door?  I'm not sure that I

23   understand why you didn't go up to his front door.

24       A.    Right, we wanted to surprise him.

25       Q.    I see.

1

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK


---------------------------x  Docket #

                              06-CV-6695 (JS)(WDW)
KOGUT,                        06-CV-6720 (JS)(WDW)
        Plaintiff,


                              U.S. Courthouse,

 - versus -                   Central Islip, New York


THE COUNTY OF NASSAU, et al.,


        Defendant.
---------------------------x


VIDEOTAPED DEPOSITION OF FRANK SIRIANNI


Tuesday, June 15, 2010
10:19 - 6:04 p.m.


295 Lakeview Avenue

West Palm Beach, Florida 33401


Reported By:
Teresa Whalen, RPR, FPR
Notary Public, State of Florida
West Palm Beach Office    Job #166489
Phone:  800.330.6952
        561.659.4155

Frank Sirianni                                          June 15, 2010

54

1         A.    Yes.

2         Q.    What was your first conversation with

3    Harry Smyle that morning after you followed him in his

4    car, to the best of your memory?

5         A.    I don't remember.

6         Q.    You'd have to rely on the contemporaneous

7    notes?

8         A.    Yes, I would.

9         Q.    Did he agree to follow you back to the station

10   in his own car?

11        A.    I believe he did.

12        Q.    Or did he ride in your car?

13        A.    I really don't remember if he followed us or

14   if he came in our car, I really don't remember.

15        Q.    Take a look at what has already been marked as

16   Exhibit 134, it's a blotter from March 5th.  And please

17   read into the record the entry for 0857, 8:57 in the

18   morning.

19        A.    Yes.  Detective Sirianni and Perrino present

20   with Harold Smyle, car 1077.

21        Q.    So as a matter of custom and practice, that

22   entry was made at 8:57 that morning?

23        A.    Yes.

24        Q.    Reflecting that you had --

25        A.    -- Harry with us, and he came with us in car

Frank Sirianni                                          June 15, 2010

55

1    1077.

2         Q.    In a police vehicle, not his own vehicle?

3         A.    Right.

4         Q.    All right.  And then you were with him much of

5    the day, weren't you?

6         A.    I don't know how long.  Until he was released,

7    I guess whatever, then we took him back home.

8         Q.    Typically the Form 79, physical condition of

9    the defendant, is filled out just before the release,

10   right?

11        A.    Should be, yeah.

12              (Plaintiff's Exhibit No. 192 was marked for

13   identification.)

14   BY MS. CORNWALL:

15        Q.    Take a look at Exhibit 192.

16        A.    Uh-huh.

17        Q.    Do you recognize that as the Form 79, physical

18   condition of the defendant questionnaire, filled out for

19   Harry Smyle on March 5th of 1985?

20        A.    Uh-huh.

21        Q.    For the record, is that a yes?

22        A.    Yes.

23        Q.    Thank you.

24              And what time was that filled out?

25        A.    At 8:15.

Frank Sirianni                                          June 15, 2010

56

1          Q.    P.m.?

2          A.    Right.

3          Q.    So he's been with you at the department over

4     eleven hours by then?

5                MR. FERGUSON:   In the headquarters?

6                MS. CORNWALL:   Thank you.   Withdrawn.

7     BY MS. CORNWALL:

8          Q.    So by 8:15 p.m. on March 5th of 1989,

9     Harry Smyle has been with the police for over eleven

10    hours?

11         A.    Yes.

12               MS. CORNWALL:   Thank you.

13               (Plaintiff's Exhibit No. 191 was marked for

14    identification.)

15               (Plaintiff's Exhibit No. 193 was marked for

16    identification.)

17    BY MS. CORNWALL:

18         Q.    Thank you.   Sir, I'd now like to show you --

19    are you ready to proceed?

20         A.    Yeah.

21         Q.    -- Exhibits 191 and 193.   Exhibit 191, do you

22    recognize as handwritten notes by Danny Perrino of your

23    interview with Harry Smyle on the 5th?

24         A.    Yes.

25         Q.    And then do you recognize Exhibit 193 as a

Frank Sirianni                                               June 15, 2010

65

1    BY MS. CORNWALL:

2        Q.    During that first two-and-a-half-hour

3    interview with Harry Smyle in the morning of March 5th,

4    1985, you learned how he knew John Restivo?

5        A.    Yes.

6        Q.    How did he know him?

7        A.    I'd have to look at the notes.

8        Q.    And would it refresh your memory -- withdrawn.

9              Do you remember that he did some moving for

10   John Restivo's company?

11       A.    I think he mentioned something to that effect.

12       Q.    And he mentioned that John Restivo was seeing

13   Joann Egington, a relative of Harry's?

14       A.    Yes.

15       Q.    And Harry told you he didn't really like John

16   very much, right?

17       A.    I don't recall that.

18       Q.    Did he tell you that he resented John for

19   giving him heavy-lifting work with the moving company?

20       A.    I don't recall that either.

21       Q.    Did he tell you John's nickname?

22       A.    No.   No.

23       Q.    Let's take a look at Exhibit 193 that you have

24   in front of you, the typed version of the interview.

25       A.    Uh-huh.

Frank Sirianni                                              June 15, 2010

66

1          Q.    Harry corroborates Eileen Tosner's statement
2     saying he's the person who drove her home, right?
3          A.    I'm trying to see where you are.
4          Q.    It's at the very top.  Perrino/Sirianni did
5     interview Smyle, did pedigree on him?
6          A.    Right.
7          Q.    You did that, right?
8          A.    Uh-huh.
9          Q.    And Smyle said he's the person described in
10    Eileen Tosner's lead sheet?
11         A.    Yeah.  Okay.
12         Q.    Do you see that?
13         A.    Yes.
14         Q.    So that's some corroboration of what she had
15    told the police?
16         A.    Yes.  Corroborates the lead sheet, right.
17         Q.    All right.  And he told you that he knew both
18    Hot Skates and the Restivo family?
19         A.    Yes.
20         Q.    And he told you that he worked for the
21    Restivos?
22         A.    Yes.
23         Q.    And then there is a statement that sometime
24    after Thanksgiving, that being Thanksgiving of 1984, he
25    was in a car with John Restivo and there was a

Frank Sirianni                                           June 15, 2010

67

1    discussion about the missing Fusco girl?
2         A.    Yeah.   Where they were drinking beer and
3    smoking pot you're talking about?
4         Q.    Uh-huh.
5         A.    Yes.
6         Q.    And Harry Smyle tells you that John Restivo
7    made a statement about Theresa Fusco?
8         A.    Yeah.
9         Q.    What was the statement that he reported having
10   heard from John Restivo?
11        A.    Said they will -- it's all blacked out --
12   probably find her strangled.
13        Q.    Now, as of March 5th of 1985, when Harry Smyle
14   told you about this statement, you were familiar with
15   the lead sheets that had been provided to date, right,
16   that were in the case file?
17        A.    Yes.
18        Q.    So at that point you were aware that there
19   were rumors all around the community that she had been
20   strangled, right?
21        A.    I don't remember somebody saying rumors that
22   she was strangled.
23             (Plaintiff's Exhibit No. 194 was marked for
24   identification.)
25

Frank Sirianni                                              June 15, 2010

73

1    ~~Q.    So fair to say, again, that lead sheet would~~
2    ~~have been in the case file?~~
3    ~~A.    Yes, it would.~~
4    ~~Q.    And you would have been familiar with it as~~
5    ~~you worked the case?~~
6    ~~A.    Not necessarily so.  It could have been in the~~
7    ~~case but I could have been doing something else.~~
8        Q.    Sir, well before your March 5th of 1985
9    interview with Harry Smyle, based on the lead sheets and
10   reports in the case file, the biweekly critiques, fair
11   to say you were aware that there had been rumors even
12   before Theresa's body was found that she had been
13   strangled and left dead in the cemetery?
14       A.    It could have been, yes.
15       Q.    The police had been hearing that from a number
16   of different sources?
17       A.    Yeah.
18       Q.    All before Harry Smyle walked in the door?
19       A.    I would think so, yes.
20       Q.    And there was nothing particularly suspicious
21   about a statement that they'll probably find her
22   strangled before the body was found in that context, was
23   there?
24       A.    Why would you say something like that?
25       Q.    It's what everyone was saying.

Frank Sirianni                                        June 15, 2010

74

1          A.    Did you ever deal with them nitwits?

2          Q.    Which nitwits are we talking about?

3          A.    All these people there, did you ever deal with

4    some of these people?

5          Q.    Let's go back through the exhibit.

6    Matt Wilson was ruled out as a suspect, right?

7          A.    Yes.

8          Q.    Tim Kehoo was not a suspect, was he?

9          A.    Kehoo?  They were all suspects until they were

10   ruled out.

11         Q.    And Ann Marie Gerace was not a suspect?

12         A.    No.

13         Q.    Nor was Maryann Liguori?

14         A.    No.

15         Q.    Just because people said they had heard she

16   had been strangled and left for dead in the cemetery

17   before the body was even found doesn't make them a

18   suspect?

19         A.    I don't think so.

20         Q.    People talk?

21         A.    Yes.  You know how kids talk.

22         Q.    Kids talk.  And part of your job as a

23   detective was to separate gossip and rumor from the

24   truth?

25         A.    Truth from fiction.

Frank Sirianni                                          June 15, 2010

75

1      Q.    Truth from fiction.
2            So it would take more than the report of a
3      rumor for someone to become a suspect?
4      A.    Yes.
5      Q.    It would take more than someone saying they'll
6      probably find her strangled to become a suspect?
7      A.    If there is something else.
8      Q.    Something else linking them to the crime?
9      A.    Yes.
10     Q.    Independent corroboration?
11     A.    Exactly.
12     Q.    Let's turn back to Exhibit 193.  In the second
13     paragraph of the interview you and Danny Perrino did of
14     Harry Smyle on March 5th, there is a reference to a
15     second conversation Harry reports having with
16     John Restivo, right?
17     A.    Uh-huh.
18     Q.    And this one he reported was after
19     Theresa Fusco's body was found, right?
20     A.    Right.
21     Q.    And what was the statement that Harry reported
22     hearing at that point?
23     A.    It said:  Restivo again comes out with he
24     knows who killed Theresa Fusco, and when Smyle asked
25     who, he said he couldn't not (sic) say.  Restivo then

Frank Sirianni                                    June 15, 2010

61

1   him more of a witness than a potential suspect?

2       A.   He wasn't agitated like some people get, you

3   know.  He was nervous, of course, but he wasn't

4   agitated.

5       Q.   And it's reasonable to be nervous when being

6   interviewed by a homicide detective?

7       A.   Yes.

8       Q.   Whether you have anything to do with the crime

9   or not, right?

10      A.   That's correct.

11      Q.   And you understood that?

12      A.   Yes.

13      Q.   And you took that into account when assessing

14  what he was telling you?

15      A.   Yes.

16      Q.   You learned very early on in your conversation

17  with Harry Smyle that he was a Vietnam war vet?

18      A.   So he says, yes.

19      Q.   That he had been exposed to Agent Orange?

20      A.   That's what he told us.

21      Q.   That he has post traumatic stress from that

22  experience?

23      A.   That's what he said.

24      Q.   And that he was on some very serious

25  medication for a back injury?

Frank Sirianni                                          June 15, 2010

62

1        A.    Yes.

2        Q.    You learned early on in your conversation with

3   him that he was retired on disability from the United

4   States Postal Service?

5        A.    Yes.

6        Q.    But that he also had been working jobs since

7   his disability retirement?

8        A.    Yes.

9        Q.    And you understood when you learned that that

10  Mr. Smyle could be subject to criminal charges for not

11  reporting the payments he got from his other side jobs

12  while receiving disability payments from the US

13  Government, right?

14       A.    I wasn't interested in that, what he was

15  making on the side or failure to report to the

16  government, my main concern was Theresa Fusco.

17       Q.    So although you weren't interested, you were

18  aware that his failure to report his income on the side

19  posed a potential criminal problem for him?

20       A.    That's his responsibility, not mine.

21       Q.    You understood it was his responsibility?

22       A.    Right.

23       Q.    Would you characterize Harry Smyle as a

24  cooperative witness from that morning?

25       A.    He was a little nervous at first, then he

Frank Sirianni                                              June 15, 2010

63

1    became a little more relaxed.

2         Q.   How did he -- withdrawn.

3              What, if anything, did you or

4    Detective Perrino do to help him go from nervous to more

5    relaxed?

6         A.   Our demeanor, the way we approached him, how

7    we talked to him.

8         Q.   And how did you talk to him?

9         A.   Like I'm talking to you.

10        Q.   Just having a conversation?

11        A.   Exactly.

12        Q.   Did you exert any pressure on him?

13        A.   No.

14        Q.   Did you tell him he was a potential suspect?

15        A.   Everybody's a potential suspect.

16        Q.   Did you tell him he, like everyone, was a

17   potential suspect?

18        A.   I might have, but I don't recall.

19        Q.   That would have helped encourage him to

20   cooperate, wouldn't it?

21        A.   What he thinks, that's his thing.

22        Q.   Telling Harry Smyle he was a potential suspect

23   would have helped encourage him to cooperate, right?

24        A.   If he thought that way, uh-huh.

25        Q.   And in fact, it did help him cooperate, didn't

Frank Sirianni                                          June 15, 2010

64

1    it?

2              MR. FERGUSON:   What helped him, telling him

3        he's a suspect?

4              Note my objection to the form of the question.

5              THE WITNESS:   How do you mean that?

6    BY MS. CORNWALL:

7        Q.   Let me ask it again.

8        A.   Yeah.

9        Q.   Didn't you tell Harry Smyle that you were

10   looking at him as a potential suspect?

11       A.   I think we did tell him that, yes.

12       Q.   And after you told him you were looking at him

13   as a potential suspect, he gave you information that

14   sent you in the direction of another suspect,

15   John Restivo?

16       A.   Yes.   He gave us other information, yes.

17       Q.   Fair to say he was more cooperative with you

18   after you told him he was a suspect?

19       A.   Yeah.   I would say, yes.

20             THE VIDEOGRAPHER:   Excuse me, change tape.

21             We are going off the record, the time is

22        11:45, this is the end of Tape No. 1.

23             (Brief recess in proceedings.)

24             THE VIDEOGRAPHER:   We are back on the record,

25        the time is 11:50, this is Tape No. 2.

Frank Sirianni                                              June 15, 2010

80

1          A.     Yes.

2          Q.     No formal statement was taken from Harry Smyle

3     on March 5th.    Why not?

4          A.     Danny was doing the interview.

5          Q.     Well, the two of you did the interview

6     together, didn't you?

7          A.     Well, I sit and he questioned him.

8          Q.     Taking a look at the beginning of Exhibit 193

9     that you have in front of you, Perrino's report says

10    Perrino/Sirianni did interview Harry Smyle, right?

11         A.     Right.

12         Q.     So you both participated?

13         A.     Staying in the same room, right.    If Danny

14    forgot something, I'd say ask him, or I'd ask him a

15    question.

16         Q.     Is it fair to say that neither of you chose to

17    make a formal statement for Harry to sign because there

18    was nothing reliable enough about what he had told you

19    to put down in a statement at that point?

20         A.     Not at this time.

21         Q.     And so you drove him home?

22         A.     Yes.

23         Q.     Did you speak to any of your fellow officers

24    after driving him home about what you had heard from

25    Harry Smyle that day?

Frank Sirianni                                                    June 15, 2010

81

1        A.    The only one that would be brought up to speed

2    would be Volpe.

3        Q.    As the carrying officer?

4        A.    Uh-huh.

5        Q.    And did Volpe tell you he was going to have

6    Smyle brought back for a polygraph?

7        A.    No.

8        Q.    When was the first time you learned he had

9    been polygraphed?

10       A.    The next day.

11       Q.    Did you speak to the polygraph person?

12       A.    No.

13       Q.    But you were aware that he had been

14   polygraphed?

15       A.    Yes.

16       Q.    You had access to the reports of the polygraph

17   questioning and the testing?

18       A.    If I wanted to.

19       Q.    Ultimately you spent quite a bit of time

20   talking to Harry Smyle in the months that followed,

21   right?

22       A.    Yes.

23       Q.    And any time you're cultivating a witness that

24   way, you want to know as much detail as possible about

25   them?

Frank Sirianni                                                    June 15, 2010

107

1          THE VIDEOGRAPHER:  We are back on the record,

2      the time is 1:09.

3  BY MS. CORNWALL:

4      Q.    Mr. Sirianni, when we broke, you had looked at

5  the March 7th statement and said that in your view this

6  was a reliable statement, right?

7      A.    Yes.  Reading over this, Harry took John

8  twice.  I think he was confused what day he went to the

9  motor vehicle and what day he went to the traffic court,

10 and maybe -- now, I know he had to go to Lynbrook PD

11 also, so he was really confused what days that they

12 went.

13     Q.    Have you looked at any documents during the

14 break, sir?

15     A.    No.  Just read this now.

16     Q.    But you're aware that you took another

17 statement from Harry Smyle?

18     A.    Yes.

19     Q.    One that differed from the statement you took

20 on March 7th?

21     A.    Yes.

22     Q.    The one from March 7 you just testified was a

23 reliable statement?

24     A.    True.

25     Q.    By the way, Harry was looking for a reward,

Frank Sirianni                                              June 15, 2010

108

1    wasn't he?

2         A.   He might have been.

3         Q.   He was looking for a $10,000 reward?

4         A.   Like I say, he might have been.  You're

5    talking a long long time ago, I can't remember what he

6    was looking for.

7         Q.   Right.  And did you do or say anything to lead

8    him to believe that might be possible if he continued to

9    cooperate?

10        A.   Me personally?

11        Q.   Yeah.

12        A.   Why would I say that?

13        Q.   Did you or did you not say or do anything --

14        A.   No.  Not that I know.

15        Q.   -- to lead him to believe there might be money

16   in it for him?

17        A.   Not that I can recall, no.

18        Q.   How about Danny Perrino?

19        A.   I can't speak for Danny.

20        Q.   In your interviews with Harry Smyle that you

21   conducted with Danny Perrino, did he do or say anything

22   to lead Smyle to believe there might be money in it for

23   him if he continued to cooperate?

24        A.   No, not to my knowledge.

25

Frank Sirianni                                              June 15, 2010

86

1        A.   Vicodin.

2        Q.   And Vicodin.  Which is a very strong

3   painkiller, right?

4        A.   Yes.

5        Q.   It's a narcotic?

6        A.   Yes.

7        Q.   He also talked to the polygraph examiner about

8   his service in Vietnam?

9        A.   Down at the bottom, organizations?

10       Q.   Yeah.

11       A.   Yes.

12       Q.   And his exposure to Agent Orange?

13       A.   Yes.

14       Q.   Had you ever known other vets who had been

15   exposed to Agent Orange?

16       A.   No.

17       Q.   Were you familiar with how that affected vets?

18       A.   No.

19       Q.   Did you seek to find out as you interviewed

20   Harry Smyle over those months?

21       A.   No.

22       Q.   Wasn't your concern?

23       A.   Right.

24       Q.   Harry Smyle had also told you that he had been

25   hospitalized, right?

Frank Sirianni                                                    June 15, 2010

87

1          A.    I believe he did.

2          Q.    And that he had been institutionalized after a

3     nervous breakdown?

4               MR. FERGUSON:  Note my objection to the form

5          of the question.

6               THE WITNESS:  He said he was, he had a nervous

7          breakdown.  As far as institutionalized, he said he

8          had a nervous breakdown.

9     BY MS. CORNWALL:

10         Q.    What did he tell you about the nervous

11    breakdown?

12         A.    That he had a nervous breakdown.

13         Q.    Did he tell you when?

14         A.    No.

15         Q.    How it affected him?

16         A.    No.

17         Q.    Or whether he had been institutionalized as a

18    result?

19         A.    No.  Not that I can recall.

20         Q.    If he had, that would be information you

21    should have written down?

22         A.    I would have made a note of it.

23         Q.    And made sure to pass that on to Volpe to make

24    sure that the prosecutor was aware of it?

25         A.    Yes.

Frank Sirianni                                          June 15, 2010

88

1          Q.    That could be information bearing on the

2     credibility of your witness?

3          A.    I would think, me personally.

4          Q.    So turning to -- let me turn for you to save

5     time -- handwritten notes by the polygraph examiner

6     about Mr. Smyle.  At paragraph eight, the examiner says

7     interview subject kept with his original statement to

8     homicide squad.

9          Do you see that?

10         A.    Yes.

11         Q.    So again, that is the same statement that's

12    reflected in Exhibit 193, the typed-up Perrino notes?

13         A.    Yes.

14         Q.    So that's consistency...

15         A.    Corroborates what he said.

16         Q.    Well, it's not independent corroboration, but

17    it's the second time he said the same thing; fair to

18    say?

19         A.    Right.  Right.  He took the polygraph.

20         Q.    And part of the polygraph process involves

21    asking the witness to talk about lies that they've told

22    in the past?

23         A.    As one of the questions, yes.

24         Q.    And bad things that they've done in their

25    lives?

Frank Sirianni                                              June 15, 2010

92

1      ~~Q.    But you had all that information accessible in~~

2      ~~the case file if you wanted to look at it?~~

3      ~~A.    If I wanted to look.~~

4      ~~Q.    Do you need to take a break?~~

5      ~~A.    Before one.~~

6          Q.    Okay.  On March 7th of 1985, you and

7      Danny Perrino interviewed Harry Smyle again?

8          A.    Okay.

9          Q.    And this time you took a formal statement from

10     him, didn't you?

11         A.    You have it?

12         Q.    I do.

13         A.    Can I look at it?

14             MS. CORNWALL:    Absolutely.

15             (Plaintiff's Exhibit No. 195 was marked for

16     identification.)

17     BY MS. CORNWALL:

18         Q.    Sir, is this one of the witness statements you

19     looked at to prepare for your deposition?

20         A.    Yes.

21         Q.    Did you look at the typed version of it as

22     well?

23         A.    No.  Just this.

24         Q.    All right.  Is it your handwriting?

25         A.    Yes, it is.

Frank Sirianni                                              June 15, 2010

93

1          Q.    So as you sit here today, can you tell us why
2     you took a statement from Harry Smyle on the 7th but not
3     the 5th?
4          A.    I really can't answer that, I really don't --
5     I can't really answer that.
6          Q.    Consistent with the policy that we looked at
7     earlier, did you do another comprehensive interview
8     before reducing a statement to writing?
9          A.    No.  We brought him in, sat down and started
10    asking questions, and I began to write what he was
11    saying.
12         Q.    And essentially Harry Smyle's statement from
13    March 7th was the same as the statement he had given you
14    in the interview two days earlier?
15         A.    Close to it, yes.
16         Q.    No important changes, were there?
17         A.    None that I recall.
18         Q.    And you knew from the policy and your
19    training, did you not, that when taking a statement, it
20    was important to have the witness sign at the bottom of
21    each page?
22         A.    Yes.
23         Q.    Okay.  And why was that?
24         A.    That he read it and that any corrections or
25    anything that wasn't right, to correct it and initial it

Frank Sirianni                                                June 15, 2010

111

1        about the 5th?

2   BY MS. CORNWALL:

3        Q.   Is there a document that would help you

4   remember what it was that made you aware that

5   Harry Smyle wasn't sure?

6        A.   You had it here earlier, I believe you had it

7   here earlier.

8        Q.   You're referring to Danny's notes?

9        A.   Yeah.

10           MR. FERGUSON:   We're talking the 27th?

11   BY MS. CORNWALL:

12        Q.   Which ones?

13           MR. FERGUSON:   You've got Exhibit 191 around?

14   BY MS. CORNWALL:

15        Q.   It's in front of you.

16        A.   Okay.   Let's see here.

17        Q.   You're looking at Exhibit 191 at which page?

18        A.   Page three.

19        Q.   You're referring to --

20        A.   3/27, statement taken, Harry amended statement

21   by recalling that John had said they would probably find

22   her strangled.   I don't know, I can't make out that

23   word.

24        Q.   You're reading from Danny Perrino's notes of a

25   conversation you and he had with Harry Smyle on

Frank Sirianni                                          June 15, 2010

112

1    March 27th?

2          A.    Yes.

3          Q.    And how did you come to be speaking to

4    Harry Smyle again to amend his statement on March 27th?

5          A.    This is Danny's notes.

6          Q.    Uh-huh.

7          A.    I know he amended it, because he wasn't sure

8    what day he went to Lynbrook PD to take care of some

9    traffic tickets, or what day he went to the department

10   of motor vehicles to turn in the plates, or traffic

11   court.

12         Q.    Right.   My question, sir, is did you reach out

13   to Harry Smyle on the 27th to amend his statement, or

14   did he pick up the phone and call you or

15   Detective Perrino?

16              MR. FERGUSON:   Or something else?

17              THE WITNESS:   It was done at that date, the

18         date taken here.

19   BY MS. CORNWALL:

20         Q.    Who called whom?

21              MR. FERGUSON:   Objection to the form of the

22         question.

23              THE WITNESS:   I don't recall who called whom,

24         I don't really know.

25

Frank Sirianni                                    June 15, 2010

118

1    paragraph, the March 27th statement has Harry saying I
2    also wish to correct we were not going to the department
3    of motor vehicles, we were going to traffic court in
4    Mineola?
5          A.    There you go.
6          Q.    Was that an important difference, in your
7    view?
8          A.    No.
9          Q.    But the decision was made to create a
10    statement accounting for that amendment?
11          A.    Yes.
12          Q.    Why?
13          A.    Just to make sure that we had it right.
14          Q.    And did you believe that you got it right in
15    the March 27th statement?
16          A.    I believe I got it right in every statement.
17          Q.    Even though the statements were inconsistent?
18          A.    Yes.
19          Q.    So in the 3/27 statement then there's a
20    discussion of a second time that they are together,
21    Harry and John Restivo, right?
22          A.    Yes.
23          Q.    John called me up again and asked me if I
24    wanted to take a ride with him to the department of
25    motor vehicles.

Frank Sirianni                                                    June 15, 2010

119

1        A.    Yes.

2        Q.    And this time, unlike the prior statements,

3    Harry says that we were in John's van and John was

4    driving?

5        A.    In the first statement?

6        Q.    In this statement here, for the first time

7    you're hearing that in the couple of weeks later

8    meeting --

9        A.    Yeah.  He says he don't remember if he drove,

10   if I drove my car to John's mother's house on Doxsey,

11   right, he doesn't remember if he did or not.

12       Q.    Uh-huh.  Then he says we were in John's van

13   and John was driving?

14       A.    That's what he said.

15       Q.    Was that an important difference to you?

16       A.    No.

17       Q.    Did it raise any question in your mind about

18   Harry Smyle's reliability given that in the first three

19   statements he had given to you, the polygraph examiner,

20   and to you again in the 3/7 statement was that he had

21   been driving both times?

22       A.    No.

23            MR. FERGUSON:  Just note my objection to the

24       form of the question.

25

Frank Sirianni                                                    June 15, 2010

28

1        A.    Yes.

2        Q.    And those were statements that the witnesses

3    signed, right?

4        A.    Yes.

5        Q.    Okay.  So it was your practice to write down,

6    in the form of a statement, whatever a witness told you,

7    regardless of its truth?

8        A.    It depended.

9        Q.    What did it depend on?

10        A.    How truthful they appeared to be.

11        Q.    And how did you go about deciding whether a

12    witness was being truthful with you?

13        A.    From other witnesses that I interviewed prior

14    to him.

15        Q.    Is it fair to say that as a detective, one of

16    the things that you looked for when deciding whether

17    someone was telling you the truth is whether what they

18    were telling you was consistent with other information

19    you had?

20        A.    True.

21        Q.    Whether you had corroboration?

22        A.    True.

23        Q.    Or whether there were inconsistencies with

24    what you already knew?

25        A.    True.

Frank Sirianni                                              June 15, 2010

29

1        Q.    Whether there were internal inconsistencies
2   between what one witness was telling you?
3        A.    Could be, yes.
4        Q.    And if there were internal inconsistencies
5   between what one witness was telling you, that would
6   raise a question in your mind about whether they were
7   telling you the truth, right?
8        A.    Yes.
9        Q.    And if there were inconsistencies between what
10   one witness told you and what other witnesses told you,
11   that would raise a question in your mind about whether
12   one of those witness was not telling the truth, right?
13        A.    Yes.
14        Q.    And if you sought out corroboration of
15   something a witness told you but you couldn't find any,
16   that too would raise a question in your mind about
17   whether the witness was telling the truth, right?
18        A.    Yes.
19        Q.    Was it your custom and practice to take a
20   formal written statement from a witness after each
21   interview?
22        A.    Sometimes we did, sometimes we didn't.
23        Q.    How did you decide?
24        A.    It depends on what he said at the time.
25        Q.    Did you receive any formal training about

120

1    BY MS. CORNWALL:

2        Q.   It didn't matter?

3        A.   No.

4        Q.   And then in this 3/27 statement there is one
5    new thing that Harry reports, right, John claiming that
6    he knew the area where the body was found, it's known as
7    the Fort?

8             Do you see that?

9        A.   John grew up around there, so he knows.  Let's
10   see.  I'm trying to find that.

11       Q.   Toward the bottom of the second long
12   paragraph.  I then said I didn't even know this place
13   even existed.  John then said I know area, it's known as
14   the Fort, and I used to play there as a kid.

15       A.   Right.

16       Q.   Now, this statement, according to Harry, in
17   this report says -- withdrawn.

18            This new statement claiming that John said he
19   knew the area where the body was found, it was known as
20   the Fort, supposedly happened during the second trip
21   Harry took with John, right?

22       A.   Could have been the first trip or the second
23   trip, he was confused, you know.

24       Q.   Uh-huh.  He was confused.

25       A.   On what day, you know, when he went.

Frank Sirianni                                              June 15, 2010

121

1          Q.    Now, you and Danny Perrino had done a very

2     thorough and comprehensive interview of Harry when you

3     first talked to him on March 5th?

4          A.    Fairly, yes.

5          Q.    We looked at the notes; they were

6     comprehensive and thorough, right?

7          A.    Yes.

8          Q.    And then the polygraph examiner interviewed

9     him again?

10         A.    Yes.

11         Q.    And he said the same things?

12         A.    Yes.

13         Q.    Specifically the claim that John said they'd

14    find her strangled somewhere, I know who did it, and

15    they'll find Kelly Morrissey in the cemetery?

16         A.    Yes.

17         Q.    Those are the three possibly incriminating

18    things Harry Smyle claimed John had said?

19         A.    Yes.

20         Q.    And again, on March 7th when you took the

21    statement, those are the only possibly incriminating

22    things related to Theresa Fusco?

23         A.    Yes.

24         Q.    Okay.  And Harry had told about two times when

25    he and John were riding in the car where such statements

Frank Sirianni                                                    June 15, 2010

122

1    were made?

2          A.    By John, yes.

3          Q.    Did it raise any question in your mind that

4    three weeks later, when taking another statement from

5    Harry Smyle on March 27th, for the first time he claims

6    to remember an additional statement by John Restivo

7    claiming that he knew this area as the Fort?

8          A.    No.

9          Q.    Isn't that something that would have come out

10   in your initial thorough interviews, if in fact it had

11   been said?

12         A.    If it was said at the time we initially

13   interviewed him, we would have put it down, but he

14   didn't know about the Fort, that's why it wasn't there.

15   He only knew about the Fort until John told him that's

16   what the area was called, the Fort.

17         Q.    If Harry Smyle had -- withdrawn.

18         When you met with Harry Smyle on March 5th,

19   you asked him extensively about his conversations with

20   John Restivo on those two occasions, right?

21         A.    Yes.

22         Q.    At that time Harry said nothing to you about

23   John Restivo knowing the area where Theresa's body was

24   found as the Fort?

25         A.    Not at that time, no.

Frank Sirianni                                                    June 15, 2010

123

1          Q.    The first time you heard that was three weeks

2     later?

3          A.    Yes.

4          Q.    Didn't that raise any question in your mind

5     about whether Harry was giving you reliable information?

6          A.    No, it didn't.

7          Q.    You thought he was just confused?

8          A.    Yes, I did.

9          Q.    Isn't it true, sir, that when you took the

10    March 27th statement from Harry Smyle that for the first

11    time put him as a passenger in John Restivo's blue van

12    during these important conversations, you now knew that

13    the blue van was an important piece of evidence in the

14    case?

15         A.    We knew it was a piece of evidence.

16         Q.    And you knew that because John Kogut had a

17    confession attributed to him on March 26th in which he

18    claims that he killed Theresa Fusco after picking her up

19    with John Restivo and Dennis Halstead in John Restivo's

20    blue van, right?

21         A.    Yes.

22         Q.    And on the 26th, after that confession, there

23    was a search warrant filled out for John Restivo's blue

24    van?

25         A.    Yes.

Frank Sirianni                                              June 15, 2010

113

1    BY MS. CORNWALL:

2        Q.    You mentioned earlier that you spent quite a

3    bit of time with Harry Smyle at home?

4        A.    At his house?

5        Q.    Yes.

6        A.    Yeah.

7        Q.    Fair to say you were there several times a

8    week at some times?

9        A.    I wouldn't say several times a week.

10       Q.    Did you have dinner at his house?

11       A.    Dinner?  No.  Not that I recall, no.

12       Q.    Did you talk to him in his living room?

13       A.    Yes.

14       Q.    On more than one occasion?

15       A.    Yes.

16       Q.    Several occasions?

17       A.    Yes.

18       Q.    Many occasions?

19       A.    Several occasions.

20       Q.    And what was the topic of conversation?

21       A.    About this case.

22       Q.    And about the statements he made?

23       A.    Yes.

24       Q.    At this point in time -- withdrawn.

25             These several visits to Mr. Smyle's home to

Frank Sirianni                                              June 15, 2010

114

1    keep talking to him about his statements, did they take

2    place between March and June of 1985?

3          A.    Probably.

4          Q.    And did they continue after June of 1985

5    leading up to the trial?

6          A.    I might have went back to robbery squad; I

7    don't recall, I don't remember.

8          Q.    Did you continue meeting with Harry Smyle at

9    his home after June of 1985?

10         A.    I might have, I don't remember.

11         Q.    And given that he made a signed statement on

12   March 7th and spoke to you again and made another

13   statement on March 27th, why did you continue to go to

14   his house to talk to him about those statements?

15         A.    I have no idea why.

16         Q.    He was cooperative?

17         A.    Yes.

18         Q.    Were you making sure he stuck to his story?

19         A.    No.

20         Q.    Were you making sure he didn't get confused

21   for his testimony?

22         A.    No.

23         Q.    Were you giving him scenarios to remember?

24         A.    No.

25         Q.    What purpose did you have then?

Frank Sirianni                                              June 15, 2010

115

1      A.    To see how he was doing, how he was faring.

2      Q.    Just checking in with him?

3      A.    Yeah.

4      Q.    See how his health was?

5      A.    His health, everything all right.

6      Q.    Did you do that with other witnesses, too?

7      A.    At times.

8      Q.    Like who?

9      A.    I can't remember.

10     Q.    Who in this case did you check in on several

11     times after taking statements from them just to see how

12     they were doing?

13     A.    Theresa's mother.

14     Q.    Any other witness?

15     A.    I might have, but I don't recall.

16     Q.    So you started to read through Danny Perrino's

17     notes of a conversation you and he had with Harry Smyle

18     on the 27th.  That conversation lead to another signed

19     statement, right?

20           MR. FERGUSON:  You mean on the 27th, or at a

21     later time?

22           THE WITNESS:  What statement are you referring

23     to?

24     BY MS. CORNWALL:

25     Q.    On March 27th.

Frank Sirianni                                                    June 15, 2010

53

1    at home on some later occasions?

2        A.   That could have happened, yes.

3        Q.   And in fact, it did happen, didn't it?

4        A.   Yes.

5        Q.   On a number of occasions?

6        A.   Yes.

7        Q.   In fact Harry Smyle, fair to say you

8    cultivated him as an informant in this case?

9        A.   Me personally?  I wouldn't say me personally.

10       Q.   Who did?

11       A.   I think probably Joe Volpe.

12       Q.   And would the officer who cultivated

13   Harry Smyle as an informant have been the same officer

14   who took formal statements from him?

15       A.   Yeah, I would say so.

16       Q.   You took formal statements from him, didn't

17   you?

18       A.   Yes, I did take them.

19       Q.   Let's focus now on the first day that you had

20   contact with him on March 5th, 1985.  All right.  Taking

21   a look through Exhibit 190, the lead sheet, there are

22   four pages of written notes here by Danny Perrino about

23   a conversation with Harry Smyle, aren't there?

24       A.   Yes.

25       Q.   Very detailed, extensive interview?

Frank Sirianni

Page 387

1            UNITED STATES DISTRICT COURT
             EASTERN DISTRICT OF NEW YORK
2
             Docket # 06-CV-6695 (JS) (WDW)
3                      06-CV-6695 (JS) (WDW)
4
    KOGUT,
5
             Plaintiff,
6
    vs.
7
    THE COUNTY OF NASSAU, et al.,
8
             Defendants.
9    _____/
10                          Wednesday, December 14, 2011
                            1601 Belvedere Road
11                          West Palm Beach, Florida
                            10:14 a.m. to 12:42 p.m.
12
13                      VOLUME 3
14                 CONTINUED VIDEOTAPED
15             DEPOSITION OF FRANK SIRIANNI
16
17
18        Reported before Tracey S. LoCastro, Registered
19   Professional Reporter, Notary Public in and for the
20   State of Florida at Large, pursuant to Notice of Taking
21   Deposition filed by the Defendants in the above cause.
22
23
24
25

1    1985, there was a very weak if non-existent case

2    against Mr. Restivo and Mr. Halstead?"

3              And he answered, "Yes."

4              Do you see that?

5         A.    Yes, I do.                              10:59:38

6         Q.    All right.  Now, as the CO of homicide, he

7    was intimately familiar with the case, right?

8         A.    Yes, he was.

9         Q.    So he was in a position to know how strong

10   the case was against John Restivo and Dennis Halstead    10:59:50

11   as of the date that John Kogut was arrested.

12        A.    Yes.

13        Q.    So do you agree with him that as of March

14   26th of 1985 there was a very weak if non-existent

15   against Mr. Restivo and Mr. Halstead?              11:00:06

16              MR. FREEMAN:  Objection.

17              THE WITNESS:  I really can't answer that,

18          because I don't know.

19   BY MS. CORNWALL:

20        Q.    Sir, was there any reliable evidence against    11:00:18

21   Mr. Restivo and Mr. Halstead that could be used against

22   them as of March 26th of 1985?

23        A.    You're talking physical evidence?

24        Q.    Any reliable evidence at all.

25        A.    Well, would be the statement that Harry    11:00:38

Frank Sirianni

Page 430

1    Smyle gave.

2        Q.      Which one?

3        A.      The first one where he said he was with John

4    Restivo and they were driving and he mentioned that

5    they'd find her strangled somewhere before the body was    11:00:54

6    even found.

7        Q.      And Harry Smyle gave you that statement

8    when?

9        A.      The 7th, I think.

10       Q.      Of March of 1985.                                11:01:08

11       A.      I believe so.

12       Q.      Four months after it was publicly reported

13   that Theresa Fusco's body had been found and that she

14   had been strangled, right?

15       A.      Yeah, well, he said that, he stated that        11:01:24

16   prior to Thanksgiving and before Christmas.

17       Q.      But you didn't hear him make that claim

18   until four months after the body had been found

19   strangled, right?

20       A.      Yes.                                            11:01:38

21       Q.      Would you have expected someone who had

22   heard such a thing to have called the police when he

23   heard it?

24       A.      I would suspect somebody would call the

25   police.                                                    11:01:54

Frank Sirianni

Page 431

1        Q.     But he didn't call the police to report

2    that, did he?

3        A.     No, he didn't.

4        Q.     So as of March 26th of 1985, the police

5    department needed to corroborate John Kogut's                    11:02:16

6    confession for one, right?

7        A.     Yes.

8        Q.     And it needed to build a case against John

9    Restivo and Dennis Halstead because John Kogut's

10   confession could not be introduced against them.              11:02:26

11            MR. FREEMAN:  Objection.

12            THE WITNESS:  The way I look at it, we first

13        got Harry Smyle; Harry led us to John Restivo;

14        Restivo then led us to Kogut and Halstead.

15   BY MS. CORNWALL:                                               11:02:58

16       Q.     As of March 26th of 1985, when Kogut was

17   arrested, wasn't the case against Mr. Restivo and

18   Mr. Halstead very weak if non-existent?

19            MR. FREEMAN:  Objection.

20            THE WITNESS:  I can't answer that and say it     11:03:24

21        was weak.

22   BY MS. CORNWALL:

23       Q.     You needed more, right?

24       A.     You try to get more.

25       Q.     Well, you needed more.  You didn't have      11:03:32