Exhibit
4

163

163

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - x
JOHN RESTIVO, DENNIS HALSTEAD, MELISSA LULLO,
JASON HALSTEAD, HEALTHER HALSTEAD and TAYLOR
HALSTEAD,

                         Plaintiffs,

        - against -                    CV-06-6720
                                       (JS)(WDW)

NASSAU COUNTY, JOSEPH VOLPE, in his
individual capacity, ROBERT DEMPSEY, in his
individual capacity, FRANK SIRIANNI, in his
individual capacity, MILTON GRUBER, in his
individual capacity, HARRY WALTMAN, in his
individual capacity, ALBERT MARTINO, in his
individual capacity, CHARLIE FRAAS, in his
individual capacity, THOMAS ALLEN, in his
individual capacity, RICHARD BRUSA, in his
individual capacity, VINCENT DONNELLY, in his
individual capacity, MICHAEL CONNAUGHTON, in
his individual capacity, WAYNE BIRDSALL, in
his individual capacity, WILLIAM DIEHL, in his
individual capacity, JACK SHARKEY, in his
individual capacity, DANIEL PERRINO, in his
individual capacity, ANTHONY KOZIER, in his
individual capacity, DETECTIVE SERGEANT
CAMPBELL (SHIELD #48) in his individual
capacity, ROBERT EDWARDS, in his individual
capacity, SEAN SPILLANE, in his individual
capacity, JOHN DOE OFFICERS AND DETECTIVES
#1-10, in their individual capacities, and
RICHARD ROE SUPERVISORS #1-10, in their
individual capacities,

                         Defendants.
- - - - - - - - - - - - - - - - - - - - - x
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - x
JOHN KOGUT,

                         Plaintiff,

        - against -                    CV-06-6695
                                       (JS)(WDW)

THE COUNTY OF NASSAU, POLICE

164

164

1  COMMISIONER DONALD KANE, POLICE COMMISSIONER
2  WILLIAM J WILLETT (2005), POLICE COMMISSIONER
   JAMES LAWRENCE, DETECTIVE SEAN SPILLANE(HEAD
3  OF HOMICIDE 1985), DETECTIVE DENNIS FARRELL
   (HEAD OF HOMICIDE 2005), DETECTIVE JOSEPH VOLPE,
4  DETECTIVE ROBERT DEMPSEY, DETECTIVE ALBERT
   MARTINO, DETECTIVE WAYNE BIRDSALL, DETECTIVE
5  MILTON G. GRUBER, DETECTIVE CHARLES FRAAS,
   DETECTIVE FRANK SIRIANNI, DETECTIVE HARRY
6  WALTMAN, P.O. MICHAEL CONNAUGHTON, P.O.
   WILLIAM DIEHL, and JOHN DOES 1-5,
7
                              Defendants.
8  - - - - - - - - - - - - - - - - - - - - - - - x
9
                              100 Federal Plaza
10                             Central Islip, New York
11                             March 18, 2009
                               11:25  A.M.
12
13
14
15          CONTINUED VIDEOTAPE DEPOSITION OF JOSEPH
16  VOLPE, one of the Defendants, taken by Plaintiffs,
17  pursuant to Notice, held at the above-noted time
18  and place, before a Notary Public of the State of
19  New York.
20
21
22
23
24
25

ALLIANCE REPORTING SERVICE, INC.  (516) 741-7585

168

1                        VOLPE                      168

2    you don't understand a question or want it

3    repeated, please do so.

4          A       Okay.

5          Q       And if you feel like you need to

6    take a break, of course, please tell us.

7                  First I'm going to show you what we

8    premarked Plaintiff's Exhibit 156, which is the

9    Complaint in this case.

10                 You've read this, right?

11         A       No, as a matter of fact, I haven't.

12   I browsed through it.

13         Q       You browsed through it?

14         A       Yeah, I haven't read it.

15         Q       Let me ask you this before we start.

16   You understand that there is an allegation here

17   that a hair from the dead body of Theresa Fusco

18   was planted in John Restivo's van or somehow

19   commingled with hairs that came from the van at

20   the police laboratory?

21         A       I'm aware of that, yes.

22         Q       Let me just call your attention then

23   to, I tabbed the paragraph here just so you're

24   aware, paragraph 86, okay?  And I'll read that to

25   you.

ALLIANCE REPORTING SERVICE, INC.  (516) 741-7585

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - -x
JOHN KOGUT,

                    Plaintiff,

        - against -                    CV-06-6695
                                       (JS)(WDW)
THE COUNTY OF NASSAU, POLICE
COMMISIONER DONALD KANE, POLICE COMMISSIONER
WILLIAM J WILLETT (2005), POLICE COMMISSIONER
JAMES LAWRENCE, DETECTIVE SEAN SPILLANE(HEAD
OF HOMICIDE 1985), DETECTIVE DENNIS FARRELL
(HEAD OF HOMICIDE 2005), DETECTIVE JOSEPH VOLPE,
DETECTIVE ROBERT DEMPSEY, DETECTIVE ALBERT
MARTINO, DETECTIVE WAYNE BIRDSALL, DETECTIVE
MILTON G. GRUBER, DETECTIVE CHARLES FRAAS,
DETECTIVE FRANK SIRIANNI, DETECTIVE HARRY
WALTMAN, P.O. MICHAEL CONNAUGHTON, P.O.
WILLIAM DIEHL, and JOHN DOES 1-5,
                        Defendants.
- - - - - - - - - - - - - - - - - - - - x
- - - - - - - - - - - - - - - - - - - - x
JOHN RESTIVO, DENNIS HALSTEAD, MELISSA LULLO,
JASON HALSTEAD, HEALTHER HALSTEAD and TAYLOR
HALSTEAD,

                    Plaintiffs,

        - against -                    CV-06-6720
                                       (JS)(WDW)
NASSAU COUNTY, JOSEPH VOLPE, in his
individual capacity, ROBERT DEMPSEY, in his
individual capacity, FRANK SIRIANNI, in his
individual capacity, MILTON GRUBER, in his
individual capacity, HARRY WALTMAN, in his
individual capacity, ALBERT MARTINO, in his
individual capacity, CHARLIE FRAAS, in his
individual capacity, THOMAS ALLEN, in his
individual capacity, RICHARD BRUSA, in his
individual capacity, VINCENT DONNELLY, in his
individual capacity, MICHAEL CONNAUGHTON, in
his individual capacity, WAYNE BIRDSALL, in
his individual capacity, WILLIAM DIEHL, in his
individual capacity, JACK SHARKEY, in his

ALLIANCE REPORTING SERVICE, INC.  (516) 741-7585

2

1

individual capacity, DANIEL PERRINO, in his

2   individual capacity, ANTHONY KOZIER, in his

individual capacity, DETECTIVE SERGEANT

3   CAMPBELL (SHIELD #48) in his individual

capacity, ROBERT EDWARDS, in his individual

4   capacity, SEAN SPILLANE, in his individual

capacity, JOHN DOE OFFICERS AND DETECTIVES

5   #1-10, in their individual capacities, and

RICHARD ROE SUPERVISORS #1-10, in their

6   individual capacities,

7                    Defendants.

- - - - - - - - - - - - - - - - - - - - x

8

9

10                    One West Street

Mineola, New York

11

January 26, 2009

12                    9:51  A.M.

13

14

15

16

17        VIDEOTAPE DEPOSITION OF JOSEPH VOLPE, one

18   of the Defendants, taken by Plaintiffs, pursuant

19   to Notice, held at the above-noted time and place,

20   before a Notary Public of the State of New York.

21

22

23

24

25

1                              VOLPE                    75

2           A       Correct.

3           Q       After the body was removed to the

4    morgue what is done with the body?

5                   MR. FERGUSON:   At the morgue?

6           Q       Right, what takes place?

7           A       In this case or in any case or

8    generally speaking?

9           Q       In this case.

10          A       Time of day, time of night, unless

11   it was of the utmost importance to do that night

12   it would be done in the morning, they would start,

13   the body would be put in the refrigerator.

14          Q       An autopsy?

15          A       Well, photographs, trace evidence,

16   then autopsy.

17          Q       In this specific case did you attend

18   the autopsy?

19          A       No.

20          Q       Even though you didn't attend the

21   autopsy you're familiar with what happens in an

22   autopsy, right?

23          A       Correct.

24          Q       For example, you're aware that they

25   routinely take blood and hair samples; correct?

1                          VOLPE                        76

2          A      Correct.

3          Q      And those blood and hair samples are

4    preserved and sent back to the SIB lab; correct?

5          A      Correct.

6          Q      And that's done in every homicide,

7    that's not unique to this case, right, standard

8    protocol?

9          A      Correct.

10         Q      It's autopsy 101, right?

11         A      I don't know that.

12         Q      Was it ever not done in any case you

13   covered?

14         A      No, I don't know that, I don't know

15   that either.  Well, there's certain evidence they

16   might keep.

17         Q      I'm asking you was there ever a

18   homicide case that you were ever involved with

19   where this wasn't done?

20         A      No.

21         Q      So in every homicide case you've

22   done this is standard operating procedure;

23   correct?

24         A      Yes.

25         Q      One of the things -- was there a

314

314

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - x
JOHN RESTIVO, DENNIS HALSTEAD, MELISSA LULLO,
JASON HALSTEAD, HEALTHER HALSTEAD and TAYLOR
HALSTEAD,

                Plaintiffs,

    - against -           CV-06-6720
                     (JS)(WDW)

NASSAU COUNTY, JOSEPH VOLPE, in his
individual capacity, ROBERT DEMPSEY, in his
individual capacity, FRANK SIRIANNI, in his
individual capacity, MILTON GRUBER, in his
individual capacity, HARRY WALTMAN, in his
individual capacity, ALBERT MARTINO, in his
individual capacity, CHARLIE FRAAS, in his
individual capacity, THOMAS ALLEN, in his
individual capacity, RICHARD BRUSA, in his
individual capacity, VINCENT DONNELLY, in his
individual capacity, MICHAEL CONNAUGHTON, in
his individual capacity, WAYNE BIRDSALL, in
his individual capacity, WILLIAM DIEHL, in his
individual capacity, JACK SHARKEY, in his
individual capacity, DANIEL PERRINO, in his
individual capacity, ANTHONY KOZIER, in his
individual capacity, DETECTIVE SERGEANT
CAMPBELL (SHIELD #48) in his individual
capacity, ROBERT EDWARDS, in his individual
capacity, SEAN SPILLANE, in his individual
capacity, JOHN DOE OFFICERS AND DETECTIVES
#1-10, in their individual capacities, and
RICHARD ROE SUPERVISORS #1-10, in their
individual capacities,

                Defendants.
- - - - - - - - - - - - - - - - - - - - - - x
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - -x
JOHN KOGUT,

                Plaintiff,

    - against -           CV-06-6695
                     (JS)(WDW)

THE COUNTY OF NASSAU, POLICE

315

1                                                    315

COMMISIONER DONALD KANE, POLICE COMMISSIONER

2   WILLIAM J WILLETT (2005), POLICE COMMISSIONER

JAMES LAWRENCE, DETECTIVE SEAN SPILLANE(HEAD

3   OF HOMICIDE 1985), DETECTIVE DENNIS FARRELL

(HEAD OF HOMICIDE 2005), DETECTIVE JOSEPH VOLPE,

4   DETECTIVE ROBERT DEMPSEY, DETECTIVE ALBERT

MARTINO, DETECTIVE WAYNE BIRDSALL, DETECTIVE

5   MILTON G. GRUBER, DETECTIVE CHARLES FRAAS,

DETECTIVE FRANK SIRIANNI, DETECTIVE HARRY

6   WALTMAN, P.O. MICHAEL CONNAUGHTON, P.O.

WILLIAM DIEHL, and JOHN DOES 1-5,

7

                         Defendants.

8   - - - - - - - - - - - - - - - - - - - - x

9

                         100 Federal Plaza

10                       Central Islip, New York

11                       May 4, 2009

                         11:17  A.M.

12

13

14

15          CONTINUED VIDEOTAPE DEPOSITION OF JOSEPH

16   VOLPE, one of the Defendants, taken by Plaintiffs,

17   pursuant to Notice, held at the above-noted time

18   and place, before a Notary Public of the State of

19   New York.

20

21

22

23

24

25

ALLIANCE REPORTING SERVICE, INC.  (516) 741-7585

354

1                          VOLPE                        354

2          A      Well, yeah, they were in bad shape,

3   so bad that her fingertips had to be removed, if I

4   remember correctly to try to obtain fingerprints.

5          Q      And was that from decay or was that

6   from --

7          A      Oh, yeah, decomposition, yes.

8          Q      So the decomposition, it wasn't from

9   let's say, a physical altercation?

10         A      Couldn't tell.

11         Q      Did you find any  -- was there any

12  evidence recovered from the body with respect to

13  the blood, the examination of the blood in the lab

14  that assisted you in this case?

15         A      Well, yeah, there was not blood,

16  seminal fluid.

17         Q      Okay, we'll get to that, but

18  nothing --

19         A      Nothing blood that I can recall.

20         Q      And we talked about that there were

21  hair and blood samples submitted to the Nassau

22  County Police Department on a prior occasion,

23  right?

24         A      That's correct.

25         Q      Her hair was pulled from her scalp

```
 1                    VOLPE                    355

 2   and blood samples were given to detective on the

 3   day of this autopsy and those were brought over to

 4   the homicide bureau to the SIB lab, right?

 5          A       Yes.

 6          Q       I think we said Detective Harry

 7   Waltman took possession of those items?

 8          A       That's correct.

 9          Q       And if we look back, flip back to

10   page 1, Detective Harry Waltman is listed as being

11   present at the homicide  --

12          A       Autopsy.

13          Q       At the autopsy, correct?

14          A       That's correct.

15          Q       Now, turning to the next page of the

16   autopsy report we have a serology laboratory

17   analysis report.

18          A       Where are you, Counselor?

19          Q       Second to last page right here.  And

20   would you agree with me that this next page is an

21   analysis report, the serology report, and if you

22   would be kind enough to read in the last two

23   sentences that are highlighted there.

24          A       The vaginal smears are positive for

25   the presence of spermatozoa, the anal and oral
```

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - -x
JOHN KOGUT,

                    Plaintiff,

        - against -                    CV-06-6695
                                       (JS)(WDW)
THE COUNTY OF NASSAU, POLICE
COMMISIONER DONALD KANE, POLICE COMMISSIONER
WILLIAM J WILLETT (2005), POLICE COMMISSIONER
JAMES LAWRENCE, DETECTIVE SEAN SPILLANE(HEAD
OF HOMICIDE 1985), DETECTIVE DENNIS FARRELL
(HEAD OF HOMICIDE 2005), DETECTIVE JOSEPH VOLPE,
DETECTIVE ROBERT DEMPSEY, DETECTIVE ALBERT
MARTINO, DETECTIVE WAYNE BIRDSALL, DETECTIVE
MILTON G. GRUBER, DETECTIVE CHARLES FRAAS,
DETECTIVE FRANK SIRIANNI, DETECTIVE HARRY
WALTMAN, P.O. MICHAEL CONNAUGHTON, P.O.
WILLIAM DIEHL, and JOHN DOES 1-5,
                    Defendants.
- - - - - - - - - - - - - - - - - - - - x
- - - - - - - - - - - - - - - - - - - - x
JOHN RESTIVO, DENNIS HALSTEAD, MELISSA LULLO,
JASON HALSTEAD, HEALTHER HALSTEAD and TAYLOR
HALSTEAD,

                    Plaintiffs,

        - against -                    CV-06-6720
                                       (JS)(WDW)
NASSAU COUNTY, JOSEPH VOLPE, in his
individual capacity, ROBERT DEMPSEY, in his
individual capacity, FRANK SIRIANNI, in his
individual capacity, MILTON GRUBER, in his
individual capacity, HARRY WALTMAN, in his
individual capacity, ALBERT MARTINO, in his
individual capacity, CHARLIE FRAAS, in his
individual capacity, THOMAS ALLEN, in his
individual capacity, RICHARD BRUSA, in his
individual capacity, VINCENT DONNELLY, in his
individual capacity, MICHAEL CONNAUGHTON, in
his individual capacity, WAYNE BIRDSALL, in
his individual capacity, WILLIAM DIEHL, in his
individual capacity, JACK SHARKEY, in his

2

1    individual capacity, DANIEL PERRINO, in his
2    individual capacity, ANTHONY KOZIER, in his
     individual capacity, DETECTIVE SERGEANT
3    CAMPBELL (SHIELD #48) in his individual
     capacity, ROBERT EDWARDS, in his individual
4    capacity, SEAN SPILLANE, in his individual
     capacity, JOHN DOE OFFICERS AND DETECTIVES
5    #1-10, in their individual capacities, and
     RICHARD ROE SUPERVISORS #1-10, in their
6    individual capacities,
7                        Defendants.
     - - - - - - - - - - - - - - - - - - - - x
8
9
10                      One West Street
                        Mineola, New York
11
                        January 26, 2009
12                      9:51  A.M.
13
14
15
16
17          VIDEOTAPE DEPOSITION OF JOSEPH VOLPE, one
18   of the Defendants, taken by Plaintiffs, pursuant
19   to Notice, held at the above-noted time and place,
20   before a Notary Public of the State of New York.
21
22
23
24
25

ALLIANCE REPORTING SERVICE, INC.  (516) 741-7585

71

1                          VOLPE                    71

2          A      Yes.

3          Q      All these items and property?

4          A      Items and property.

5          Q      Now, after this property is sent out

6    to the various bureaus for analysis you get the

7    reports back, right?

8          A      Eventually.

9          Q      And you have ready  -- you have

10   access to these various bureaus; correct?

11         A      Yes.

12         Q      Specifically SIB in this case, the

13   SIB bureau was in the same building as the

14   homicide bureau; correct?

15         A      Yes.

16         Q      And Wayne Birdsall and Gary Faas

17   were working on examination of certain evidence

18   that was recovered from the crime scene in this

19   case; correct?

20         A      Yes.

21         Q      And you could go visit them at your

22   leisure, you were in the same building, to ask

23   them questions concerning their examination of

24   this recovered property; true?

25         A      Yes.

```
1                         VOLPE                    72
2         Q       And you did so; correct?
3         A       On occasion.
4         Q       With respect to the physical
5    property that was recovered from the crime scene
6    there's different things that you look for, right,
7    one would be just a visual examination of the
8    property; correct?
9         A       Correct.
10        Q       The other would be to see if there's
11   anything unique about the property that could link
12   the property with an individual, right, items of
13   personal effects?
14        A       With the victim?
15        Q       With either the victim --
16        A       Or potential defendant.
17        Q       -- or perhaps suspect?
18        A       Yes.
19        Q       And you would also do forensic
20   examination of the particular property to
21   determine if there were fingerprints, blood, hair,
22   et cetera on what was recovered from the crime
23   scene?
24        A       Yes.
25        Q       And all that was done in this
```

163

163

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - x
JOHN RESTIVO, DENNIS HALSTEAD, MELISSA LULLO,
JASON HALSTEAD, HEALTHER HALSTEAD and TAYLOR
HALSTEAD,

                         Plaintiffs,

        - against -                        CV-06-6720
                                           (JS)(WDW)

NASSAU COUNTY, JOSEPH VOLPE, in his
individual capacity, ROBERT DEMPSEY, in his
individual capacity, FRANK SIRIANNI, in his
individual capacity, MILTON GRUBER, in his
individual capacity, HARRY WALTMAN, in his
individual capacity, ALBERT MARTINO, in his
individual capacity, CHARLIE FRAAS, in his
individual capacity, THOMAS ALLEN, in his
individual capacity, RICHARD BRUSA, in his
individual capacity, VINCENT DONNELLY, in his
individual capacity, MICHAEL CONNAUGHTON, in
his individual capacity, WAYNE BIRDSALL, in
his individual capacity, WILLIAM DIEHL, in his
individual capacity, JACK SHARKEY, in his
individual capacity, DANIEL PERRINO, in his
individual capacity, ANTHONY KOZIER, in his
individual capacity, DETECTIVE SERGEANT
CAMPBELL (SHIELD #48) in his individual
capacity, ROBERT EDWARDS, in his individual
capacity, SEAN SPILLANE, in his individual
capacity, JOHN DOE OFFICERS AND DETECTIVES
#1-10, in their individual capacities, and
RICHARD ROE SUPERVISORS #1-10, in their
individual capacities,

                         Defendants.

- - - - - - - - - - - - - - - - - - - - - x
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - -x
JOHN KOGUT,

                         Plaintiff,

        - against -                        CV-06-6695
                                           (JS)(WDW)

THE COUNTY OF NASSAU, POLICE

164

1 COMMISIONER DONALD KANE, POLICE COMMISSIONER
2 WILLIAM J WILLETT (2005), POLICE COMMISSIONER
  JAMES LAWRENCE, DETECTIVE SEAN SPILLANE(HEAD
3 OF HOMICIDE 1985), DETECTIVE DENNIS FARRELL
  (HEAD OF HOMICIDE 2005), DETECTIVE JOSEPH VOLPE,
4 DETECTIVE ROBERT DEMPSEY, DETECTIVE ALBERT
  MARTINO, DETECTIVE WAYNE BIRDSALL, DETECTIVE
5 MILTON G. GRUBER, DETECTIVE CHARLES FRAAS,
  DETECTIVE FRANK SIRIANNI, DETECTIVE HARRY
6 WALTMAN, P.O. MICHAEL CONNAUGHTON, P.O.
  WILLIAM DIEHL, and JOHN DOES 1-5,

7

8              Defendants.
  - - - - - - - - - - - - - - - - - - - - - - x

9

10             100 Federal Plaza
               Central Islip, New York

11             March 18, 2009
               11:25  A.M.

12

13

14

15       CONTINUED VIDEOTAPE DEPOSITION OF JOSEPH

16 VOLPE, one of the Defendants, taken by Plaintiffs,

17 pursuant to Notice, held at the above-noted time

18 and place, before a Notary Public of the State of

19 New York.

20

21

22

23

24

25

ALLIANCE REPORTING SERVICE, INC.  (516) 741-7585

169

VOLPE                                                   169

~~It alleges in paragraph 86, quote:~~

~~"Defendants either intentionally~~

~~planted Miss Fusco's hair samples in the van or~~

~~deliberately commingled Miss Fusco's hair samples~~

~~with the hair samples found in the van, in the~~

~~laboratory or elsewhere, to corroborate~~

~~Mr. Kogut's fabricated confession which indicated~~

~~that he, Mr. Restivo and Mr. Halstead allegedly~~

~~transported the victim's dead body in the van from~~

~~the cemetary to quote, unquote, fort area on the~~

~~night her death."~~

~~Do you see that?~~

~~A      Yes.~~

~~Q      Okay, and you understand what I just~~

~~read to you?~~

~~A      Yes.~~

Q      Now, what I'd like to do is review

with you your contact or interaction with

individuals that handled these hairs or examined

them, clear enough?

A      I understand.

Q      Now, first I'd like to point out to

you that Mr. Fraas, the hair examiner was deposed

in this case.   Okay?

ALLIANCE REPORTING SERVICE, INC.  (516) 741-7585

1                         VOLPE                         170

2          A       I'm aware of that.

3          Q       And you know him, right?

4          A       I know him, yes.

5          Q       Did you review his deposition by the

6    way?

7          A       No.

8          Q       And I'm now going to call your

9    attention and read to you from page 84 of

10   Mr. Fraas' deposition just so you know what he

11   said.  Okay?

12         A       Okay.

13         Q       At page 84 Line 9 he was asked the

14   question:

15                 Question:  "And at least at some

16   point during your work on this case you saw

17   Detective Volpe in that SIB office?"

18                 Answer:  "I'm sure I did, but I

19   don't specifically recall.  I'm sure I did

20   though."

21                 Okay, do you see that?

22         A       Yes, I do.

23         Q       And during the course of his

24   deposition Mr. Fraas never mentioned having any

25   specific memory or recollection of talking with

231

231

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - x
JOHN RESTIVO, DENNIS HALSTEAD, MELISSA LULLO,
JASON HALSTEAD, HEATHER HALSTEAD and TAYLOR
HALSTEAD,

                    Plaintiffs,

    - against -               CV-06-6720
                              (JS)(WDW)

NASSAU COUNTY, JOSEPH VOLPE, in his
individual capacity, ROBERT DEMPSEY, in his
individual capacity, FRANK SIRIANNI, in his
individual capacity, MILTON GRUBER, in his
individual capacity, HARRY WALTMAN, in his
individual capacity, ALBERT MARTINO, in his
individual capacity, CHARLIE FRAAS, in his
individual capacity, THOMAS ALLEN, in his
individual capacity, RICHARD BRUSA, in his
individual capacity, VINCENT DONNELLY, in his
individual capacity, MICHAEL CONNAUGHTON, in
his individual capacity, WAYNE BIRDSALL, in
his individual capacity, WILLIAM DIEHL, in his
individual capacity, JACK SHARKEY, in his
individual capacity, DANIEL PERRINO, in his
individual capacity, ANTHONY KOZIER, in his
individual capacity, DETECTIVE SERGEANT
CAMPBELL (SHIELD #48) in his individual
capacity, ROBERT EDWARDS, in his individual
capacity, SEAN SPILLANE, in his individual
capacity, JOHN DOE OFFICERS AND DETECTIVES
#1-10, in their individual capacities, and
RICHARD ROE SUPERVISORS #1-10, in their
individual capacities,

                    Defendants.
- - - - - - - - - - - - - - - - - - - - - x
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - -x
JOHN KOGUT,

                    Plaintiff,

    - against -               CV-06-6695
                              (JS)(WDW)

THE COUNTY OF NASSAU, POLICE

232

232

COMMISIONER DONALD KANE, POLICE COMMISSIONER
WILLIAM J WILLETT (2005), POLICE COMMISSIONER
JAMES LAWRENCE, DETECTIVE SEAN SPILLANE(HEAD
OF HOMICIDE 1985), DETECTIVE DENNIS FARRELL
(HEAD OF HOMICIDE 2005), DETECTIVE JOSEPH VOLPE,
DETECTIVE ROBERT DEMPSEY, DETECTIVE ALBERT
MARTINO, DETECTIVE WAYNE BIRDSALL, DETECTIVE
MILTON G. GRUBER, DETECTIVE CHARLES FRAAS,
DETECTIVE FRANK SIRIANNI, DETECTIVE HARRY
WALTMAN, P.O. MICHAEL CONNAUGHTON, P.O.
WILLIAM DIEHL, and JOHN DOES 1-5,

                              Defendants.
- - - - - - - - - - - - - - - - - - - - - - - x


                         100 Federal Plaza
                         Central Islip, New York

                         April 6, 2009
                         11:27  A.M.




          CONTINUED VIDEOTAPE DEPOSITION of JOSEPH

VOLPE, one of the Defendants, taken by Plaintiffs,

pursuant to Notice, held at the above-noted time

and place, before a Notary Public of the State of

New York.

ALLIANCE REPORTING SERVICE, INC.  (516) 741-7585

242

1                    VOLPE                    242

2    not have completed his hair examination until

3    after you filled out this affidavit on March 29th,

4    it's your assumption, I guess, that somebody must

5    have told you that there was a hair consistent

6    with Theresa Fusco's in the Restivo van because

7    you wouldn't put such a statement in a warrant if

8    nobody had told you that, right?

9            A        That's correct.

10            Q        And that's because you would never

11   put anything in an affidavit for a warrant that

12   nobody had told you to be true?

13            A        If I hadn't had that information I

14   wouldn't have put it in there.

15            Q        Well, let's go back to paragraph 10.

16   That says, again, a search of the van has produced

17   hair consistent with Theresa Fusco's and possible

18   human blood.

19            Do you see that?

20            A        Yes.

21            Q        Okay.  So who was it that processed

22   the van, Birdsall?

23            A        Fraas and Birdsall.

24            Q        And you didn't go inside and process

25   the van, did you?

ALLIANCE REPORTING SERVICE, INC.  (516) 741-7585

1                    V O L P E                         243

2           A       No.

3           Q       So they reported back to you their

4    reports, right?

5           A       Not on the first night, just what

6    they had collected.

7           Q       So you were counting on Birdsall to

8    report to you whether or not he found possible

9    human blood in the van?

10          A       Or certainly him or one of his

11   supervisors or one of my supervisors.

12          Q       But as far as you know it was

13   Birdsall that was processing the van?

14          A       As far as I know, yes.

15          Q       So you would expect that Birdsall

16   would have been the person that reported back to

17   you that there was possible human blood in the

18   van, right?

19                  MR. FERGUSON:  He just said three

20          times the list of people it could have been.

21          He's already answered that three times.

22          Q       Can you answer my question?

23          A       I've already  -- could have been

24   anyone, could have been any one of my supervisors

25   or a lab supervisor.

Joseph Volpe                                November 19, 2010

140

```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------)
JOHN KOGUT et al.,                        )
                                          )
              Plaintiff,        )
                                )         Docket No.
   -vs.-                        )         06-CV-6695
                                )
                                )
THE COUNTY OF NASSAU,POLICE     )
COMMISSIONER DONALD KANE,       )
POLICE COMMISSIONER             )
WILLIAM J. WILLETT (2005),      )
POLICE COMMISSIONER             )
JAMES LAWRENCE,                 )
DETECTIVE SEAN SPILLANE         )
(HEAD OF HOMICIDE 1985),        )
DETECTIVE DENNIS FARRELL        )
(HEAD OF HOMICIDE 12005),       )
DETECTIVE ALBERT MARTINO,       )
DETECTIVE WAYNE BIRDSALL,       )
DETECTIVE MILTON G. GRUBER,     )
DETECTIVE CHARLES FRAAS,        )
DETECTIVE FRANK SIRIANNI,       )
DETECTIVE HARRY WALTMAN,        )
P.O. MICHAEL CONNAUGHTON,       )
P.O. WILLIAM DIEHL,             )
and JOHN DOES 1-5,              )
                                )
              Defendants.       )
                                )
------------------------------)
```

          CONTINUED VIDEOTAPE DEPOSITION OF
JOSEPH VOLPE, held at the Nassau County
Attorney's office, One West Street, Mineola,
New York, on November 19, 2010, at 12:23 p.m.,
before HELGA CHRISTIANE LAVAN, a Registered
Professional Reporter and notary public,
within and for the State of New York.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

Joseph Volpe                                   November 19, 2010

272

Volpe

1

2    Q.   Did you plant hairs in this case?

3    A.   No.

4    Q.   Did you go to either -- did you go to

5    the M.E.'s office and take hairs from the

6    M.E.'s office and put them in envelopes?

7    A.   No.

8    Q.   Did you have access to the M.E.'s

9    office?

10   A.   No.   For either hairs?   No.

11   Q.   Were you present when the van that

12   the hairs were found in were -- was being

13   searched by SIB?

14   A.   By the time I came in that evening, I

15   mean, I was out on the road doing something

16   else.   The lab, the SIB people were already in

17   it.   They were in the van.

18   Q.   Did you go in the van?

19   A.   No.

20   Q.   Are you permitted to go in the van?

21   A.   No.   It's a crime scene.

22   Q.   Do you recall making an affidavit for

23   an eavesdropping warrant on March 26, 1985?

24   A.   Yes.

25   Q.   Did you indicate in that affidavit



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

163

163

```
SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - x
JOHN RESTIVO, DENNIS HALSTEAD, MELISSA LULLO,
JASON HALSTEAD, HEALTHER HALSTEAD and TAYLOR
HALSTEAD,
                         Plaintiffs,

        - against -                      CV-06-6720
                                         (JS)(WDW)
NASSAU COUNTY, JOSEPH VOLPE, in his
individual capacity, ROBERT DEMPSEY, in his
individual capacity, FRANK SIRIANNI, in his
individual capacity, MILTON GRUBER, in his
individual capacity, HARRY WALTMAN, in his
individual capacity, ALBERT MARTINO, in his
individual capacity, CHARLIE FRAAS, in his
individual capacity, THOMAS ALLEN, in his
individual capacity, RICHARD BRUSA, in his
individual capacity, VINCENT DONNELLY, in his
individual capacity, MICHAEL CONNAUGHTON, in
his individual capacity, WAYNE BIRDSALL, in
his individual capacity, WILLIAM DIEHL, in his
individual capacity, JACK SHARKEY, in his
individual capacity, DANIEL PERRINO, in his
individual capacity, ANTHONY KOZIER, in his
individual capacity, DETECTIVE SERGEANT
CAMPBELL (SHIELD #48) in his individual
capacity, ROBERT EDWARDS, in his individual
capacity, SEAN SPILLANE, in his individual
capacity, JOHN DOE OFFICERS AND DETECTIVES
#1-10, in their individual capacities, and
RICHARD ROE SUPERVISORS #1-10, in their
individual capacities,

                         Defendants.
- - - - - - - - - - - - - - - - - - - - - x
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - -x
JOHN KOGUT,

                         Plaintiff,

        - against -                      CV-06-6695
                                         (JS)(WDW)
THE COUNTY OF NASSAU, POLICE
```

164

164

COMMISIONER DONALD KANE, POLICE COMMISSIONER
WILLIAM J WILLETT (2005), POLICE COMMISSIONER
JAMES LAWRENCE, DETECTIVE SEAN SPILLANE(HEAD
OF HOMICIDE 1985), DETECTIVE DENNIS FARRELL
(HEAD OF HOMICIDE 2005), DETECTIVE JOSEPH VOLPE,
DETECTIVE ROBERT DEMPSEY, DETECTIVE ALBERT
MARTINO, DETECTIVE WAYNE BIRDSALL, DETECTIVE
MILTON G. GRUBER, DETECTIVE CHARLES FRAAS,
DETECTIVE FRANK SIRIANNI, DETECTIVE HARRY
WALTMAN, P.O. MICHAEL CONNAUGHTON, P.O.
WILLIAM DIEHL, and JOHN DOES 1-5,

                        Defendants.

- - - - - - - - - - - - - - - - - - - - - x

                    100 Federal Plaza
                    Central Islip, New York

                    March 18, 2009
                    11:25  A.M.

         CONTINUED VIDEOTAPE DEPOSITION OF JOSEPH

VOLPE, one of the Defendants, taken by Plaintiffs,

pursuant to Notice, held at the above-noted time

and place, before a Notary Public of the State of

New York.

                ALLIANCE REPORTING SERVICE, INC.  (516) 741-7585

176

1                           VOLPE                      176

2                    ~~Answer:  "I don't believe I did."~~

3                    ~~Okay, do you see that?~~

4         A        ~~Yes.~~

5         Q        ~~So, and what you said, you used the~~

6    ~~term processing the van, right?~~

7         A        ~~Yes.~~

8         Q        ~~So would it be your understanding of~~

9    ~~this testimony that Mr. Fraas was saying that the~~

10   ~~van was being processed on the 26th and he did not~~

11   ~~begin any examination of the hairs that were taken~~

12   ~~out of the van until the next day, the 27th?~~

13                   ~~MS. BEN-SOREK:  Objection.~~

14        A        ~~I would say that, yes.~~

15        Q        Okay.  Now I call your attention to

16   page 40 of the deposition.

17                   MS. CORNWALL:  It should also be

18        tabbed.

19        Q        Yes, it's tabbed.

20                   MS. BEN-SOREK:  Which line.

21        Q        Starting at line 5.  And it's at

22   this section incidentally that Mr. Fraas is

23   testifying about how when the hairs are obtained

24   first he does a gross visual examination.

25                   Does any of that ring a bell for you

         ALLIANCE REPORTING SERVICE, INC.  (516) 741-7585

177

1                              VOLPE                              177

2      now, as to how this was done?

3              A        I knew that that's the way it was

4      done.

5              Q        Fine.  So he was asked:

6                       Question:  Doing a careful thorough

7      gross visual examination of over a hundred

8      questioned hairs you certainly couldn't have

9      finished that in a single day, could you?

10                      Answer:  "That's correct."

11                      Do you see that?

12             A        Yes.

13             Q        Do you have any reason to doubt that

14     Mr. Fraas is accurate in that testimony?

15                      MS. BEN-SOREK:  Objection.

16             A        I don't recall the time frame on the

17     identification of the hairs, I just don't.

18             Q        No, I understand that and that's why

19     I'm reviewing this with you, to show you in

20     fairness what Fraas testified to, okay?

21             A        Yes.

22             Q        So he's saying here, would you not

23     agree, that to do a gross visual examination of

24     over a hundred questioned hairs he couldn't have

25     done that all in a single day?

184

1                              VOLPE                              184

2    you.

3              So then he talks about mounting

4    hairs on glass slides.  And maybe if you turn to

5    page 34, okay?  Now you're familiar with the

6    process that there's a gross visual examination

7    and then hairs are mounted on these glass slides;

8    do you remember that?

9         A    Yes.

10         Q    Okay.  So starting at page 34, line

11    10, Mr. Fraas is asked:

12              Question:  "So you mounted the

13    questioned hairs in the days and weeks following

14    your examination of the van, right?"

15              Answer:  "Yes."

16              Question:  "After you had gone

17    through the careful process of undertaking a gross

18    visual examination of each of those hundred or

19    more hairs?"

20              Answer:  "Yes."

21              Then he goes on, if you turn to  --

22    let me show you now -- let me do this.

23              Now I'm going to show you what's

24    been previously marked as Plaintiff's Exhibit 4

25    and this is Mr. Fraas' testimony at the criminal

181

1                        VOLPE                        181

2   understanding today whether what I'm saying to you

3   makes sense based on his assertions; do you see

4   what I'm saying?

5                MS. BEN-SOREK:  Objection.

6        A        I do, except that it's a logical,

7   but it may not be actual based on my recollection

8   of it.

9        Q        Well, okay.

10       A        Some of the things I can't pinpoint

11  for you even with his testimony.

12       Q        I understand.  You have no

13  recollection of observing Fraas doing the gross

14  visual examination or the microscopic examination

15  or any of that, do you?

16       A        No participation in it either.

17       Q        Right, no participation, okay.  So

18  what I'm trying to do with you now is show you his

19  testimony in the deposition as to what he

20  remembers happening or his best estimate of how

21  this process would work; do you understand me?

22       A        Yes, I do.

23       Q        And so when I'm asking you these

24  questions and asking you to follow along what I'm

25  only asking you to do right now is logically

1                          V O L P E                           170

2          A    I'm aware of that.

3          Q    And you know him, right?

4          A    I know him, yes.

5          Q    Did you review his deposition by the

6    way?

7          A    No.

8          Q    And I'm now going to call your

9    attention and read to you from page 84 of

10   Mr. Fraas' deposition just so you know what he

11   said.  Okay?

12         A    Okay.

13         Q    At page 84 Line 9 he was asked the

14   question:

15              Question:  "And at least at some

16   point during your work on this case you saw

17   Detective Volpe in that SIB office?"

18              Answer:  "I'm sure I did, but I

19   don't specifically recall.  I'm sure I did

20   though."

21              Okay, do you see that?

22         A    Yes, I do.

23         Q    And during the course of his

24   deposition Mr. Fraas never mentioned having any

25   specific memory or recollection of talking with

1                              VOLPE                        171

2     you about these hair results, okay?

3          A       That's correct.

4          Q       Did you ever talk with him about the

5     hair results?

6          A       Most of my dealings with the lab in

7     that area were with Birdsall, but I didn't talk to

8     him about his work, just generic general

9     conversation.

10         Q       You're talking here about Birdsall,

11    right?

12         A       No, No, I'm talking about Fraas.

13         Q       Fraas?

14         A       Yeah.  We didn't ignore each other

15    during the course  --

16         Q       Right.  So as you sit here today do

17    you have any independent recollection of any

18    unusual conversations with Fraas about the hairs?

19                 MS. BEN-SOREK:  Objection to form.

20         Q       Maybe I'm -- I'll restate that

21    question because I think you said you have no

22    memory of any conversations with Fraas about the

23    hair, is that right?

24         A       Specifically about the hair, I don't

25    recall.

172

1                         VOLPE                        172

2          Q        Okay. So as you sit here today do
3    you have any independent recollection of some
4    unusual conversation with Mr. Fraas where he
5    called you up right away about results from his
6    hair examination?

7

8                   MS. BEN-SOREK:   Still objection to
9          form.

10                  You can answer.

11         A        No, I don't.

12         Q        Now, I'd like to  -- do you have any
13   familiarity with the process of microscopic hair
14   comparison?

15         A        Not really, no.

16         Q        Do you have any general idea of how
17   it's done?

18         A        I'm retired seven years, to be quite
19   frank, and with my various unfortunate illnesseses
20   I don't have too much recollection about the
21   specifics about scientific studies.

22         Q        Okay.  Incidentally  -- so let me in
23   fairness, review with you some of what Mr. Fraas
24   said in his testimony about the microscopic hair
25   comparison and see if it refreshes your

ALLIANCE REPORTING SERVICE, INC.  (516) 741-7585

```
                                                     199
 1                    V O L P E                      199

 2                        Do you see that?

 3         A        Yes, there's a lot of work here,

 4  Counselor.

 5         Q        So -- make sure you understand this.

 6  Would you not agree that it was Fraas' position at

 7  the trial that the earliest that he could have

 8  possibly have completed all the work in this case,

 9  microscopic hair comparison, he couldn't have

10  possibly done it in four days, right?

11                  MS. BEN-SOREK:  Objection to form.

12         A        Now he said it wasn't likely to do

13  it in four days? May I take a look back?

14         Q        Yes, just read it.

15         A        Question?

16                  MS. BEN-SOREK:  Start at line 13.

17         A        I know, I have it, but your question

18  Mr. Scheck.

19         Q        My question is, would you not agree

20  that it was Fraas' position at the criminal trial

21  that he couldn't have possibly finished this --

22  all the microscopic hair comparison in this case

23  in just four days?

24                  MS. BEN-SOREK:  Objection.

25         A        I agree with the testimony.
```

ALLIANCE REPORTING SERVICE, INC.  (516) 741-7585

```
                                                            200
1                      V O L P E                            200
2          Q        Right.
3          A        That's what the testimony reads.
4          Q        That's what the testimony reads,
5    okay.
6                   And do you have any reason based on
7    your own personal knowledge of how the hair
8    examination went to dispute that?
9                   MS. BEN-SOREK:  Objection.  He said
10         already he didn't have knowledge of the hair
11         investigation.
12         A        No.
13         Q        Now, you did not have any advance
14   knowledge -- withdrawn.  Let me ask it to you this
15   way.
16                  Would you agree that if you had been
17   part of planting a hair either in John Restivo's
18   van or in the hair evidence that was gathered from
19   the van, hair from Theresa Fusco's dead body, that
20   that would give you some advance knowledge of how
21   the microscopic comparison would turn out?
22                  MS. BEN-SOREK:  Objection.
23         A        I can't even fathom that question
24   because it certainly didn't happen and  --
25         Q        I understand it's your position that
```

ALLIANCE REPORTING SERVICE, INC.  (516) 741-7585

                                                                    202
1                         V O L P E                         202

2    how many hairs, I really don't.  I don't recall

3    how many hairs that at that time were consistent

4    with Theresa Fusco were found.

5            Q         Two.

6            A         Two.

7            Q         Well, let me put it to you this

8    way --

9            A         You understand?  I'm trying to

10   answer that question.

11           Q         I understand that there was one that

12   was found to be microscopically consistent and

13   there was a second Q8 and then there was a second

14   Q4 that eventually was found to come from her.

15                     But let me go back over this with

16   you just for a second.  Would you not agree that

17   if somebody planted Theresa Fusco's hair either in

18   the van or put them in the materials that Fraas

19   was going to be examining, that that individual

20   would have some advance knowledge that Fraas might

21   find that there was a hair that was

22   microscopically consistent with Theresa Fusco?

23                     MS. BEN-SOREK:  Objection.

24          A         First of all, if somebody planted

25   two hairs, you know, they're rolling the dice to

             ALLIANCE REPORTING SERVICE, INC.  (516) 741-7585

203
1                         VOLPE                         203
2    see if they would be found, number one.  And
3    number two, yes, it is possible if that's what
4    you're looking for.
5           Q       Yeah, somebody plants a hair they
6    would have advance knowledge that Fraas might look
7    at it and say that the hair is microscopically
8    consistent?
9                   MS. BEN-SOREK:  Objection.
10          A       Well, it's a crap shoot, they'd have
11   to find the hair.  If this phantom puts two hairs
12   in that van or places them someplace strategically
13   then it's a roll of the dice that they'll be
14   found.
15          Q       Well, if somebody put the hair among
16   Fraas' materials after he finished the gross
17   visual examination and he was ready to mount the
18   hairs then you'd have a better shot of him finding
19   a hair that was microscopically consistent with
20   Theresa Fusco, right?
21                  MS. BEN-SOREK:  Objection.
22          A       I understand, yes.
23          Q       Okay.  So if one were in the hair
24   planting business that would be the best way to do
25   it, right?

ALLIANCE REPORTING SERVICE, INC.  (516) 741-7585

204

1                              VOLPE                              204

2          A        Would be the only technique I would

3    think.

4                   MS. BEN-SOREK:  Objection.

5          Q        And assuming that somebody was able

6    to do that, right, then you would have some

7    reasonable expectation that when Fraas went

8    through the hairs that he would find the hair that

9    was microscopically consistent with Fusco?

10                  MS. BEN-SOREK:  Objection.

11         A        Nobody I know did something like

12   that.

13         Q        Now, and would you agree that if no

14   hairs were either put into the van from Theresa

15   Fusco or put into the hairs that Fraas had

16   gathered after gross visual examination then there

17   would be no way to know in advance whether or not

18   Fraas would find a hair consistent with Theresa

19   Fusco, right?

20                  MS. BEN-SOREK:  Objection.

21            Speculation.

22         Q        As a matter of logic?

23                  MS. BEN-SOREK:  Still objection.

24                  You can answer.

25         A        Well, phrase it that way, I guess,

ALLIANCE REPORTING SERVICE, INC.  (516) 741-7585

205

1                    V O L P E                    205

2      yeah, it's correct.

3          Q      Incidentally when this van was being

4   seized this was five weeks after the murder,

5   right?

6                  MS. BEN-SOREK:  Objection.

7          Q      Even longer than that.  I think the

8   murder was -- November 10th she went missing,

9   right?

10         A      That's correct.

11         Q      And then it was -- her body was

12  found on December 5th of '84, right?

13         A      That's correct.

14         Q      And the van was seized on March 26th

15  of '85, right?

16         A      Yes, correct.

17         Q      So it certainly, it's five weeks

18  since she went missing, that five weeks since she

19  went missing when you began the examination of the

20  van, right?

21         A      No.

22                MS. BEN-SOREK:  Objection.

23         Q      How many weeks?

24         A      Months.

25         Q      Months, I'm sorry.  I was

208

1                          VOLPE                          208

2       hairs and fiber there?

3                    MS. BEN-SOREK:   Objection.

4           A       I'm certainly not being sarcastic.

5       I don't think that there's such a thing as a

6       longshot when you're approaching evidence in a

7       homicide.

8           Q       Well, how would you describe your

9       expectations that you were really going to find

10      there, what was your state of mind?

11          A       Well, you know, having a bit of

12      knowledge about the people involved, I wouldn't be

13      surprised if they didn't, if you're asking me my

14      opinion.

15          Q       That there wouldn't be any hair?

16          A       They wouldn't have cleaned it.

17          Q       All right. Now, I like to show

18      you -- now there was -- wire taps were sought and

19      granted on the home of Dennis Halstead, right?

20          A       Correct.

21          Q       And I think first there was a bug

22      planted in his living room and then they

23      wire-tapped his phone?

24          A       I don't recall the order, I'm sorry.

25          Q       But there was electronic

ALLIANCE REPORTING SERVICE, INC.   (516) 741-7585

209

1                    V O L P E                    209

2    surveillance of Denis Halstead's home, correct?

3          A       That's correct, yes.

4          Q       And in order to get surveillance

5    warrants had to be obtained, correct?

6          A       Correct.

7          Q       And you recall in this case you were

8    the affiant, you were the person that swore out an

9    affidavit that was then used by the District

10   Attorney as a basis for the wire tap notice?

11         A       I believe so.

12         Q       And incidentally, how does that

13   process work in terms of timing?

14                 MS. BEN-SOREK:  In general or in

15         this particular case.

16         Q       In this particular case how would it

17   work?

18         A       Be more specific, please.

19         Q       Sure.  I'll move forward a little

20   bit.

21                 Now after you get an eavesdropping

22   warrant, an electronic surveillance warrant in

23   order to continue the electronic surveillance past

24   a certain point in time you have to get a

25   supplemental warrant, right?

217

1                         V O L P E                          217

2    couldn't be done in less than an hour?

3           A      This is my first eavesdrop.

4           Q      This is your first eavesdrop?

5           A      In 27 years.

6           Q      Okay.  Well, I'd like to call your

7    attention to paragraph number 10, okay?  Now this

8    is your affidavit, right?

9           A      Yes.

10          Q      Right.  You see it's your affidavit,

11   right?

12          A      Yes.

13          Q      And this is an affidavit that's

14   being filled out on March 29th, 1985, right?

15          A      Yes.

16          Q      And that is just two days after

17   Detective Fraas said he first began examining

18   hairs from the van, right?

19          A      Yes.

20          Q      And this is a process that Detective

21   Fraas said couldn't have been completed any

22   earlier than four days, right?

23          A      I believe what he said was the

24   process in its entirety.

25          Q      Yeah.

ALLIANCE REPORTING SERVICE, INC.  (516) 741-7585

219

1                      VOLPE                      219

2    though.

3                    I don't know if he's going to say on

4    the 27th I already went one slide that was

5    consistent with Fusco.  You know, I don't know

6    what he said.

7         Q        Well, you do know what he testified

8    to, right, because I just reviewed it with you,

9    right?

10        A        From what you reviewed with me,

11   yeah.

12        Q        And his testimony is that he

13   couldn't have finished this examination that he

14   began on the 27th any earlier than four days

15   meaning carry you all the way through March 31st,

16   right?

17                 MS. BEN-SOREK:   Objection.

18        Q        That's what he said?

19        A        That's what he said.

20        Q        That's what you and I reviewed in

21   the testimony, right?

22        A        Yes.

23        Q        Now, you see a problem here, don't

24   you?

25        A        Of course.

220

1                          VOLPE                          220

2          Q        And the problem is, let's read

3    paragraph 10.    On paragraph 10 in your sworn

4    affidavit of March 29th you say, quote, "On March

5    27th, 1985, Nassau County Court Judge Lawrence

6    signed an order authorizing the seizure of the

7    above-described van to wit:    1977 Ford van blue in

8    color, New York registration 3524BG operated by

9    John Restivo during the murder of Theresa Fusco."

10   And now the big sentence, quote, "A search of that

11   van has produced hair consistent with Theresa

12   Fusco's and possibly human blood."

13               Do you see that, right?

14        A        Yes, I do.

15        Q        So if Fraas' testimony is true and

16   he couldn't have possibly finished the hair

17   comparisons until March 31st at the earliest, how

18   can you swear in an affidavit on March 29th that

19   there is a hair consistent with Theresa Fusco's in

20   the Restivo van?

21

22               MS. BEN-SOREK:    Objection.

23        A        To the best of my recollection, when

24   I did this affidavit I recall being aware of a

25   similarity of hairs.    Now if he gave that to me in

ALLIANCE REPORTING SERVICE, INC.    (516) 741-7585

221

1                          VOLPE                    221

2    the first phase of his 80 slides -- I do recall

3    it, I certainly wouldn't have put it in there.

4          Q      Wait a second.  When we began this

5    deposition today you said you recalled no

6    conversations with Fraas about the hairs, right?

7          A      But at each phase when you're

8    refreshing my recollection if I can remember from

9    that point on then I'm successful.  I just, I

10   don't remember, I don't even remember this

11   paragraph.

12         Q      I'm confident you don't remember

13   this paragraph.

14         A      Yeah.

15                MS. BEN-SOREK:   Objection.

16         A      But just reading it, for me to have

17   put that in there as part of it.

18         Q      So let's just review this.  When I

19   asked you before whether you had any recollection

20   of having conversations with Fraas about the hair

21   comparisons or having any unusual conversations or

22   any statements from him, hey, we got a result, you

23   didn't remember anything, right?

24         A      No, I didn't.

25         Q      And I showed you Fraas' testimony

223

1                        V O L P E                        223

2       Q     Yes, Fraas never said that.

3       A     In his testimony?

4       Q     Yeah.

5       A     Well, I certainly, I don't recall,

6   you know.

7       Q     And I just want to see if I got your

8   position right.  So now that I've confronted you

9   with a warrant on March 29th which indicates that

10  you knew already when you were seeking on March

11  29th the warrant that there was a hair consistent

12  with Theresa Fusco in the van, you're now telling

13  us that it's come to you, suddenly come to you

14  that you now remember a conversation with Fraas

15  before he completed the hair analysis where he

16  told you, we've got a hair that's consistent with

17  Fusco.  Is that what you're telling us?

18            MS. BEN-SOREK:  Objection.

19       A     I don't recall.  I'm trying now,

20  I'm trying now to give you the correct answer what

21  I recall.  No, I can't, I can't say I talked with

22  him.  I can't say I talked with Birdsall or one of

23  the supervisors, I just can't.  I can't, I can't

24  answer that.

25       Q     So other than, well, I think we

ALLIANCE REPORTING SERVICE, INC.  (516) 741-7585

224

1                              VOLPE                         224

2      agreed before that if one were aware of a hair

3      being planted, right, in the van or among the

4      materials that Fraas had picked after gross

5      examination to put on slides, if one were aware of

6      a Theresa Fusco hair being planted there then one

7      would have some advance knowledge that the

8      microscopic comparison would come back to Theresa

9      Fusco, right?

10                    MS. BEN-SOREK:   Objection.

11            A      I guess so.

12            Q      And would it be fair enough to say

13     that based on the testimony you and I reviewed

14     from Mr. Fraas, he's saying that it was impossible

15     for him to have finished the microscopic hair

16     comparison and reported back that he had found a

17     hair consistent with Theresa Fusco by March 29th?

18                    MS. BEN-SOREK:   Objection.   It's a

19            mischaracterization of the testimony.

20            Q      You want me to repeat that question?

21            A      Yeah.

22            Q      Sure.  I'll read it to you again so

23     there's no question about it.  Let me read you

24     something else just to make sure that we're  --

25     you were saying that just before that maybe when

ALLIANCE REPORTING SERVICE, INC.  (516) 741-7585

1                           VOLPE                           225

2      Fraas was conducting some early side-by-side

3      examination early in the process maybe he told you

4      that he had a similar hair, is that what you were

5      speculating before?

6              A      Only because for me to to have put

7      this in here that would have had to.

8              Q      Yeah.  I mean the problem we have is

9      that based on Fraas' testimony it's impossible for

10     you to have known that there would be a hair

11     consistent with Theresa Fusco on March 29th unless

12     you had knowledge that somebody had planted a

13     hair, right?

14                    MS. BEN-SOREK:   Objection.   That's

15             not what Fraas said.

16             A      That's incorrect.  I can't agree

17     with that.

18             Q      Let's try this.

19             A      I'm in atrial fib, I'm about done.

20             Q      You're about done today?

21             A      Yeah.

22             Q      Do you need a break now, is that

23     what you're telling me?

24             A      No, when I'm in an atrial fib I know

25     I'm finished.

ALLIANCE REPORTING SERVICE, INC.  (516) 741-7585

231

231

```
SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - x
JOHN RESTIVO, DENNIS HALSTEAD, MELISSA LULLO,
JASON HALSTEAD, HEATHER HALSTEAD and TAYLOR
HALSTEAD,
                         Plaintiffs,

         - against -                      CV-06-6720
                                          (JS)(WDW)
NASSAU COUNTY, JOSEPH VOLPE, in his
individual capacity, ROBERT DEMPSEY, in his
individual capacity, FRANK SIRIANNI, in his
individual capacity, MILTON GRUBER, in his
individual capacity, HARRY WALTMAN, in his
individual capacity, ALBERT MARTINO, in his
individual capacity, CHARLIE FRAAS, in his
individual capacity, THOMAS ALLEN, in his
individual capacity, RICHARD BRUSA, in his
individual capacity, VINCENT DONNELLY, in his
individual capacity, MICHAEL CONNAUGHTON, in
his individual capacity, WAYNE BIRDSALL, in
his individual capacity, WILLIAM DIEHL, in his
individual capacity, JACK SHARKEY, in his
individual capacity, DANIEL PERRINO, in his
individual capacity, ANTHONY KOZIER, in his
individual capacity, DETECTIVE SERGEANT
CAMPBELL (SHIELD #48) in his individual
capacity, ROBERT EDWARDS, in his individual
capacity, SEAN SPILLANE, in his individual
capacity, JOHN DOE OFFICERS AND DETECTIVES
#1-10, in their individual capacities, and
RICHARD ROE SUPERVISORS #1-10, in their
individual capacities,

                         Defendants.
- - - - - - - - - - - - - - - - - - - - - - x
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - x
JOHN KOGUT,

                         Plaintiff,

         - against -                      CV-06-6695
                                          (JS)(WDW)
THE COUNTY OF NASSAU, POLICE
```

232

COMMISIONER DONALD KANE, POLICE COMMISSIONER
WILLIAM J WILLETT (2005), POLICE COMMISSIONER
JAMES LAWRENCE, DETECTIVE SEAN SPILLANE(HEAD
OF HOMICIDE 1985), DETECTIVE DENNIS FARRELL
(HEAD OF HOMICIDE 2005), DETECTIVE JOSEPH VOLPE,
DETECTIVE ROBERT DEMPSEY, DETECTIVE ALBERT
MARTINO, DETECTIVE WAYNE BIRDSALL, DETECTIVE
MILTON G. GRUBER, DETECTIVE CHARLES FRAAS,
DETECTIVE FRANK SIRIANNI, DETECTIVE HARRY
WALTMAN, P.O. MICHAEL CONNAUGHTON, P.O.
WILLIAM DIEHL, and JOHN DOES 1-5,

                                    Defendants.
- - - - - - - - - - - - - - - - - - - - - - - x


                              100 Federal Plaza
                              Central Islip, New York

                              April 6, 2009
                              11:27  A.M.




          CONTINUED VIDEOTAPE DEPOSITION of JOSEPH

VOLPE, one of the Defendants, taken by Plaintiffs,

pursuant to Notice, held at the above-noted time

and place, before a Notary Public of the State of

New York.

236

1                                                          236

2    J O S E P H   V O L P E, the witness herein, having

3              been first duly sworn by Jeanette L.

4              Hoolan, a Notary Public in and for the

5              State of New York, was examined and

6              testified as follows:

7                   THE COURT REPORTER: Would you state

8         your name on the record, please?

9                   THE WITNESS: Joseph P. Volpe,

10        V O L P E.

11   CONTINUED EXAMINATION BY

12   MR. SCHECK:

13        Q     Mr. Volpe, it was a little over

14   two weeks ago that we last discussed the wire tap

15   affidavit that you submitted in this case.

16              Do you remember that?

17        A     Yes.

18        Q     And have you had a chance to read

19   your answers in the deposition that we had

20   two weeks ago?

21        A     No.

22        Q     Have you thought about it some more?

23              MR. FERGUSON:   Objection.

24        A     Oh, of course, yes.

25        Q     Okay.   And what happened the last

ALLIANCE REPORTING SERVICE, INC.  (516) 741-7585

237

1                           VOLPE                            237

2      time is that when you saw paragraph 10 of the

3      Exhibit 157, the eavesdropping warrant, we agreed

4      that you noticed a problem there, right?

5                    MR. FERGUSON:    Objection.

6           A        Yes.

7           Q        And the problem was that in this

8      affidavit you indicated that a search of that van

9      produced a hair consistent with Theresa Fusco's

10     and this affidavit you filled out was done at a

11     time before Detective Fraas testified he could

12     have completed his examination wherein he found a

13     hair consistent with Theresa Fusco's, correct?

14          A        My problem with this is that I

15     didn't recall.  The basic problem I had with this

16     I didn't recall who told me or gave that

17     information prior to going for the affidavit on

18     the 29th of March.

19          Q        So you now have an explanation?

20          A        No, I don't.

21                   MR. FERGUSON:    Objection to the form

22          of the question.

23          A        I just don't recall who told me

24     about the hairs, you know, I can't speculate or

25     guess.

ALLIANCE REPORTING SERVICE, INC.  (516) 741-7585

240

1                          V O L P E                          240

2          Q      So if I understand you now, we agree

3     that after we reviewed Fraas' testimony he, at

4     least based on his deposition and trial testimony

5     in this case, indicated he could not have possibly

6     have finished the hair examination by March 29th,

7     the date that you swore out this affidavit saying

8     that there was a hair consistent with Theresa

9     Fusco's in the Restivo van?

10                    MR. FERGUSON:  Same objection.

11          A      I thought we said between four hours

12    and four weeks.  If you can correct me on that,

13    that's what he said.

14          Q      You now think  --

15          A      I'm not sure.

16                    MR. FERGUSON:  Wait for a question.

17          Q      All right, here we go.  Let me see

18    if I understand what you're saying.  You don't

19    recall Fraas saying to you prior to filling out

20    this affidavit and prior to him completing the

21    hair examination, oh, Volpe, we've discovered a

22    hair consistent with Theresa Fusco, right?

23          A      If I have that information it may

24    not have come from Fraas, come from a supervisory

25    level, I just don't recall.  It doesn't have to

ALLIANCE REPORTING SERVICE, INC.  (516) 741-7585

241

1                    VOLPE                         241

2    come from Fraas.

3          Q        Who else could it have come from?

4          A        Could have come Birdsall, could have

5    come from one of the supervisors.

6          Q        Who would the supervisor be?

7          A        Spillane would have been the boss,

8    Lieutenant Spillane.

9          Q        So you're thinking that Fraas told

10   Lieutenant Spillane that he had found a hair

11   consistent with Theresa Fusco's in the Restivo van

12   before he completed his hair examination?

13                  MR. FERGUSON:   Objection.   He didn't

14        say that.

15         Q        Is that what you're thinking?

16         A        No, that's not what I'm thinking nor

17   did I say that.   What I'm saying is I don't recall

18   who would have given me that information that I

19   would have in turn put in paragraph 10 here,

20   that's what my issue is.

21         Q        So you think Birdsall could have

22   told you that?

23         A        I don't recall.

24         Q        Let me  -- so even though we

25   reviewed together Fraas' testimony that he could

                                                              242
1                        V O L P E                           242

2    not have completed his hair examination until

3    after you filled out this affidavit on March 29th,

4    it's your assumption, I guess, that somebody must

5    have told you that there was a hair consistent

6    with Theresa Fusco's in the Restivo van because

7    you wouldn't put such a statement in a warrant if

8    nobody had told you that, right?

9              A         That's correct.

10             Q         And that's because you would never

11   put anything in an affidavit for a warrant that

12   nobody had told you to be true?

13             A         If I hadn't had that information I

14   wouldn't have put it in there.

15             Q         Well, let's go back to paragraph 10.

16   That says, again, a search of the van has produced

17   hair consistent with Theresa Fusco's and possible

18   human blood.

19                       Do you see that?

20             A         Yes.

21             Q         Okay.  So who was it that processed

22   the van, Birdsall?

23             A         Fraas and Birdsall.

24             Q         And you didn't go inside and process

25   the van, did you?

         ALLIANCE REPORTING SERVICE, INC.  (516) 741-7585

244

1                          VOLPE                        244

2          Q          All right.   Let's go back to this

3    issue of human blood.   Are you with me?

4          A          I'm with you, yes.

5          Q          Birdsall was the one that processed

6    the van, right?

7          A          Correct.

8          Q          So Birdsall, if there were possible

9    human blood in the van Birdsall would have told it

10   to you, right?

11         A          No, he would have told it to his

12   supervisor.

13         Q          Let's just go through the

14   possibilities.   He might have told it directly to

15   you, that's one possibility, right?

16         A          Might have, yes.

17         Q          And he might have told it to his

18   supervisor who would then in turn told it to you,

19   right?

20         A          Or told it to one of my supervisors.

21         Q          Okay.   Now, you would not you're

22   telling us put in a warrant this affidavit of

23   March 29th, that there was possible human blood in

24   the van, unless you would receive that information

25   from Birdsall himself, Birdsall's supervisor or

```
                                                          245
1                          VOLPE                          245
2     your supervisor, right?
3            A        That would be it, correct.
4            Q        And the source of the observation
5     that there was possible human blood in the van,
6     that would have to come from Birdsall, right,
7     because he's the one that processed the van?
8            A        I don't know that.  I don't know if
9     he had anybody assisting him or supervising him, I
10    don't know that.
11           Q        Now, this is a copy of Birdsall's
12    deposition in this case and tabbed for you first
13    page 71 and I'm starting at line 10.  Okay, are
14    you with me?
15           A        I got you.
16           Q        And Mr. Birdsall was asked:
17                    Question:  "Did you collect any
18    blood from the van?"
19                    Answer:  "No."
20                    Question:  "Did you see anything
21    that was possibly human blood in the van?"
22                    Answer:  "No."
23                    Question:  "Did you collect any
24    semen from the van?"
25                    Answer:  "No."
```

246

1                                     VOLPE                                   246

2                    Question:   "Did you conduct any

3        serological testing whatsoever on any part of the

4        van or anything collected from it?"

5                    Answer:   "No."

6                    Question:   "Did you tell anybody,

7        anybody, that you had found anything that was

8        possible human blood?"

9                    Answer:   "No."

10                   Do you see that?

11            A        Yes.

12            Q        How do you explain that?

13                   MR. FERGUSON:   Objection.

14            A        Well, you're describing what

15       Birdsall said.

16            Q        This is Birdsall's testimony, right?

17            A        Yes.

18                   MR. FERGUSON:   Objection.

19            A        That doesn't mean that there wasn't

20       blood on clothing or some other area in the van.

21            Q        Well --

22            A        You're asking me about the van or

23       was he talking about the vehicle in its entirety

24       or its contents?

25            Q        Let's talk about your affidavit,

              ALLIANCE REPORTING SERVICE, INC.  (516) 741-7585

248

1                    VOLPE                    248

2        ~~speaking objection.~~

3               ~~MR. SCHECK:  No, it is a speaking~~

4        ~~objection.  Don't suggest any answers to the~~

5        ~~withness.~~

6        ~~Q       Now I'm asking if you had found~~

7  ~~human blood on the blanket in the van wouldn't you~~

8  ~~have stated that in the affidavit?~~

9        ~~A       I may not have known it at that~~

10 ~~time.  It's a very benign statement, that there's~~

11 ~~human blood in the van, wherever I got it from.~~

12        Q       Well, based on Birdsall's testimony

13 over here on page 71 of his testimony, when he

14 says, did you tell anybody you had found anything

15 that was possible human blood and the answer is

16 no, do you see that?

17        A       Yes.

18        Q       Well, isn't it pretty clear that

19 according to Birdsall's testimony you couldn't

20 have got that information from him or from him

21 reporting to his supervisor or from Birdsall

22 reporting to his supervisor to your supervisor,

23 right?

24               MR. FERGUSON:  Just note my

25        objection.

ALLIANCE REPORTING SERVICE, INC.  (516) 741-7585

249

1                          V O L P E                          249

2        A        I don't -- I don't know how to

3   answer that in a way that would be satisfactory.

4   I just, I recall in the same time frame being told

5   about there were hairs similar and that there was

6   possible human blood.  I can't tell you who it

7   was, can't tell you.

8        Q        Let's take a look at page 150  --

9   115 of the Birdsall deposition starting at line

10  20.  You with me?

11            Question:  "With the exception of

12  identifying hairs on a blanket that you removed

13  and forwarded to Detective Fraas did your

14  examination of any items yield any probative

15  evidence?"

16            Answer:  "No."

17            Question:  "No blood?."

18            Answer:  "No blood."

19            Question:  "No semen?"

20            Answer:  "No semen."

21            Question:  "Nothing of value to the

22  investigation?"

23            Answer:  "No."

24            Do you see that?

25        A        Yes, I do.

250

1                           VOLPE                        250

2          Q        So Birdsall is being clear that he

3    didn't see anything in the van, on a blanket, that

4    was possible blood; right?

5          A        That's what he's indicating here,

6    yeah.

7          Q        And he's the one, to the best of

8    your knowledge, that processed the van for

9    serological fluids, right?

10         A        Yes, I guess.  I don't know who else

11   would have done it.

12         Q        Well, you have any idea whatsoever

13   how you could write paragraph 10 of this affidavit

14   based on information from Birdsall?

15         A        But I'm not saying I got it from

16   Birdsall, you know.  I put that information there

17   on Birdsall.  I just don't recall who gave it to

18   me, but I got it.

19         Q        How do you know you got it?

20         A        Because I put it in paragraph 10.

21         Q        Right.

22         A        I wouldn't have recorded that.

23         Q        So it's not possible at all that you

24   put in paragraph 10 that a hair consistent with

25   Theresa Fusco was found in the van because you had

ALLIANCE REPORTING SERVICE, INC.  (516) 741-7585